## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) THE CHEROKEE NATION,<br>a federally recognized Indian Tribe,<br>(2) THE CHICKASAW NATION, a<br>federally recognized Indian Tribe, and<br>(3) THE CHOCTAW NATION,<br>a federally recognized Indian Tribe,<br><br>　　　Plaintiffs,<br><br>v.<br><br>(1) J. Kevin Stitt, in his official capacity as the<br>Governor of the State of Oklahoma,<br><br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.　CIV-19-1198-D |

## COMPLAINT

### I.　　NATURE OF THE ACTION

1.　　This lawsuit seeks a declaratory judgment of the legal effect of the "shall automatically renew" clause of Part 15.B. of a Tribal-State gaming compact ("Compact")[1] that the State of Oklahoma ("State") offered to federally recognized Indian Tribes in 2004, that the Plaintiffs the Cherokee Nation, the Chickasaw Nation, and the Choctaw Nation (collectively, "the Tribes") accepted and the Secretary of the United States Department of the Interior then approved under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721.  The Compact has the force of Federal law, 25 U.S.C. § 2710(d)(2)(C), and

---

[1] The State's offer of Compact is codified at Okla. Stat. tit. 3A, § 281 (2004) and was approved by Oklahoma voters as a ballot referendum on November 2, 2004, relevant materials relating to which are available at the Oklahoma Secretary of State website (https://www.sos.ok.gov/documents/questions/712.pdf).

vests each compacting Tribe with rights protected by Federal law, including the right to automatic renewal that is expressly set forth in Compact Part 15.B.

2.     While various other Compact matters have recently garnered public attention, this complaint does *not* address secondary questions, including any question of a compacting party's right to seek to renegotiate the Compact's revenue-sharing provisions, rates, or the "substantial exclusivity" in gaming rights the State must provide under the compact in exchange for revenue-sharing payments.  The necessary predicate for the renegotiation of these matters is the continuing effect of the Compact, without which any such renegotiations would be meaningless.

3.     Accordingly, the single question on which this complaint seeks declaratory relief is whether the Compact "shall automatically renew" on January 1, 2020 under Part 15.B., which provides that if horse racetracks or others continue to be authorized to conduct electronic gaming on January 1, 2020, pursuant to governmental action of the State or court order, the Compacts automatically renew for a fifteen-year term.  That condition has been satisfied, and state-regulated horse racetracks have been authorized to conduct electronic gaming during the calendar year beginning January 1, 2020.  Accordingly, the Compact will automatically renew on that date per the plain terms of Part 15.B.

4.     The State offered the Compact to the Tribes on these terms, the Tribes accepted that offer, and "[g]reat nations, like great men, should keep their word."  *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 142 (1960) (Black, J., dissenting).  The single goal of this lawsuit is to hold the State to its word by declaring plainly the legal effect of the Compact's "shall automatically renew" clause.

5.     This lawsuit is necessitated by Oklahoma Governor J. Kevin Stitt's refusal to recognize that under Part 15.B., the Compact "shall automatically renew" on January 1, 2020, and his public declarations that the gaming activities the Tribes conduct will be illegal as of that date, both of which are contrary to Federal law and directly interfere with the Tribes' Federal rights to conduct gaming under their renewing Compacts.

6.     The Governor's actions manifest an intent to unsettle and destabilize the Tribes' Federal rights to conduct gaming under their automatically renewing Compact in order to force the Tribes to negotiate a brand new compact with him.  That conduct causes immediate injury to the Tribes' rights because it requires the Tribes either to tolerate actions that deny the existence of their Federal rights or to give up those rights entirely.  In addition, the Governor's declarations and threats concerning the legality of the Tribes' conduct of gaming activities have had the intended effect of manufacturing public uncertainty over the lawfulness of the Tribes' conduct of gaming under their renewing Compacts, which constitutes an invasion of Tribal sovereignty and injures Tribal rights held under Federal law.

7.     The Tribes therefore now invoke Federal law to protect themselves from, *inter alia*, the Defendant's persistent and ongoing public dismissal of the Tribes' Compact rights, including his assertions that:  (i) the "shall automatically renew" clause "doesn't even pass the smell test"; (ii) the Tribes' conduct of Class III gaming will be illegal as of January 1, 2020; and (iii) "extreme uncertainty" hangs over the Tribes' ongoing gaming activities.

8.     To protect their Federal rights and stop further injury to their sovereignty, the Tribes file this lawsuit under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), *see generally Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012) (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)), against J. Kevin Stitt in his official capacity as Governor of the State of Oklahoma ("Defendant") to obtain a declaration that the Compact renews January 1, 2020, for another fifteen-year term and such other relief as the Court may deem appropriate.

## II.     PARTIES

9.     The Plaintiff Cherokee Nation is a federally recognized Indian Tribe, *see* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 84 Fed. Reg. 1200, 1201 (Feb. 1, 2019), with a governing body duly recognized by the United States Department of the Interior ("Department").

10.    The Plaintiff Chickasaw Nation is a federally recognized Indian Tribe, *id.* at 1204, with a governing body duly recognized by the Department.

11.    The Plaintiff Choctaw Nation is a federally recognized Indian Tribe, *id.*, with a governing body duly recognized by the Department.

12.    The Defendant J. Kevin Stitt is the Governor of the State of Oklahoma and is sued in his official capacity.

## III.     JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1362 because it is brought by federally recognized Indian Tribes, and it seeks to protect and enforce rights held by those Tribes under IGRA, 25 U.S.C. §§ 2701-2721, and

Compacts that were entered into and are now in effect between the State and the Tribes under IGRA and which therefore have the force of Federal law, *id.* § 2710(d)(2)(C); *accord Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1239 n.17 (10th Cir. 2018) (quoting *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997)).

14.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendant is a resident of the State and resides within this district and a substantial part of the events giving rise to the claim occurred within this district.

## IV.    FACT ALLEGATIONS

### A.    Background on The Indian Gaming Regulatory Act.

15.    "In 1987, the Supreme Court decided *California v. Cabazon Band of Mission Indians*, [480 U.S. 202, 207 (1987),] in which it held that states could not regulate gaming activities on Indian land without Congressional authorization." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1200 (10th Cir. 2018).

16.    In response to *Cabazon*, "Congress enacted IGRA in 1988 to create a framework for states and Indian tribes to cooperate in regulating on-reservation tribal gaming." *Id.* at 1201 (citations omitted).  IGRA serves the consistent and overarching purpose of protecting tribal sovereignty and supporting tribal economic self-sufficiency.

17.    Congress's purpose in enacting IGRA was "to provide a statutory basis for": (1) "the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1); and (2) "the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the

gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players," *id*. § 2702(2).

18.    Congress found in IGRA that tribes engage in gaming "as a means of generating tribal governmental revenue," *id*. § 2701(1), and that "a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government," *id*. 2701(4).  In accord with that policy, IGRA requires that:  (a) tribes be the primary beneficiaries of tribal gaming, *id.* § 2702(2); and (b) tribal gaming revenues be used only to fund tribal government operations and programs, provide for the general welfare of the tribe, promote tribal economic development, and for charitable and local governmental purposes, *id*. § 2710(b)(2)(B); *see id.* § 2710(d)(1)(A)(ii).

19.    "IGRA rests on a premise that 'Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.'"  *Muhammad v. Comanche Nation Casino*, No. 09-CIV-968-D, 2010 WL 4365568, at *9 (W.D. Okla. Oct. 24, 2010) (quoting 25 U.S.C. § 2701(5)).

20.    "Congress provided in IGRA a 'framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights, unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities.  The mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction

and the application of state laws to activities conducted on Indian land is a tribal-State compact.'" *Id.* (quoting S. Rep. No. 100-446, at 5-6 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3075).

21.    Accordingly, such compacts provide States with their only lawful means for directly asserting any governmental interests with respect to tribal gaming activities.

22.    IGRA divides Indian gaming into three classes:  Class I gaming comprises social games played for prizes of minimal value and traditional forms of Indian gaming, 25 U.S.C. § 2703(6), and is exclusively regulated by the tribe, *id.* § 2710(a)(l); Class II gaming consists of bingo and similar games, *id.* § 2703(7), which are regulated by the tribe subject to standards set forth in IGRA and oversight by the National Indian Gaming Commission ("NIGC"), *id.* § 2710(a)(2); and Class III gaming comprises "all forms of gaming that are not class I gaming or class II gaming," *id.* § 2703(8), "'includ[ing] casino games, slot machines, and horse racing,'" *Navajo Nation*, 896 F.3d at 1201 (quoting *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 785 (2014)), and is subject to exclusive regulation by the tribe (with oversight by the NIGC), except as otherwise agreed upon in a tribal-State compact on terms that comport with IGRA, which "prescribes the matters that are permissible subjects for gaming-compact negotiations between tribes and states," *id.* at 1201-02 (citing 25 U.S.C. § 2710(d)(3)(C)).

23.    "Under IGRA, tribes that seek to conduct gaming activities are incentivized to negotiate gaming compacts with states because, absent such compacts, the most 'lucrative' form of gaming – Class III gaming – is forbidden." *Id.* at 1201 (quoting *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1212 (10th Cir. 2017)).  For their part, States are

incentivized to negotiate compacts for Class III gaming to gain a share of the gaming revenue for themselves, which the Secretary of the Interior allows only if, in exchange for these payments, the State provides the tribe with meaningful concessions that have substantial economic benefit to the tribe.

24. To conduct Class III gaming under IGRA, a tribe must satisfy three requirements. First, the gaming activities must be authorized by a tribal ordinance that meets the requirements of 25 U.S.C. § 2710(b) and has been approved by the Chairman of the NIGC, *id.* § 2710(d)(1)(A). Second, the tribe's gaming activities must be "located in a State that permits such gaming for any purpose by any person, organization, or entity." *Id.* § 2710(d)(1)(B). Third, such gaming must be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under [§ 2710(d)(3)] that is in effect." *Id.* § 2710(d)(1)(C); *see United Keetoowah Band of Cherokee Indians v. Oklahoma*, 927 F.2d 1170, 1177 (10th Cir. 1991).

25. IGRA provides that when the requirements set forth in the preceding paragraph are met, "class III gaming activity on the Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal-State compact entered into under [§ 2710(d)(3)] by the Indian tribe that is in effect." 25 U.S.C. § 2710(d)(2)(C).

26. In sum, tribal rights to conduct gaming within their jurisdiction are held under Federal law, which defines the scope of tribal sovereign authority over gaming on Indian lands, and provides for the exclusive regulation of gaming by Indian tribes, except as the compact may otherwise expressly provide, and as IGRA may allow.

**B.      The Tribes' Compact Vests Rights Arising Under Federal Law.**

27.     Each Tribe conducts Class III gaming under a Compact that was entered into with the State and is in effect under IGRA, which secures to the Tribe the right to conduct Class III gaming in accordance with the Compact's terms.

28.     Each Tribe has enacted an ordinance authorizing Class III gaming activities on its Indian lands, and each of those ordinances satisfies IGRA requirements and has been approved by the Chairman of the NIGC.

29.     The Class III gaming activities of each Tribe are "located in a State that permits such gaming for any purpose by any person, organization, or entity," 25 U.S.C. § 2710(d)(1)(B).   The State permits such gaming pursuant to the Compact it offered the Tribes and other provisions of state statutes that authorize horse racetracks to conduct electronic gaming after at least four Compacts have been entered into and are in effect.

30.     In 2004, the State offered "to federally recognized tribes in the State of Oklahoma" a model Compact under which accepting Tribes could lawfully "engage in Class III gaming on tribal lands" in accord with the IGRA.   *Sheffer v. Buffalo Run Casino, PTE, Inc.*, 315 P.3d 359, 361 (Okla. 2013) (citing *Griffith v. Choctaw Casino of Pocola*, 230 P.3d 488, 492 (Okla. 2009), *rev'd on other grounds by Sheffer*, 315 P.3d at 367); *accord* Okla. Stat. tit. 3A, §§ 280-281; Okla. State Question 712 (Nov. 4, 2004).

31.     The Compact expressly provides that "[t]his Compact shall not alter tribal, federal, or state civil adjudicatory or criminal jurisdiction."   Compact Part 9.

32.     The Compact authorizes the compacting Tribe to conduct Class III gaming, specifically the "covered games" defined at Compact Part 3.5.

33.     The Compact renews automatically at the close of its initial term if electronic gaming continues to be offered at state-regulated horse racetracks or by others at that time, as the Compact the State offered to the Tribes expressly provides.  Compact Part 15.B.

34.     Each Tribe accepted the State's offer, and each accepted Compact was then approved by the Secretary of the Interior in accordance with IGRA.

35.     Each Tribe's Compact constitutes a Tribal-State Compact within the meaning of IGRA, and the terms of each Tribe's Compact therefore have the force of Federal law, 25 U.S.C. § 2710(d)(2)(C).  More specifically, as the Tribes' Compacts were entered into and are in effect under IGRA, the "class III gaming activity on the Indian lands of [each of the Tribes] shall be fully subject to the terms and conditions of the Tribal-State compact entered into under [25 U.S.C. § 2710(d)(3)] by [each of the Tribes] that is in effect."  *Id.* § 2710(d)(2)(C).

36.     This Court so held in *Choctaw Nation of Oklahoma v. Oklahoma*, 724 F. Supp. 2d 1182, 1184 (W.D. Okla. 2010), and in *Cherokee Nation v. Oklahoma*, No. CIV-10-979-W, at 2 (W.D. Okla. Nov. 9, 2010), summarizing the procedural history and legal substance of the formation of this Compact relationship between the Tribes and the State.

**C.     The Compact Renews on January 1, 2020, in Accord with Part 15.B., and Will Remain in Effect Through Another Fifteen-Year Term.**

37.     Compact Part 15.A. sets forth the requirements that must be met for the Compact to go into effect.

38.     Those conditions were satisfied on or around the following dates:  for the Cherokee Nation, on or around January 27, 2005; for the Chickasaw Nation, on or around February 8, 2005; and for the Choctaw Nation, on or around February 9, 2005.

39.     Compact Part 15.B. provides that Compact's initial term will expire on January 1, 2020, and "shall automatically renew" for successive fifteen-year terms on that same date, if at that time "organization licensees [i.e., horse race tracks, *see* Okla. Stat. tit. 3A, §§ 200.1(9) and 205.2] or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or court order following the effective date of this Compact."  Part 15.B. also allows the parties to seek to renegotiate subsections A and E of Part 11 of the Compact, which address revenue-sharing and the "substantial exclusivity" in gaming rights that the State promised the Tribes in order to justify such revenue sharing.  Under Part 15.C., the Compact will remain in effect until either its term expires without renewal or it is terminated by mutual consent of the parties.

40.     Part 15.B.'s requirements have been satisfied, and the Compact therefore "shall automatically renew" on January 1, 2020, for a fifteen-year term.

41.     With respect to the electronic gaming conducted by the "organization licensees or others" that is referenced in Part 15.B., the Compact recognizes that state-regulated entities will be permitted to conduct such gaming *after* the Compact has gone into effect, Compact Part 11.A., E.  Oklahoma statutes expressly provide that state-regulated entities may offer electronic gaming *only after* "at least four Indian tribes enter

into the [Compact] and such compacts are approved by the Secretary of the Interior." Okla. Stat. tit. 3A, § 262(A).

42.     The Oklahoma Horse Racing Commission ("Commission") authorizes "organization licensees" to conduct electronic gaming. Okla. Stat. tit. 3A, § 262. The Commission considers applications for and issues licenses authorizing such gaming pursuant to state statutes and its own rules and regulations. The Commission did not promulgate its original Rules for Racetrack Gaming until *after* the Compact went into effect, and those rules were subsequently approved by Oklahoma Governor Brad Henry on April 6, 2005. Since then, the Commission has repeatedly amended these rules, most recently in 2013.

43.     Consistent with state statutes, the Compact, and the timing of the promulgation of the Commission's rules and regulations, state-regulated entities were authorized to conduct electronic gaming in any form *only after* the Compact went into effect. The Commission issued its first electronic gaming licenses on August 11, 2005, and has done so every year since. Most recently, the Commission issued licenses for the conduct of electronic gaming at the state-regulated Remington Park and Will Rogers Downs for the calendar year beginning January 1, 2020. The Commission issued those licenses on October 17, 2019.

44.     After the Compact went into effect, the State also expanded state-regulated electronic gaming by enacting changes in state law. State statutes originally restricted the conduct of Class III electronic gaming by organization licensees to specific days and times. However, in 2017, the State enacted amendments to those restrictions, effectively

authorizing the conduct of Class III electronic gaming by organization licensees around the clock and throughout the week.  2017 Okla. Sess. Laws § 115.

45.     Apart from the gaming conducted by organization licensees and the lottery conducted by the State, the Compact provides compacting Tribes "substantial exclusivity" within the State's Class III gaming market.  In exchange for this "substantial exclusivity," compacting Tribes make periodic revenue-share payments to the State.  Compact Part 11.

46.     The Tribes' obligation to make such payments is expressly contingent on the State _not_ authorizing any additional form of electronic gaming that would diminish the Tribes' "substantial exclusivity" in Class III gaming.  If the State breaches that commitment, it must pay liquidated damages to the compacting Tribes.  *Id.*  Part 11.E.

47.     The Department has treated exchanges of value such as that provided for in the Compact as lawful under IGRA, so long as the tribal revenue-share obligation could be construed as not constituting an unlawful tax on the compacting tribe or its gaming activities.  In approving the Tribes' Compacts, the Department approved the "substantial exclusivity"/revenue-share exchange made in each of the Tribe's Compacts, concluding the Tribes' payments were being made in exchange for a meaningful concession by the State that had substantial economic benefit to the Tribes.

**D.     The Defendant's Continuing Violations of Federal Law.**

48.     The Defendant first declared his intention to disavow the renewing Compact in a letter to the Tribes dated July 5, 2019, stating that "since there has been no governmental action of the State, or court order authorizing electronic gaming in the State, since the effective date of the Compact, . . . the Compact will not automatically renew" on

January 1, 2020.  The Defendant further stated he was not interested in renegotiating only subsections A and E of Part 11, as contemplated by Compact Part 15.B., and that instead he wanted to renegotiate "the rest of the terms of the Compact as well."  He concluded his letter by stating that unless the Tribes agreed to do so, Class III gaming would be illegal in Oklahoma after December 31, 2019:  "[B]ecause of the January 1, 2020, termination date, it is imperative that we reach an agreement and obtain the approval of the Department of the Interior prior to the end of 2019, so that the [Tribes] may continue to lawfully conduct certain class III games in Oklahoma after that date."

49.    The Tribes responded by letter, stating that the Compact would automatically renew on January 1, 2020 in accord with the plain terms of Part 15.B.  Each Tribe also stated that the Defendant could request renegotiation of subsections A and E of Part 11, if he so chose.

50.    Shortly thereafter, in an interview televised on *Oklahoma News9* on July 25, 2019, the Defendant stated that the Tribes' articulation of the Compact's terms "doesn't even pass the smell test."  He also insisted the only relevant issue presented by the Compacts is "what is a market-fair deal to operate exclusive rights to operate gaming in our State."

51.    Thereafter, the Defendant sent a letter dated August 13, 2019, in which he proposed the parties "table the issue of the renewal or termination date of the existing compact, and use our time more productively by focusing on coming to a shared vision of gaming in Oklahoma for the future."  The Defendant did not rescind his position that the

Compacts expire on January 1, 2020 and that Tribal gaming in Oklahoma would be illegal on that date.

52.     In response, the Tribes signed on to an inter-Tribal resolution dated August 22, 2019, which reiterated that under Part 15.B. the Compact "shall automatically renew" on January 1, 2020, and invited the Defendant to make a rates renegotiation proposal under the process provided by the Compact, if he wished to do so.

53.     In late August, the Defendant designated Attorney General Mike Hunter ("Attorney General") to serve as the State's lead in attempting to frame negotiations with the compacting Tribes. Throughout this period, the Defendant never rescinded his rejection of the Tribal position that the Compacts automatically renew on January 1, 2020 under Part 15.B.  Instead, he insisted that state negotiators request that the Tribes enter "non-exclusive arbitration," a term the negotiators did not define, to resolve the question of whether the Compact automatically renews.   The efforts that were subsequently taken to establish meaningful negotiations ultimately failed.

54.     On October 17, 2019, the Commission issued licenses for the conduct of electronic gaming at the state-regulated Remington Park and Will Rogers Downs for the calendar year beginning January 1, 2020.

55.     By inter-Tribal letter dated November 5, 2019, the Tribes thanked the Attorney General for meeting with them to attempt to resolve the dispute but declined the State's invitation to arbitrate the matter of renewal.  The Tribes explained that they did not see arbitration as presently justified given the lack of factual or legal support for the

position taken by the Defendant and again invited the State to make a proposal for renegotiation of subsections A and E of Part 11.

56.     In response to the inter-Tribal letter, the Defendant called a press conference on November 14, 2019, and inveighed against the Tribes' position.  Declaring categorically that the Compact would expire at year's end, the Defendant pointedly warned of "extreme uncertainty" for Tribal gaming operations unless and until the Tribes negotiated a new compact with him.

57.     In immediate response, representatives of the Tribes met with media, explained that the Compact would automatically renew and why that is clearly so and decried the Defendant's public statements as an attempt to dragoon the Tribes into a renegotiation of gaming revenue-share rates.

58.     On December 3, 2019, Plaintiff Chickasaw Nation wrote to Assistant Secretary of the Interior for Indian Affairs Tara Sweeney.  The Chickasaw Nation's letter expressly did _not_ call on the United States to take any action but instead provided a statement of the Tribe's legal position, supported by a formal legal opinion letter drafted by former Solicitor General of the United States Seth Waxman.  Mr. Waxman's legal opinion letter explained the "shall automatically renew" clause, opined that "[u]nder that provision's plain language, the compacts will renew automatically when they expire on January 1, because the provision's sole condition precedent for automatic renewal is unquestionably satisfied" and concluded that Mr. Waxman "do[es] not believe that the reading apparently adopted by [the Defendant's] office is defensible."  Plaintiff Chickasaw Nation also sent a copy of this letter and its enclosures to the Attorney General.

59.     On or about December 17, 2019, the Attorney General stepped aside as the Governor's designated negotiator on this matter.

60.     On December 17, 2019, the Defendant called another press conference and again made unfounded statements about the lawfulness of the Tribes' gaming operations, saying that without immediate action "all Class III gaming activity will be illegal on January 1, 2020," that "[t]his creates tremendous uncertainty of [sic] Oklahoma Tribes, for those conducting business with the casinos, for casino patrons" and "I cannot put Oklahomans in this position." He also stated "[w]e do not want gaming to be illegal and we do not want vendors to be operating illegally."

61.     On or about December 23, 2019, the Defendant's Secretary of Native American Affairs Lisa J. Billy resigned. In her letter of resignation, Ms. Billy stated it had "become increasingly clear [the Defendant is] committed to an unnecessary conflict that poses a real risk of lasting damage to the State-Tribal relationship and to our economy." She added that the Defendant had "dismissed advice and facts that show the peril of [his] chosen approach and ha[s] remained intent on breaking faith with the Tribes, both by refusing to engage with the compact's language and, more recently, by suggesting you would displace our Tribal partners with private, out-of-state commercial gaming operators."

62.     At no time has the Defendant responded to the Tribes' invocation of the Compact, particularly Part 15.B.'s "shall automatically renew" clause, with anything other than dismissal and public ridicule. At no time has the Defendant provided the Tribes with a written analysis of his interpretation of the Compact's "shall automatically renew" clause

or of the basis on which he claims that the requirements of that clause have not been met. Instead, the Defendant has expressed disdain for the Compact and continued to attempt to compel the Tribes to abandon their Federal law rights to the Compact's automatic renewal by manufacturing "uncertainty" about the lawfulness of continued Tribal gaming operations.

63.     In sum, rather than engage with the Tribes in any meaningful effort to construe and give legal effect to Part 15.B. or to otherwise amicably and voluntarily resolve the parties' dispute, the Defendant has pled his position in public while issuing numerous direct and intimated threats against the Tribes' lawful conduct of gaming under Federal law.

64.     The Defendant's actions continually violate the Tribes' rights under Federal law and pose an unreasonable and intolerable threat to the exercise of those rights by the Tribes.

65.     As a direct result of the Defendant's public actions, vendors and others who do business with the Tribes have already expressed concern to the Tribes regarding the Defendant's intent and what further actions he may take on or after January 1, 2020, to advance his position that Tribes, gaming facility patrons, and vendors will be acting illegally on or after that date by engaging in gaming activities and doing business in gaming matters with the Tribes.

66.     The Defendant's statements and actions violate the plain meaning and effect of Part 15.B., are intended to interfere with and deny the Tribes' Federal law rights to conduct Class III gaming in accord with their renewing Compacts, and constitute a

continuing violation of Federal law and intrusion on Tribal sovereignty that injures the Tribes' rights under Federal law.

## V.   DECLARATORY JUDGMENT

67.   The Tribes incorporate by reference all allegations of the preceding paragraphs.

68.   IGRA provides that Class III gaming activities on Indian lands are lawful if three requirements are met, 25 U.S.C. § 2710(d)(1), all of which the Tribes have satisfied; namely, the gaming activities of each Tribe are:   (a) authorized by a tribal ordinance appropriate under IGRA, *id.* §§ 2710(d)(1)(A), (d)(2); (b) are "located in a State that permits such gaming for any purpose by any person, organization, or entity," *id.* § 2710(d)(1)(B); and are (c) "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under [§2710(d)(3)] that is in effect," *id.* § 2710(d)(1)(C).

69.   The effective date of the Cherokee Nation's Compact is on or about January 27, 2005.

70.   The effective date of the Chickasaw Nation's Compact is on or about February 8, 2005.

71.   The effective date of the Choctaw Nation's Compact is on or about February 9, 2005.

72.   The terms of the Compacts have the force of Federal law, *id.* § 2710(d)(2)(C).

73.   The terms and conditions of the Tribes' Compacts provide that they "shall automatically renew" on January 1, 2020 if, at that time, "organization licensees or others

are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or a court order following the effective date of this Compact." Compact Part 15.B.

74.    The Compacts "automatically renew" if Compact Part 15.B.'s requirements are satisfied on January 1, 2020, which means that the renewal occurs on that date without any further action of the parties.

75.    Part 15.B.'s requirements have been satisfied, and the Compacts accordingly "shall automatically renew" on January 1, 2020.

76.    The Tribes therefore have a right under Federal law to continue their conduct of Class III gaming activities under their Compacts on and after January 1, 2020.

77.    The Defendant's contentions that the Compacts terminate on January 1, 2020, and that it will be unlawful for the Tribes to conduct Class III gaming activities after that date is wrong as a matter of fact and law.

78.    The Defendant's efforts to interfere with the Tribes' conduct of such gaming activities, including his public declarations that such conduct is unlawful, constitute a continuing violation of Federal law and an invasion upon the Tribes' sovereignty, which constitute an injury to the Tribes' Federal law rights. *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250-51 (10th Cir. 2001).

79.    The Tribes are entitled to declaratory and, if necessary, injunctive relief to remedy the Defendant's ongoing violation of Federal law and invasion upon their sovereignty.

## PRAYER FOR RELIEF

WHEREFORE, the Tribes respectfully pray for a judgment in their favor as follows:

1.      The Tribes seek a declaration that:

(a) the Tribes possess a Federal law right to conduct Class III gaming pursuant to 25 U.S.C. § 2710(d)(2)(C) and under Compacts they have entered with the State of Oklahoma and that are in effect under IGRA;

(b) the Compacts under which the Tribes conduct Class III gaming provide in Part 15.B. that the Compacts "shall automatically renew" on January 1, 2020, if at that time "organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or a court order following the effective date of this Compact";

(c) the State, which drafted and offered the terms of the Compact to the Tribes, has taken actions that satisfy Part 15.B.'s conditions for automatic renewal;

(d) the Compacts accordingly "shall automatically renew" on January 1, 2020, for another fifteen-year term; and

(e) the Defendant's denying, interfering with, or otherwise acting contrary to the Tribes' rights under their Compacts as renewed on January 1, 2020, either through his direct action or through the action of any of his agents, officers, employees, or representatives, are null and void and have no legal effect.

2.      Such further relief as the Court may deem appropriate.

Respectfully submitted,

Dated:  December 31, 2019                 By:  /s/ Robert H. Henry

_____

Robert H. Henry, OBA No. 4111
512 N. Broadway, Suite 230
Oklahoma City, OK 73102
Lead Counsel for the Cherokee,
Chickasaw and Choctaw Nations
Phone no.: 405-516-7824
Fax no.: 405-516-7859
E-mail: rh@rhhenrylaw.com

Douglas B. L. Endreson
Frank S. Holleman
Sonosky, Chambers, Sachse,
    Endreson & Perry, LLP
1425 K. Street, NW Suite 600
Washington DC 20005
Counsel for The Cherokee, Chickasaw
 and Choctaw Nations
Phone no.: 202-682-0240
Fax no.: 202-682-0249
E-mail: dendreson@sonosky.com
          fholleman@sonosky.com

Sara Hill, OBA No. 20072
P.O. Box 1533
Tahlequah, OK 74465
Counsel for Cherokee Nation
Phone no.: 918-207-3836
Fax no.: 918-458-6142
E-mail: sara-hill@cherokee.org

Stephen Greetham, OBA No. 21510
4001 N. Lincoln Blvd
Oklahoma City, OK 73105
Counsel for Chickasaw Nation
Phone no. 580-272-5236
E-mail:
stephen.greetham@chickasaw.net

Bradley Mallett, OBA No. 15810
P.O. Box 1210
Durant, OK 74702
Counsel for Choctaw Nation
Phone no.: 580-380-3024
E-mail: bmallett@choctawnation.com