UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) THE CHEROKEE NATION, <br> a federally recognized Indian Tribe, <br> (2) THE CHICKASAW NATION, <br> a federally recognized Indian Tribe, <br> (3) THE CHOCTAW NATION, <br> a federally recognized Indian Tribe, <br> (4) THE CITIZEN POTAWATOMI NATION, <br> a federally recognized Indian Tribe, <br><br>     Plaintiffs, <br><br> v. <br><br> (1) J. KEVIN STITT, in his official capacity <br> as Governor of the State of Oklahoma, <br><br>     Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 5:19-cv-01198-D <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

COMPLAINT IN INTERVENTION

Plaintiff/Intervenor Citizen Potawatomi Nation, a federally recognized

Native American tribe ("CPN"), for its causes of action against Defendant J.

Kevin Stitt, in his official capacity as Governor of the State of Oklahoma

("Defendant") states as follows:

## I. JURISDICTION AND VENUE

1.    CPN is a federally recognized Indian Tribe.[1]

2.    Plaintiffs the Cherokee Nation, the Chickasaw Nation, and the

Choctaw Nation are federally recognized Indian Tribes.[2]

---

[1] 84 Fed. Reg. 22, p. 1201 (Feb. 1, 2019).
[2] Complaint (Doc. No. 1) at p. 4.

3.      Defendant is the Governor of the State of Oklahoma and is sued in his official capacity.

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1362 because CPN and the Plaintiffs are federally recognized Indian Tribes, and the action seeks to protect and enforce rights held by those Tribes under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, and gaming compacts that were entered into and are now in effect between the State of Oklahoma and the Tribes under IGRA and which therefore have the force of Federal law.[3]

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendant is a resident of the State and resides within this district, and because a substantial part of the events giving rise to the claim occurred within this district.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

6.      In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA"). Among the purposes of IGRA is:

> (T)o provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[4]

---

[3] 25 U.S.C. § 2710(d)(2)(C); *Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1239 n.17 (10th Cir. 2018) (quoting *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997)).
[4] 25 U.S.C. § 2702(1).

7.      As it is relevant to this cause, IGRA permitted Native American tribes to engage in Class III gaming.[5] In order to do so, a tribe is required, *inter alia*, to enter into a federally-approved Tribal-State gaming compact.[6]

8.      The Oklahoma Supreme Court recounted the history of the origins of class III gaming compacts in Oklahoma in its *per curiam* opinion in *Griffith v. Choctaw Casino of Pocola*, 230 P.3d 488, 492-493 (Okla. 2009):

> In 1988, the Oklahoma Legislature authorized the Governor to negotiate and enter into cooperative agreements with federally recognized Indian tribes in furtherance of federal policy and state-tribal relations, subject to approval by a legislative Joint Committee on State-Tribal Relations. At that time, Oklahoma permitted pari-mutuel wagering on horse races. Our governors negotiated and entered into off-track wagering compacts with numerous Indian tribes. The compacts are filed with the Oklahoma Secretary of the State as required by law...
>
> In 2004, Oklahoma voters approved casino-style gambling at horse race tracks and in Indian country. The Oklahoma Legislature passed the State-Tribal Gaming Act and sent it to a vote of the people. The Act sets out standards for the gaming machines and authorizes the Oklahoma Horse Racing Commission to implement and enforce the gaming statutes. It provides for the regulation and oversight of Indian gaming in accordance with the model compact. It also fully sets forth the "Model Tribal Gaming Compact," offering Indian tribes a nearly exclusive right to operate the covered gaming machines without substantial competition from nontribal entities.
>
> The model compact is offered, all or none, to the Indian tribes of Oklahoma, which if accepted, constitutes the gaming compact between this state and the accepting tribe for purposes of IGRA without any further action on behalf of the State of Oklahoma. The model compact consists of Part 1 through Part 16. The model compact sets the fee to be

---

[5] 25 U.S.C. § 2703(8)(" 'class III gaming' means all forms of gaming that are not class I gaming or class II gaming.")
[6] 25 U.S.C. § 2710(d).

paid to the state by the Indian tribe for the "substantial exclusivity and, consistent with the goals of IGRA, special opportunities for tribal economic opportunity through gaming within the external boundaries of Oklahoma in respect to the covered games." It defines the games that the tribes may offer to casino patrons as a means of generating revenue as authorized by IGRA, places responsibility for operation and regulation of the casino with the tribe, and places the oversight and monitoring of class III gaming with the Office of State Finance as the state compliance agency (SCA) (Citations omitted).[7]

9.      The offered terms of the model gaming compact were codified as

Oklahoma statutes,[8] which provide in pertinent part:

The State of Oklahoma through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe, and by means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act, hereby makes the following offer of a model tribal gaming compact regarding gaming to all federally recognized Indian tribes…[9]

10.     In offering the terms of the model gaming compact, the people of

the State of Oklahoma explicitly stated at Part 2(5-6):

The tribe desires to offer the play of covered games … as a means of generating revenues for purposes authorized by the Indian Gaming Regulatory Act … including without limitation the support of tribal governmental programs, such as health care, housing, sewer and water projects, police, corrections, fire, judicial services, highway and bridge construction, general assistance for tribal elders, day care for the

---

[7] This portion of the opinion cited to 3A O.S. §§ 261-281; 74 O.S. §§ 1221-1223; 25 U.S.C. § 2706(b); *Washington v. Confederated Bands and Tribes of the Yakima Indian Nations*, 439 U.S. 463, 493 n. 39, 99 S.Ct. 740, 757 n. 39, 58 L.Ed.2d 740 (1979); *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951).

[8] 3A O.S. §§ 280-281.

[9] 3A O.S. § 280.

children, economic development, educational opportunities and other typical and valuable governmental services and programs for tribal members.

The state recognizes that the positive effects of this Compact will extend beyond the tribe's lands to the tribe's neighbors and surrounding communities and will generally benefit all of Oklahoma. These positive effects and benefits may include not only those described in paragraph 5 of this Part, but also may include increased tourism and related economic development activities.

11.     CPN did not participate in drafting or negotiating the offered terms of the model gaming compact. Rather, the State presented CPN with the same, non-negotiable proposed model gaming compact terms offered to all tribes.[10]

12.     The offered terms of the model gaming compact provide pertinently at Part 15(A):

This Compact shall become effective upon the last date of the satisfaction of the following requirements:
1. Due execution on behalf of the tribe …
2. Approval of this Compact by the Secretary of the Interior … and publication in the Federal Register … and
3. Payment of the start-up assessment provided for in subsection C of Part 11 of this Compact.

13.     CPN's Tribal Chairman signed the "Tribal Gaming Compact Between the Citizen Potawatomi Nation and the State of Oklahoma" ("CPN's Gaming Compact") on November 30, 2004.

---

[10] *Griffith*, 230 P.3d at 493.

14.     CPN paid the Part 11(C) start-up assessment to the State of Oklahoma on January 14, 2005.

15.     The United States Secretary of the Interior published approval of CPN's Gaming Compact in the Federal Register on February 9, 2005.

16.     The effective date of CPN's Gaming Compact is February 9, 2005.

17.     CPN conducts Class III gaming under CPN's Gaming Compact, to which the State is a party, and which is in effect under IGRA, which Federal law secures to CPN the right to conduct Class III gaming in accordance with the terms of the CPN Gaming Compact.

18.     CPN has enacted an ordinance authorizing Class III gaming activities on its Indian lands, and this ordinances satisfies IGRA requirements and has been approved by the Chairman of the NIGC.

19.     As to term and duration, CPN's Gaming Compact provides pertinently at Part 15(B) that:

> This Compact shall have a term which will expire on January 1, 2020, and at that time, if organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or court order following the effective date of this Compact, the Compact shall automatically renew for successive additional fifteen-year terms ….

20.     As to possible renegotiation, CPN's Gaming Compact provides pertinently at Part 15(B):

> … (W)ithin one hundred eighty (180) days of the expiration of this Compact or any renewal thereof, either the tribe or the state, acting

through its Governor, may request to renegotiate the terms of subsections A and E of Part 11[11] of this Compact.

21.    The offer of a tribal gaming compact was a constituent part of the larger State-Tribal Gaming Act, 3A O.S. §§ 261-282, which was enacted by referendum on November 2, 2004.[12]

22.    The State-Tribal Gaming Act provides that if at least four Native American tribes enter into the State's offered terms of a gaming compact and receive the approval of the Secretary of the Interior to do so, then 3A O.S. § 205.2 organization licensees (i.e. horse racetracks) [13] could apply to the Oklahoma Horse Racing Commission ("OHRC") for licenses to conduct any form of electronic gaming authorized by the State-Tribal Gaming Act or which may be lawfully conducted by tribes.[14]

23.    The State-Tribal Gaming Act imposes an annual electronic gaming license fee on organization licensees.[15]

---

[11] Part 11(A) sets out the calculation of the "exclusivity fees" imposed on CPN by the Compact, and Part 11(E) sets out the scope of "substantial exclusivity" for Class III gaming promised to CPN by the State.
[12] This offer was supplemented by additional terms offered by the State of Oklahoma in 2018. See 3A O.S. § 280.1.
[13] 3A O.S. § 205.2. See OAC 325:80-3-1(a)("Organization License, which authorizes the Licensee to conduct a race meeting in Oklahoma and accept pari-mutuel wagers on the outcome of live and simulcast horse racing."); OAC 325:80-1-2(" 'Organization licensee' means any Person receiving an Organization License issued by the Commission.") "Race meetings" are horse racing events. See 3A O.S. § 200.1(A)(13).
[14] 3A O.S. § 262(A).
[15] 3A O.S. § 282.

24.     The State-Tribal Gaming Act imposes a tax on the adjusted gross revenues from electronic gaming conducted by organization licensees.[16]

25.     After the effective date of CPN's Gaming Compact, the portion of the State Tribal Gaming Act relating to electronic gaming by organization licensees was amended on May 25, 2005, November 1, 2007, July 1, 2017, and August 2, 2018.[17]

26.     After the effective date of CPN's Gaming Compact, pursuant to the authority of the State-Tribal Gaming Act, the OHRC promulgated regulations governing electronic gaming by organization licensees on April 6, 2005.[18] After promulgation, these regulations have been amended many times.[19]

27.     After the effective date of CPN's Gaming Compact, organization licensees Backstretch, LLC, Remington Park, Inc., and Will Rogers Downs, LLC were initially licensed by the OHRC to conduct electronic gaming in forms other than pari-mutuel wagering on live horse racing on August 11, 2005.

28.     After the effective date of CPN's Gaming Compact, organization licensees Will Rogers Downs, LLC, Remington Park, Inc. and its successor-in-interest Global Gaming RP, LLC, have received annually renewed licenses

---

[16] 3A O.S. § 263.

[17] Laws 2005, SB 556, c. 222, § 1; Laws 2007, SB 984, c. 158, § 2; Laws 2017, HB 1836, c. 115, § 1; Laws 2018, HB 3375, c. 11, § 1.

[18] OAC Title 325, Chs. 80, 85, and 90.

[19] See e.g. OAC 325:80-3-1, added effective April 6, 2005, amended May 11, 2006 (23 Ok Reg 2079) and June 25, 2006 (23 Ok Reg 2602).

from the OHRC to conduct electronic gaming in forms other than pari-mutuel wagering on live horse racing from 2006 to the present.

29.     After the effective date of CPN's Gaming Compact, on October 17, 2019, the OHRC unanimously voted to renew the electronic gaming licenses for organization licensees Global Gaming RP, LLC and Will Rogers Downs, LLC for a period to include January 1, 2020.

30.     Upon information and belief, for the period from February 9, 2005 to August 15, 2019, the State of Oklahoma accepted the total sum of $2,500,000.00 in 3A O.S. § 282 gaming application fees from organization licensees.

31.     Upon information and belief, for the period from February 9, 2005 to August 15, 2019, the State of Oklahoma accepted the total sum of $5,497,191.00 in 3A O.S. § 263 electronic gaming taxes from organization licensees.

32.     In *Question Submitted by The Honorable Leslie Osburn, State Representative for District 47,* 2018 OK AG 14 (Oct. 31, 2018), Oklahoma Attorney General Mike Hunter determined that the OHRC must pay to the State's General Fund the amount of ten percent of organization licensees' electronic gaming license fees.[20]

---

[20] 3A O.S. § 282 fees, as distinct from 3A O.S. § 263 taxes.

33.   On July 5, 2019, Defendant, in his capacity as Governor of the State of Oklahoma, issued a letter to CPN which stated that he had "been advised that the Compact will not automatically renew" and requested renegotiation of "not only the terms of Subsections A and E of Part 11 of the Compact, but the rest of the terms of the Compact as well." Defendant asserted that unless CPN entered into a new gaming compact, CPN's class III gaming activities would be unlawfully conducted after December 31, 2019.

34.   Upon information and belief, Defendant issued a substantially similar letter to the Plaintiffs and to all tribes who are parties to gaming compacts with the State of Oklahoma.[21]

35.   On July 23, 2019, CPN, together with several other tribes, responded that any renegotiation would require the State's affirmation that the automatic renewal clause was effective and a substantive proposal from the State.

36.   On August 13, 2019, Defendant requested that CPN, together with several other tribes, enter into mediation to renegotiate the gaming compacts.

37.   On August 22, 2019, CPN, together with several other tribes, responded that any mediation or renegotiation would require the State's

---

[21] See Complaint (Doc. No. 1) at p. 13.

affirmation of the gaming compacts' effective automatic renewal clause and a substantive proposal from the State.

38.   On October 28, 2019, Oklahoma Attorney General Mike Hunter made an in-person, oral request that CPN, among several other tribes, enter into arbitration with the State on the question of whether the gaming compacts renew.

39.   On November 5, 2019, CPN, together with several other tribes, declined General Hunter's offer to enter arbitration.

40.   Throughout late 2019, the Defendant has been dismissive of the plain language of Part 15(B) of CPN's Gaming Compact. According to media reports, the Defendant has stated variously:

> "The (gaming compacts) between the state and the tribes giving them exclusivity to the gaming industry are, however, terminating as of Jan. 1, 2020, and it is imperative that we come to terms on new compacts prior to the end of the year." Tulsa World (July 8, 2019)

> "I know that they're saying (the gaming compacts) auto-renew. They don't auto-renew. You can't have a contract that in perpetuity that continues forever on one side … Contract law. I've got contract law. That doesn't even pass the smell test. No contracts go on forever." News 9 (July 25, 2019)

> "That's why the fact that we continue to have this conversation about them not expiring and they auto-renew, it just defies logic that a contract can go on in perpetuity. Forever. That's not a contract." KOCO 5 (Nov. 14, 2019)

> "I feel so confident that Oklahomans can see right through a certain industry, the casino industry, saying, 'These go on forever.'" Tulsa World (Dec. 5, 2019)

11

41.     At a December 17, 2019 press conference at the State Capitol

building, the Defendant summarized his position on the language of Part 15(B)

of CPN's Gaming Compact:

> Some of the tribes are saying that (the gaming compacts) auto-renew
> because we've renewed racetracks. So, just so, Oklahomans understand
> this, there is a non-elected group of a commission of three people that
> renew racetracks in Oklahoma.[22] I don't think the intent of this contract
> was to allow three unelected officials to auto-renew a contract in
> perpetuity.
>
> What happens in 2035? In fifteen years? Which is it that makes it auto-
> renew? So we can make sure we don't make this mistake in 2035. What
> section are they looking to? Is it, is it, can we not auto-renew the
> racetracks next year? Within fifteen years? That's what's so confusing.
>
> I'm also working on, I'll be releasing a white paper that also addresses
> from contract lawyers, that explain why these do expire. No contract goes
> on forever. I've been saying that for years. The big question is: why is
> this sentence in here if these things auto-renew forever?

42.     The Defendant has stated that he might seek to authorize non-

Indian gaming operators to have operations in Oklahoma. On December 10,

2019, the Defendant was quoted by the Pauls Valley Democrat as follows:

> "Gov. Kevin Stitt said he's personally talked with commercial operators
> who have told him they'd sign a deal tomorrow to open up a casino, and
> they've offered to pay the state 18% in taxes.
>
> 'Let's open it to everybody then,' Stitt said. 'What is operating a casino
> worth to have (the) exclusive right to do that?'"

---

[22] Presumably a reference to the OHRC, a nine member body created by
Oklahoma statute. The members are gubernatorially appointed, subject to the
advice and consent of the State Senate. 3A O.S. § 201.

43.    On December 11, 2019, the Defendant was quoted by Fox25 as

stating:

> Commercial operators have proactively reached out and shown interest
> in Oklahoma's market. One operator explicitly told me over the phone
> he'd sign a deal tomorrow at an 18% fee, and this business person is
> eager because his offer is a low rate for what his casinos are paying on
> average across the nation. Commercial operators are reading the news
> headlines in our papers, and in industry trade publications, and they
> are wanting a chance to break into the third largest casino market in
> the nation. While this is something I am not pursuing with the
> Legislature, at this time, the conversations have been enlightening
> about the value of the gaming industry in Oklahoma.

44.    The Defendant has also publically explored the possibility of

taking action against tribal vendors. On December 6, 2019, the Defendant was

quoted in The Oklahoman as saying,

> Are (tribes) going to be operating illegally class III games? That brings a
> whole host of issues with vendors.

45.    At the above-referenced December 17, 2019, State Capitol press

conference, the Defendant again asserted that tribes which were parties to

gaming compact, including CPN, would be "operating illegally" after December

31, 2019. The Defendant also had the following exchange with a journalist:

> Q: …Would you take action against vendors beyond the casinos?
> A: That's absolutely a possibility, and the vendors need to understand
> that if they're operating and serving an industry that's illegal, just like
> if the State can't receive money from an illegal activity.

46.    On December 31, 2019, the Plaintiffs filed their Complaint in this

action, seeking a declaratory judgment of the legal effect of the "shall

automatically renew" clause of Part 15(B) of the Plaintiffs' gaming compacts, and if necessary, injunctive relief to remedy the Defendant's ongoing violation of Federal law and invasion upon the Plaintiffs' sovereignty.[23]

### III.   CLAIM FOR DECLARATORY JUDGMENT

47.    CPN incorporates by reference the above-numbered paragraphs 1-46.

48.    To protect its Federal rights and stop further injury to its sovereignty, CPN files this Complaint under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908),[24] against J. Kevin Stitt in his official capacity as Governor of the State of Oklahoma ("Defendant") to obtain a prospective declaration of its rights.

49.    Specifically, CPN seeks a declaration that CPN's Gaming Compact renewed January 1, 2020 for another fifteen-year term, and the Defendant's repeated public declarations that the CPN's gaming activities are "illegal," constitute ongoing violations of Federal law and an invasion upon CPN's sovereignty.

50.    CPN conducts class III gaming activities on its Indian lands located in a State that permits such gaming, according to a valid tribal-state

---

[23] Complaint (Doc. No. 1).
[24] See *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012) (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

gaming compact, and according to a valid tribal ordinance, both accepted by the Secretary of the United States Department of the Interior and approved under IGRA. Therefore, such activities are lawful pursuant to IGRA, 25 U.S.C. § 2710(d).

51.   CPN's Gaming Compact Part 15(B) provides in relevant part:

> This Compact shall have a term which will expire on January 1, 2020, and at that time, if organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or court order following the effective date of this Compact, the Compact shall automatically renew for successive additional fifteen-year terms….

52.   As of January 1, 2020, organization licensees and others were authorized to conduct electronic gaming in forms other than pari-mutuel wagering on live horse racing pursuant to governmental actions of the State of Oklahoma and court orders following the effective date of CPN's Gaming Compact, therefore, CPN's Gaming Compact has automatically renewed for an additional fifteen-year term.

53.   CPN therefore has a right under Federal law to continue its conduct of Class III gaming activities under CPN's Gaming Compact in 2020 and beyond.

54.   The Defendant's repeated and ongoing public declarations that the CPN's lawfully conducted gaming activities are "illegal" are contrary to Federal law and directly interfere with CPN's Federal rights to conduct gaming

under its valid and renewed Gaming Compact.[25]

55.     The Defendant's actions manifest an ongoing intent to unsettle and destabilize CPN's Federal right to conduct gaming under its valid Gaming Compact in order to attempt force CPN to negotiate a new gaming compact.

56.     This ongoing conduct causes immediate injury to CPN's rights because it requires CPN either to tolerate actions that deny the existence of its Federal rights or to give up those rights entirely.

57.     In addition, the Defendant's ongoing declarations and threats concerning the legality of CPN's conduct of gaming activities have had the intended effect of manufacturing public uncertainty over the lawfulness of CPN's conduct of gaming under its valid Gaming Compact, which constitutes an invasion of CPN's sovereignty and CPN's rights held under Federal law.

58.     CPN is entitled to prospective declaratory and, if necessary, injunctive relief to remedy the Defendant's ongoing violation of Federal law and invasion upon its sovereignty.

---

[25] *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250-51 (10th Cir. 2001).

## PRAYER FOR RELIEF

WHEREFORE, CPN respectfully prays for a judgment in its favor as follows:

1.    CPN seeks a declaration that:

a) CPN possesses a Federal law right to conduct Class III gaming pursuant to 25 U.S.C. § 2710(d)(2)(C) and under CPN's Gaming Compact with the State of Oklahoma and in effect under IGRA;

b) CPN's Gaming Compact under which it conducts Class III gaming provides at Part 15(B) that CPN's Gaming Compact "shall automatically renew" on January 1, 2020, if at that time "organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or a court order following the effective date of this Compact";

c) the State of Oklahoma, which drafted and offered the terms of CPN's Gaming Compact to CPN, has taken actions that satisfy Part 15(B)'s conditions for automatic renewal;

d) CPN's Gaming Compact "shall automatically renew" on January 1, 2020, for another fifteen-year term, and therefore, has automatically renewed; and

e) the Defendant's denying, interfering with, or otherwise acting contrary

to CPN's rights under CPN's Gaming Compact, as renewed on January 1, 2020, either through his direct action or through the action of any of his agents, officers, employees, or representatives, are null and void and have no legal effect.

2.      Such further relief as the Court may deem appropriate.

Respectfully submitted,

*/s George Wright*_____
Gregory Quinlan, NM Bar #4450
                        Colo. Bar # 21605
George Wright,      OBA #21873
1601 Gordon Cooper Drive
Shawnee, OK 74801
(405) 275-3121
george.wright@potawatomi.org
**ATTORNEYS FOR INTERVENOR
CITIZEN POTAWATOMI NATION**