# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **(1) THE CHEROKEE NATION, a federally recognized Indian Tribe; (2) THE CHICKASAW NATION, a federally recognized Indian Tribe, and (3) THE CHOCTAW NATION, a federally recognized Indian Tribe,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**(1) J. Kevin Stitt, in his official capacity as the Governor of the State of Oklahoma,**<br><br>**Defendant.** | **No. CIV-19-1198-D** |

## FIRST AMENDED COMPLAINT IN INTERVENTION OF WICHITA AND AFFILIATED TRIBES

The Wichita and Affiliated Tribes (Wichita, Keechi, Waco, and Tawakoni) ("Wichita Tribe"), Intervenor-Plaintiff, brings this complaint against J. Kevin Stitt, in his official capacity as the Governor of the State of Oklahoma.  Defendant was served with a copy of the summons and Complaint on February 27, 2020; accordingly, consistent with Fed. R. Civ. P. 15(a)(1), this First Amended Complaint is being filed within 21 days of service.

## NATURE OF ACTION

1.      The Plaintiff Tribes (including Intervenor-Plaintiff Wichita Tribe) and the State are parties to federally approved Class III gaming compacts originally offered to all Oklahoma tribes pursuant to the State-Tribal Gaming Act, located at 3A O.S. §§ 261, *et*

*seq.* (the "Act"), and the model gaming compact authorized thereunder, the terms of which are located at 3A O.S. § 281 ("Compact" or "Compacts").

2.      The Act sets forth a single model compact, the terms of which were offered to and separately have been accepted by each tribe that has determined to enter into a Compact with the State and obtained the necessary federal approval thereof.  Thus, the terms of each compacting tribe's Compact with the State are the same – including the automatic renewal provision at the heart of this litigation – regardless of when a particular tribe opted to enter into a Compact with the State.

3.      The terms of the Compact were approved by Oklahoma voters by referendum on November 2, 2004, with 849,882 votes, or 59.47% of the total cast in that election, in favor of the Compact terms.

4.      The Wichita Tribe's Compact with the State took "effect on the date the approval [was] published in the Federal Register," which occurred on September 12, 2006. 71 Fed. Reg. 53706 (Sep. 12, 2006), as amended effective August 17, 2018, 83 Fed. Reg. 41101 (Aug. 17, 2018).  A copy of the Wichita Tribe's Compact is attached hereto as Exhibit A and incorporated herein by reference.

5.      Subsection B of Part 15 of the Compacts ("Part 15(B)") provides as follows:

> This Compact shall have a term which will expire on January 1, 2020, and at that time, if organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or court order following the effective date of this Compact, the Compact shall automatically renew for successive additional fifteen-year terms … .

6.     By their express terms, the Compacts (including the Wichita Tribe's Compact) automatically renewed January 1, 2020, for a second consecutive term because electronic gaming remained legal in Oklahoma on January 1, 2020, for entities other than compacting Indian tribes and because of official state actions authorizing additional forms of electronic gaming, other than pari-mutuel wagering on live horse racing, for various persons and entities, including organization licensees and others, after the effective dates of the tribes' Compacts.

7.     The Defendant, Governor Stitt ("Governor" or "Defendant") disputes that the Compacts automatically renewed.

## PARTIES

8.     Intervenor Wichita and Affiliated Tribes (Wichita, Keechi, Waco, and Tawakoni) is a federally recognized Indian tribe with a governing body duly recognized by the Secretary of the Interior.  *See* 85 Fed. Reg. 5462, 5466 (Jan. 30, 2020).

9.     Plaintiff Cherokee Nation is a federally recognized Indian tribe with a governing body duly recognized by the Secretary of the Interior.  *See id.* at 5463.

10.     Plaintiff Choctaw Nation is a federally recognized Indian tribe with a governing body duly recognized by the Secretary of the Interior.  *See id.* at 5465.

11.     Plaintiff Chickasaw Nation is a federally recognized Indian tribe with a governing body duly recognized by the Secretary of the Interior.  *See id* at 5465.

12.     Intervenor Plaintiff Citizen Potawatomi Nation is a federally recognized Indian tribe with a governing body duly recognized by the Secretary of the Interior. *See id.* at 5463.

13.     Intervenor Muscogee (Creek) Nation is a federally recognized Indian tribe with a governing body duly recognized by the Secretary of the Interior. *See id.* at 5465.

14.     J. Kevin Stitt is the Governor of the State of Oklahoma and is sued in his official capacity.

## JURISDICTION AND VENUE

15.     This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362 because this dispute arises under the Constitution, laws, or treaties of the United States, and the action is brought by the Wichita Tribe, a federally recognized Indian tribe with a governing body duly recognized by the Secretary of the Interior.

16.     Further, this action seeks to protect and enforce rights held by the Wichita Tribe and its co-Plaintiffs under the Indian Gaming Regulatory Act ("IGRA"), 28 U.S.C. §§ 2701–2721.  Plaintiffs' Compacts are now in effect between Oklahoma and Plaintiffs pursuant to IGRA, and therefore have the force of federal law. *Id.* § 2710(d)(2)(C); *accord Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1239 n.17 (10th Cir. 2018) (quoting *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997)).

17.     Accordingly, the Compacts vest the Wichita Tribe and its co-Plaintiffs with rights protected under federal law, including the express automatic renewal provision of Part 15(B)

18.     Venue is proper under 28 U.S.C. § 1391 because Defendant resides in the Western District of Oklahoma, and such district is where a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL ALLEGATIONS

19.     The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

20.     To the extent not inconsistent with the Wichita Tribe's allegations herein, The Wichita Tribe incorporates by reference Paragraphs 15–66 of the Complaint filed by Plaintiffs Cherokee Nation, Chickasaw Nation, and Choctaw Nation.

21.     Under IGRA, Indian gaming activities are divided into three classes, each of which is subject to differing degrees of tribal, state, and federal jurisdiction and regulation. *See id.* §§ 2703, 2710.

22.     IGRA defines Class I gaming as "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." *Id.* § 2703(6).

23.     Class II gaming includes bingo and similar games, as well as certain card games. *Id.* § 2703(7)(A). Class II gaming does not include banking card games or slot machines. *Id.* § 2703(7)(B).

24.     Class III gaming is "all forms of gaming that are not class I gaming or class II gaming." *Id.* § 2703(8). Indian tribes and states may negotiate compacts that authorize Class III gaming on Indian land located within the state's boundaries. IGRA requires a

state to negotiate a compact in good faith with a tribe for Class III gaming where such

gaming is otherwise permitted by the state.  *Id.* § 2710(d)(3)(A).

25.     Under the Oklahoma Enabling Act, Oklahoma's authority to join the Union

was expressly conditioned on the requirement that Oklahoma's Constitution not "limit or

impair the rights of person or property pertaining to the Indians of said Territories" or "limit

or affect the authority of the [federal] Government … to make any law or regulation

respecting such Indians, their lands, property, or other rights."  Act of June 16, 1906, § 1,

ch. 3335, 34 Stat. 267.  Congress also required the State to "disclaim all right and title …

to all lands … owned or held by any Indian, tribe, or nation."  *Id.* § 25.

26.     Accordingly, Oklahoma's Constitution disclaims all title and jurisdiction to

tribal lands.

> The people inhabiting the State do agree and declare that they
> forever disclaim all right and title in or to any unappropriated
> public lands lying within the boundaries thereof, and to all
> lands lying within said limits owned or held by any Indian,
> tribe, or nation; and that until the title to any such public land
> shall have been extinguished by the United States, the same
> shall be and remain subject to the jurisdiction, disposal, and
> control of the United States.

Okla. Const. art. 1, § 3.

27.     The State-Tribal Gaming Act, located at 3A O.S. §§ 261, *et seq.*, along with

the Compacts authorized thereunder, the terms of which are located at 3A O.S. § 281, was

the result of extensive negotiation and substantial bargaining designed to accommodate a

variety of interests.

28.     Although at first blush the Act may appear primarily concerned with tribal gaming, the negotiations that led to the final form of the Act were carefully designed to preserve a delicate balance between the State's primary desire to save the State's horse industry and horse racing industry through gaming, and its corresponding federal obligation to negotiate in good faith with tribes for compacts covering the gaming the State sought to allow at the horse tracks.

> In order to encourage the growth, sustenance and development of live horse racing in this state and of the state's agriculture and horse industries, the [Oklahoma Horse Racing] Commission is hereby authorized to issue licenses to conduct authorized gaming to no more than three organization licensees operating racetrack locations . . .

3A O.S. § 262(C).

29.     The Governor has argued that this initial statutory authorization for gaming at horse tracks is the only "authorization" for gaming that has occurred, and that the State has not issued any authorization for electronic gaming since the effective date of the Compacts.  The Governor is incorrect.

30.     As an initial matter, whatever gaming authorization was contained in the Act was conditional and made dependent solely upon tribal acceptance and federal approval of the Compact terms:

> If at least four Indian tribes enter into the model tribal-state compact set forth in Section 281 of this title, and such compacts are approved by the Secretary of the Interior and notice of such approval is published in the Federal Register, the Oklahoma Horse Racing Commission ("Commission") shall license organization licensees which are licensed pursuant to Section 205.2 of this title to conduct authorized gaming as that term is defined by this act pursuant to this act utilizing gaming

> machines or devices authorized by this act subject to the
> limitations of subsection C of this section.

3A O.S. § 262(A).

31.    Thus, organization licensees were not authorized to conduct such gaming until:

   a.    at least four tribes had entered into and obtained federal approval of their Compacts, and

   b.    the OHRC thereafter licensed the organization licensees and their gaming devices.

32.    Further, as will be discussed in more detail below, the continued conduct of gaming at the horse tracks is dependent upon the Oklahoma Horse Racing Commission's ("OHRC") annual reauthorization of such gaming at the tracks, as well as the issuance of various licenses associated with the conduct of gaming at the tracks.

33.    For example, the Act states that it is the annual "Gaming Machine or Device License, which authorizes the racetrack gaming operator to use or have a gaming machine or device on the racetrack premises."  3A O.S. § 262.1(B)(11).  Thus, without this annual gaming machine or device license reauthorization by the OHRC, the horse tracks are not "authorized" to conduct electronic gaming.  Significantly, the Compacts do not require that the governmental authorization by the State take the form of legislation.

34.    Prior to the Act, various tribes had attempted to negotiate Class III electronic gaming compacts with the State, but those negotiations were ultimately unsuccessful.

Some Oklahoma tribes had sued the State for failing to negotiate in good faith for gaming compacts.

35.     Then, when horse racing interests began to lobby the State to allow electronic gaming at race tracks to preserve the horse racing industry, the tribes pressed the State to fulfill its standing obligation under IGRA to negotiate with the tribes as well.

36.     As part of the negotiations, the tribes sought to limit the types of other entities who could engage in any form of electronic gaming.

    a.     In exchange for these limitations, the negotiating tribes agreed to pay the State a certain percentage of gaming revenue – known as "exclusivity fees." *See generally,* 3A O.S. § 281, Part 11.[1]

    b.     The tribes' payment of exclusivity fees was expressly conditioned on the State's adherence to the exclusivity provisions.

---

[1] Pursuant to 3A O.S. § 280, 88% of the exclusivity fees "shall be deposited in the Education Reform Revolving Fund." The Director of Oklahoma Office of Management and Enterprise Services ("OMES") is appointed by and serves at the pleasure of the Governor. 62 O.S. § 34.5. By letter dated February 11, 2020, the Oklahoma Office of Management and Enterprise Services notified the Wichita Tribe that, rather than being deposited as required, exclusivity fees paid by the Tribe after January 1, 2020, would be deposited in a separate account and held in escrow. The Attorney General later determined this to be improper. See Op. Okla. A.G. 2020-3. Further, pursuant to Subparagraph B of Part 11, each compacting tribe is to pay the State an annual $35,000 "oversight assessment fee" to be used by the State "for its costs incurred in connection with the oversight of covered games to the extent provided herein[.]" According to public reports, the Governor has utilized these funds for other purposes, notably the payment of private counsel retained for his battle with the tribes. https://www.tulsaworld.com/news/state-uses-funds-derived-from-gaming-to-defend-against-lawsuit/article_a31c3ffb-5da9-5037-a41a-12088050b272.html#1.

c.      The parties further negotiated a right for the tribes to receive liquidated damages in the event the State violated the exclusivity provisions. *Id.* Part 11(E).

d.      The tribes further secured the right to conduct gaming under the Compacts during the entirety of the initial term even if the State opted to repeal the Act. *Id.*, Part 13(B).

e.      The tribes further secured the right of additional consecutive terms provided "organization licensees or others are authorized to conduct electronic gaming in any form." Part 15(B).

f.      Throughout the compact negotiations, the tribes resisted the State's attempts to impose unreasonable limitations and restrictions on the compacts and their automatic renewal.  For instance, various drafts of the legislation contained initial compact terms of six years, 12 years and, ultimately, 15 years.  The tribes fought for and secured an initial term of 15 years.

g.      Also during the compact negotiations, various drafts of the legislation expressed State positions on compact renewal, such as no automatic renewal, or automatic renewal tied to the operation of only specific games.  The tribes fought for and obtained an expansive automatic renewal provision under which the Compact would automatically renew so long as "electronic gaming in any form" could still be operated legally within the State.

h.     Thus, the tribes ultimately convinced the State to agree to automatic renewal without the limitations it had sought to impose during the negotiations.   Rather than connecting automatic renewal to the operation of specific games, automatic renewal would result from the operation of "electronic gaming in any form."  Rather than a six- or 12-year term, the State agreed to 15 years.  Rather than no automatic renewal, the State agreed to the automatic renewal provision in what ultimately became Part 15(B).

37.     Accordingly, the negotiations concerning the Compacts' renewal language were extensive.

38.     Fundamentally, the goal of both the tracks and the tribes was to ensure that at no point would either the tribes or the tracks be permitted to conduct some form of electronic gaming that the other could not, ensuring fairness and stability for each.

39.     If Oklahoma's public policy had changed so that gaming was outlawed after the effective date of the Compacts, then the Compacts were designed to terminate at the end of their initial term on January 1, 2020.

40.     However, the Compacts were designed so that, so long as anyone was still authorized to conduct electronic gaming in any form at the end of the initial term, each tribe's Compact rights would be preserved through the Compacts' automatic renewal, with a 180-day negotiation window during which the State or the tribes could request to renegotiate the amount of the exclusivity fees paid by the tribes to the State.  Any actual

revision of the fees would require mutual agreement and approval by the federal government.

41.      Contrary to the Governor's representations, the Compacts did not give him the unilateral power to decide specifically not to renew the Compacts. "This Compact shall remain in full force and effect until the sooner of expiration of the term or until the Compact is terminated by **mutual consent of the parties."**  3A O.S. § 281 ("Model Tribal Gaming Compact," Part 15(C)) (emphasis added).  In fact, the Governor has turned the entire analysis of the Compacts' renewal provision upside down.

42.      When read as intended, and as interpreted by the Legislature at the time of enactment, the only event that could trigger nonrenewal of the Compacts was a change in State law that prohibited electronic gaming by anyone.  This event has not occurred.

> The compact will expire January 1, 2020, but will automatically renew for 15 years. The fees and penalties may be renegotiated at that time. These provisions will go into effect if approved by the voters at the November 2, 2004, General Election.

Oklahoma House of Representatives Research Division, "Session Highlights 2004" at 8 (published August 2004); *see also,* House Research, Legal & Fiscal Divisions, "Session Overview, Second Regular Session of the 49th Legislature," at 6 (Final Revised Edition, June 22, 2004).

43.      Part 15(B) provides as follows:

> This Compact shall have a term which will expire on January 1, 2020, and at that time, if organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or court order following the

> effective date of this Compact, the Compact shall
> automatically renew for successive additional fifteen-year
> terms … .

44.     Part 15(B) was a specific and exhaustively negotiated provision that took many different forms before the final enacted version.  The goal of the tribes, consistent with the framework of IGRA, was maintaining the right to engage in gaming pursuant to their Compacts so long as the State allowed electronic gaming in any form for anyone at the end of the Compacts' initial term.

45.     The exclusive arrangement had been developed based on the State's federal obligation to negotiate in good faith with the tribes for Class III gaming.  Neither side wanted to leave open the requirement that the entire model Compact would have to be renegotiated in the future, but understood that future market conditions might justify the need to revisit the amount of exclusivity fees.

46.     The parties knew that renegotiating the entire model Compact – a process that originally took years – could not be accomplished in a mere 180 days (as proposed by the Governor).

47.     Therefore, the Compact language was specifically designed so that only a fundamental reversal of Oklahoma gaming law to prohibit electronic gaming in any form would serve to terminate the Compacts – short of that, the State's obligations, and the tribes' rights, pursuant to their Compacts remained.

48.     The intent for the Compacts to persevere is evident in Section 11(E) – even in the event of a breach, the Compacts continue, but the tribes' obligation to pay exclusivity fees would no longer exist and the State would owe the tribes penalties.  Thus, the Compact

structure was designed to maintain the stability of the arrangement while allowing an injured party to be made whole.

49.     The Compact was even designed to survive a full repeal of the Act:

> Each party hereto agrees to defend the validity of this Compact and the legislation in which it is embodied. This Compact shall constitute a binding agreement between the parties and shall survive any repeal or amendment of the State-Tribal Gaming Act.

3A O.S. § 281, Part 13(B).

50.     Even if the Court were to accept the Governor's narrower, and severely flawed premise – that some additional State action to authorize the conduct of electronic gaming was required to trigger the renewal of the Compacts – the Governor denies the legal effect of several such State actions, and ignores many more, that served not merely to maintain the conduct of gaming in Oklahoma, but authorize expanded forms of electronic gaming.

51.     Nevertheless, to the extent the Court indulges the Governor's argument that State actions were necessary to "trigger" automatic renewal of the Compacts, the State has provided such "triggers" in at least 12 different ways since the effective dates of the Compacts, presented below in reverse chronological order.  Accordingly, the Court need not go beyond Count I to satisfy its inquiry into whether the Compacts automatically renewed on January 1, but all are presented to demonstrate the numerous "governmental action[s] of the state" over the past 15 years that support the Plaintiffs' argument that the Compacts automatically renewed pursuant to Part 15(B).

<u>**COUNT I**</u>

**THE COMPACTS AUTOMATICALLY RENEWED BECAUSE GOVERNOR
STITT ENTERED INTO COMPACT EXTENSION AGREEMENTS
WITH TWO TRIBES**

52.    The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

53.    On December 27, 2019, Governor Stitt executed agreements with two tribes purporting to extend the "expiration date" of the two tribes' Compacts to August 31, 2020.

54.    One of the tribes was the United Keetoowah Band of Cherokee Indians ("UKB"), which does not have a federally-approved compact, but had most recently conducted electronic gaming pursuant to an agreement under which it agreed to pay the State $2 million (discussed in more detail below).

55.    On December 17, 2019, Governor Stitt announced the State would be offering an extension to the tribal gaming compacts.  Welcome to Governor Kevin Stitt's Website, *Gov. Stitt Offers Extension on Gaming Compacts* (Dec. 17, 2019). <u>https://www.governor.ok.gov/articles/pressreleases/gov--stitt-offers-extension-on-gaming-compacts</u>.

56.    The next day, Governor Stitt issued a letter to tribes formally offering the extension, including the State-drafted extension agreement.  *See, e.g.*, Letter to Governor Anoatubby from J. Kevin Stitt, Governor (Dec. 18, 2019).

57.    On December 27, 2019, two tribes, the Kialegee Tribal Town and UKB, entered into the extension agreement.  A copy of the UKB extension, executed by the

Governor and attested to by Michael Rogers, Oklahoma Secretary of State, is available online at: https://www.governor.ok.gov/static-assets/documents/gamingcompacts/United_Keetoowah_Band_Gaming_Compact_Extension.pdf. A copy of the Kialegee Tribal Town's extension is available online but is only executed by the tribe. https://www.governor.ok.gov/static-assets/documents/gamingcompacts/Kialegee_Gaming_Compact_Extension.pdf.

58.     In the extension, Governor Stitt represents and warrants that he is authorized to execute the extension and that it is "the binding obligation of the parties upon execution."

59.     The extension agreement makes clear that "[a]ll other provisions of the Compact shall remain in full force and effect," which includes a signatory tribe's right to conduct electronic gaming.

60.     In other words, Governor Stitt, personally and purporting to act on behalf of the State, authorized the operation of electronic gaming in Oklahoma in any form on and after January 1, 2020, thereby nullifying any assertion against Compact renewal for all compacting tribes.

61.     "At that time" (January 1, 2020), two tribes ("others") were authorized to conduct "electronic gaming in any form" ("covered games" under the Compact) as a result of the Governor's purported extension ("governmental action of the state"), which extension occurred after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

62.     Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

a.    Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

b.    The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.    The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT II

**THE COMPACTS AUTOMATICALLY RENEWED BECAUSE OF RENEWAL OF ANNUAL ORGANIZATION LICENSING AND RACETRACK GAMING OPERATOR LICENSES**

63.    The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

64.    Aside from compacting tribes, the Act authorizes "organization licensees" to conduct gaming, stating that the OHRC "shall license organization licensees … to conduct authorized gaming."  3A O.S. § 262(A).

65.    An "organization licensee" is an entity authorized by the OHRC to conduct a race meeting, at which pari-mutuel wagering on horse races is conducted.  3A O.S. § 200.1.

66.    "Authorized games" are those games Indian tribes may conduct either under the Compact or the Indian Gaming Regulatory Act.  *See* 3A O.S. § 262(C)(2).

67.    Before the OHRC could authorize organization licensees to conduct electronic gaming, it was required to "promulgate rules to regulate the operation and use of authorized gaming by organization licensees," 3A O.S. § 262(C)(2), and "to regulate, implement and enforce the provisions of [the Act][.]"  3A O.S. § 262(F).

68.    The OHRC went through the promulgation process three times, the last two of which were well after the effective dates of the Compacts.

OHRC Emergency Rules 1st set

- Adopted 3/17/05

- Approved by Governor 4/6/05

- Effective 4/6/05

OHRC Emergency Rules 2nd Set

- Adoption 4/23/06

- Approved by Governor 5/11/06

- Effective 5/11/06

OHRC Permanent/Final Rules

- Comment period 12/1/05 to 1/8/06

- Public hearing 1/9/06

- Adoption 3/23/06

- Submitted to Governor, House, Senate 3/28/06

- Governor approval 5/11/06

- Legislative approval: Failure of the Legislature to disapprove the rule resulted in approval on May 23, 2006

- Final Adoption 5/23/06

- Effective 6/25/06.  *See* 23 Okla. Reg. 2603 (Jun. 15, 2006) (Issue 19).

69.     The rules establish the standards "and requirements for licensure, certification, registration, renewal and other approval under the State-Tribal Gaming Act." *Id.*

70.     The rules were subject to a comment period and public hearing.  *Id.*  After that, the rules were submitted to the Oklahoma Governor, House of Representatives, and Senate.  *Id.*

71.     On May 11, 2006, the Governor approved the rules.  The Legislature did not disapprove of the proposed rules within the required time period, and the rules thereafter took effect.  *Id.*

72.     Rules promulgated by the OHRC provide for the application, administration, and issuance of licenses, gaming license classifications, the terms of the licenses, the application process, the fees required, and the conditions attached to licensure.  *See id.* at 2606–13.

73.     Organization licenses are issued for a calendar year, and applications for the license must be submitted no later than June 1 of the preceding calendar year.  Okla. Admin. Code 325:80-5-1(a) ("all gaming licenses of whatever type are issued for a calendar year

and no matter when issued during a calendar year, the license will expire at midnight, December 31, of the calendar year"); Okla. Admin. Code 325:15-3-2(a).

74.    If a license is not renewed, the organization is no longer authorized to conduct electronic gaming.

75.    The Racetrack Gaming Operator License is the license issued by the OHRC that authorizes organization licensees to conduct authorized gaming.  Okla. Admin. Code 325:80-1-2.

76.    A Racetrack Gaming Operator License authorizes the licensee to "acquire, own, lease, possess, and operate [a] Gaming Machine on its licensed premises." *Id.* at 325:80-3-1.

77.    As with Organization Licenses, Racetrack Gaming Operator Licenses are issued for a calendar year, and applications for the license must be submitted no later than June 1 of the preceding calendar year.  Okla. Admin. Code 325:80-5-2.

78.    Moreover, there are numerous licenses issued by the OHRC that encompass virtually every aspect of electronic gaming and, without which, neither the tracks, nor the individuals employed by the tracks, are authorized to conduct electronic gaming:

> B. The activities authorized by the occupation gaming licenses issued pursuant to this section are as follows:
>
> (1) Manufacturer License, which authorizes the approved licensee to manufacture, fabricate, assemble, produce, program, refurbish, or make modification to any gaming machine or device, authorized game, or associated equipment in accordance with the State-Tribal Gaming Act and Commission rules;

(2) Distributor License, which authorizes the approved non-manufacturer to lease, sell, distribute or market any gaming machine, associated equipment, game program or program storage device in Oklahoma or outside the state in accordance with the State-Tribal Gaming Act and Commission rules;

(3) Manufacturer/Distributor License, which authorizes the approved licensee to manufacture, fabricate, assemble, produce, refurbish, lease, sell, distribute, market or make modifications to any gaming machine, associated equipment, game program or program storage device in Oklahoma or outside the state in accordance with the State-Tribal Gaming Act and Commission rules;

(4) Vendor License, which authorizes a vendor, not licensed as a manufacturer, distributor, or manufacturer/distributor, that conducts operations on-site at a racetrack gaming facility to sell or lease goods and/or services to racetrack gaming operators;

(5) Manufacturer's Employee License, which authorizes the approved licensee to be an employee of a manufacturer who supplies gaming-related goods and/or services to the racetrack gaming operator on-site at the gaming facility;

(6) Distributor's Employee License, which authorizes the approved licensee to be an employee of a distributor who supplies gaming-related goods and/or services to the racetrack gaming operator on-site at the gaming facility;

(7) Manufacturer/Distributor's Employee License, which authorizes the approved licensee to be an employee of a manufacturer/distributor who supplies gaming-related goods and/or services to the racetrack gaming operator on-site at the gaming facility;

(8) Key Executive License, which authorizes the recipient to be employed as a key executive;

(9) Vendor Employee License, which authorizes any employee to work for a licensed vendor and supply goods and/or services on-site at the gaming facility;

(10) Gaming Employee License, which authorizes the recipient to be employed as a gaming employee; and

(11) Gaming Machine or Device License, which authorizes the racetrack gaming operator to use or have a gaming machine or device on the racetrack premises.

3A O.S. § 262.1(B).

79.     The OHRC is further empowered to authorize and certify particular games for use by both organization licensees and tribes.  3A O.S. § 281, Part 3(5) and related procedures under 3A O.S. § 368.

80.     On August 22, 2019, the OHRC considered the approval of calendar year 2020 Organization and Racetrack Gaming Operator Licenses for Will Rogers Downs, L.L.C., and Global Gaming RP, LLC (doing business as Remington Park).  Okla. Horse Racing Comm'n, Meeting Agenda (Aug. 22, 2019).

81.     At the October 17, 2019, meeting, the OHRC took final action to approve the organization license orders.  As the licenses are for calendar year 2020, the action authorizes the licensees to conduct electronic gaming on and after January 1, 2020. Significantly, this State action occurred after the effective date of the Wichita Tribe's Compact and *every other* federally-approved Compact entered into pursuant to the Act. Therefore, the renewal provision of Part 15(B) has been supported by the approval of the licenses, under which organization licensees are authorized to conduct electronic gaming on January 1, 2020 – gaming that could not have occurred but for this official authorization of a State agency.

82.     The OHRC has renewed licenses and issued new licenses during calendar year 2019 authorizing the conduct of electronic gaming by organization licensees during calendar year 2020.

83.     "At that time" (January 1, 2020), organization licensees were authorized to conduct "electronic gaming in any form" ("authorized games" under 3A O.S. § 269(1)) as a result of the OHRC's licensing ("governmental action of the state"), which licensing occurred after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

84.     Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

a.      Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

b.      The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.      The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT III

## THE COMPACTS AUTOMATICALLY RENEWED BECAUSE THE STATE PERMITS ELECTRONIC REDEMPTION GAMES

85.    The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

86.    Redemption gaming is an extensive class of electronic gaming authorized by the State.

87.    The Oklahoma Tax Commission ("OTC") requires annual tax decals for "coin-operated amusement devices." 68 O.S. § 1503. Many of these devices, however, are slot machines under Oklahoma law.

88.    Oklahoma defines "slot machine" as any device that may be played by inserting any representative or thing of value and by the play of which a person stands to win or lose, whether by skill or chance, a thing of value. 21 O.S. § 964(A).

89.    The typical redemption game generally has the same elements of play as a slot machine under Oklahoma law.

    a.    First, a token or coin (a thing of value) is inserted into the gaming device, or the player scans a card onto which he or she has loaded value, to initiate play.

    b.    Next, the play of the game typically involves skill, chance, or both.

c.     The player is then rewarded, typically in coupons that may be redeemed for a prize (a thing of value), in proportion to the player's score in the game.

90.     Thus, amusement devices permitted by the OTC require submission of a thing of value, which generates the play of a game, and depending on the outcome of the play, results in a reward or thing of value – in other words, a slot machine.

91.     The OTC authorizes the operation of redemption games annually via regulations and the provision of decals for these devices.

92.     Its Coin-Operated Device Guide indicates the decal requirements for various "Prize Redemption Games Requiring 25 Cents or More per Game." Okla. Tax Comm'n, Coin-Operated (Vending Decal) Device Guide at 6 (updated 2018), https://www.ok.gov/tax/documents/Coin-Op%20Guide%20(2018)%20Public_sm.pdf.

93.     Redemption games have the same features common to regulated gambling machines. *See, e.g.*, Nicole Schultz, Global Gaming Business Magazine, *Skill Games Part I: A New Paradigm* (Apr. 21, 2019)[2] ("'skill' games dominate trade show exhibition halls and bustling conference rooms."); Technical Services Bureau, New Jersey Division of Gaming Enforcement, *Expanded Features Codes* at 1 (providing a code number for "attract mode during idle")[3]; SG Gaming, *Willy Wonka Dream Factory* ("Jackpot Feature").[4]

---

[2] https://ggbmagazine.com/article/skill-games-part-i-a-new-paradigm/
[3] https://www.nj.gov/oag/ge/bureaus/tsbdocs/nj_expanded_features.pdf
[4] https://www.sggaming.com/games/Bally/class3/premium-games/Willy-Wonka-Dream-Factory-6624

94.    The OTC issues the decals for redemption games upon payment of the annual fee, with the fee year beginning July 1 and ending on June 30.  68 O.S. § 1505.

95.    To operate redemption games on January 1, 2020, the operator must have paid a fee and the OTC must have issued the appropriate decal prior to January 1, 2020. *See* 68 O.S. § 1506 (noting that if a game is placed in operation without decal, the person operating the redemption game is liable for the annual fee and a penalty).

96.    Redemption game decals are renewed annually on a rolling basis; thus, any machine decals renewed after January 1, 2019, constitute authorization by the OTC for a particular machine to be used for electronic gaming on January 1, 2020.

97.    The annual authorization of redemption gaming machines constitutes authorization of "electronic gaming in any form" under Oklahoma law, supporting automatic renewal of the Compacts.

98.    The OTC has issued decals authorizing the operation of electronic redemption games for calendar year 2020.

99.    "At that time" (January 1, 2020), operators of electronic redemption gaming machines ("others") were authorized to conduct "electronic gaming in any form" (electronic redemption games) as a result of the OTC's issuance of electronic redemption gaming machine decals for calendar year 2020 ("governmental action of the state"), which issuance occurred after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

100.    Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

a.    Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

b.    The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.    The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT IV

### THE COMPACTS AUTOMATICALLY RENEWED BECAUSE THE STATE LICENSED LOTTERY RETAILERS TO ENGAGE IN ELECTRONIC GAMING

101.   The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

102.   As approved by voters by referendum on November 2, 2004, Oklahoma Education Lottery Act specifically permitted "on-line games," wherein "tickets or shares are purchased through a network of computer terminals located at retail outlets, and such terminals are linked to a central computer that records the purchases," subject to regulations subsequently promulgated by the OLC and approved by the Governor on a permanent basis

in 2006.   3A O.S. § 703(9), (15); *see also* Okla. Admin. Code 429:1-1-3, 429:10-1-2; 429:15-1-2, 429:20-1-2.

103.   Oklahoma law permits the State lottery and related forms of gambling overseen by the Oklahoma Lottery Commission ("OLC") to be conducted through various electronic means and in electronic environments, subject to annual authorizations.

104.   The OLC's electronic games include, but are not necessarily limited to, "online games" (including the multistate lottery games), electronic self-service kiosks (discussed below), and internet-based and mobile app-based second-chance games (discussed below), which, according to the Oklahoma Attorney General, are lotteries, and, thus, gambling otherwise prohibited by State law.

105.   The OLC's multistate "on-line," or "online," games are electronic gaming "in any form."  These include the multistate games, such as Powerball and Mega Millions, and similar games.  The winning numbers for Powerball, for example, are selected by a machine and broadcast from a central location to television stations around the country (though none are listed in Oklahoma) and over the internet (https://www.youtube.com/user/PowerbaLL39).

106.   Another common type of game is the "instant ticket" or "scratcher" game, which requires the player to remove a coating to determine if a prize has been won.  See 3A O.S. § 703, but as discussed below, these "scratcher" games may also be played electronically by lottery patrons.

107.   The electronic "online" games are played through terminals and satellite dishes communicating with the OLC's central computer "to log, prepare, print, and validate

online tickets." OLC, *Minutes of Meeting*, at 2 (Nov. 8, 2005). The "online terminals" are OLC-authorized sales terminals "used to sell various online lottery number games." Okla. Admin. Code 429:1-1-3, 429:10-1-2; 429:15-1-2, 429:20-1-2. "Terminal," as used here, means "a combination of a keyboard and output device (such as a video display unit) by which data can be entered into or output from *a computer or electronic communications system*." Merriam-Webster, *Terminal* (entry 2 of 2, definition 2), https://www.merriam-webster.com/dictionary/terminal (emphasis added).

108.   Players of "online" games may have a computer select numbers for them. *See id.*

109.   An "online" game ticket must be "recorded in the OLC central computer system or recording media before the drawing." Okla. Admin. Code. 429:20-1-6.

110.   "All information about winning Oklahoma Lottery numbers has been and will continue to be provided free of charge ..." on the OLC's web site. Oklahoma Lottery, *Winning Numbers*. https://www.lottery.ok.gov/winning_numbers.asp.

111.   In addition, players may view the results on the OLC's mobile application and may also sign up for electronic mail and text alerts to have winning numbers sent to their mobile phones or emailed after each drawing. *Id.*

112.   Although largely electronic, participation in the Lottery is still only available through retailers licensed by the OLC.

113.   The OLC itself is "an instrumentality of the state," having any and all powers in carrying out and effectuating the purposes and provisions of the Oklahoma Education Lottery Act. 3A O.S. §§ 704, 709.

114.    Before the OLC was actually authorized to conduct the State lottery and begin the process of permitting lottery sales, the OLC was required by law to promulgate regulations.  This process occurred twice, first on an emergency basis, and second on a permanent basis:

Lottery Emergency Rules

- Adopted 10/5/05

- Approved by Governor 10/10/05

- Effective 10/10/05

Lottery Permanent/Final Rules

- Comment period 1/17/06 to 2/17/06

- Public hearing 2/17/06

- Adoption 2/21/06

- Submitted to Governor, House, and Senate 3/2/06

- Governor Approval 4/17/06

- Legislative Approval: Failure of the Legislature to disapprove the rules resulted in approval on April 28, 2006

- Final Adoption 4/28/06

- Effective 6/25/06. 23 Okla. Reg. 2778 (Jun. 15, 2006) (Issue No. 19).

115.    The first authorized lottery sales were scheduled to occur on or about November 10, 2005. ("Mr. Scroggins stated that everything was in place for the start-up of

online game ticket sales on the 10th of November.")  OLC Meeting Minutes, October 8, 2005.

116.   The regulations established "rates of compensation to retailers and the criteria for selection of retailers,"  23 Okla. Reg. at 2778, or in other words, the selection of businesses that sell lottery tickets on behalf of the OLC.  23 Okla. Reg. at 2780 (defining "retailer").

117.   The regulations also established "rules for the conduct of online lottery games," and the sale of online lottery tickets.  *Id.* at 1291.  These included the requirement that "[o]nly retailers who have a current contract with OLC are authorized to sell Online Game tickets."  *Id.* at 2794.

118.   Since 2005, the OLC, sometimes in conjunction with the Legislature, has expanded its lottery gaming into increasingly electronic forms.

119.   The OLC authorizes hundreds of retailers to conduct electronic lottery gaming through annual contracts and the issuance of "certificates of authority."  Without annual authorization, retailers are not authorized to conduct lottery sales.

120.   Only OLC-authorized retailers may sell lottery tickets or shares.  3A O.S. § 723 ("No person other than a duly certified lottery retailer shall sell lottery tickets or shares.").

121.   The OLC has the power "[t]o select and contract with … retailers," 3A O.S. § 709, and "only retailers who have a current contract with the [OLC] are authorized to sell" online games and instant tickets.  Okla. Admin. Code 429:20-1-4 and 429: 15-1-4.

122.    The OLC must annually issue a "certificate of authority" to each contracting retailer for purposes of display for each location at which tickets or shares are offered for sale.  3A O.S. § 717.

123.    A person who sells a lottery ticket or share without a contract and certificate of authority, is subject to a number of Oklahoma's criminal gambling statutes, e.g., 21 O.S. §§941, 982 and 1053.

124.    Retailer contracts are for one year, renewable annually.  OLC, Lottery Retailer Application, Part 1 (revised Nov. 1, 2018); Okla. Admin. Code 429:10-1-4.

125.    As of June 25, 2019, the OLC had at least 1,839 lottery retailers.  OLC, *Board of Trustees Meeting Minutes* at 3 (June 25, 2019).

126.    Almost two-thirds of the authorized retailers were "accepting debit cards to purchase Lottery products."  OLC, *Board of Trustees Meeting Minutes* at 3 (June 25, 2019).

127.    Lottery retailer contracts are renewed annually on the annual renewal date for the retailer.  Lottery Retailer Application, Part 1 (revised Nov. 1, 2018); Okla. Admin. Code 429:10-14.  Retailers are required to pay prizes of $600.00 or under, and the OLC may designate retailers to pay prizes of up to $5,000.00.  Okla. Admin. Code 429:10-1-7.

128.    The contracts and certificates of authority issued by the OLC authorize roughly 2,000 retailers to conduct electronic lottery games, by offering tickets for sale, accepting wagers and/or bets, and paying prize money.  Thus, with each contract and certificate of authority, the OLC is authorizing a retailer to conduct electronic gaming, after the effective date of the compacts and without such contract and certificate of authority the retailer is not authorized to conduct electronic lottery games.

129.    The OLC has renewed licenses and issued new licenses during calendar year 2019 authorizing the conduct of electronic gaming by lottery retailers during calendar year 2020.

130.    "At that time" (January 1, 2020), lottery retailers ("others") were authorized to conduct "electronic gaming in any form" (electronic lottery gaming) as a result of the OLC's licensing ("governmental action of the state"), which licensing occurred after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

131.    Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

a.      Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

b.      The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.      The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT V

### THE COMPACTS AUTOMATICALLY RENEWED BECAUSE THE STATE AUTHORIZED MOBILE INTERNET GAMING

132.     The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

133.     On April 26, 2018, the Oklahoma Governor approved Oklahoma House Bill 3538, providing that:

> Entries submitted by lottery players to the Oklahoma Lottery Commission for lottery-sponsored promotions and second-chance drawing promotions offered by the Commission may be submitted using a web application provided or sponsored by the Commission.

134.     Thus, beginning November 1, 2018, Oklahoma law authorized the OLC to offer lottery games over the internet and via smartphone apps.[5]  Okla. H.B. 3538 (2018) (codified at 3A O.S. § 724.5) ("HB 3538").

135.     The new "second-chance promotions" conducted by the OLC via the internet and smartphone apps contain the three required elements of a lottery under Oklahoma law (prize, chance, and consideration); thus, these games are lotteries otherwise prohibited as gambling under Oklahoma law.  Okla. Att'y Gen. Op. 2017-2 at 3 ("While a second-chance

---

[5] To further facilitate gaming via the lottery, effective November 1, 2018, Oklahoma authorized the use of debit cards, which provide for the electronic transfer of funds, for lottery purchases.[5]  Okla. S.B. 1303 (2018).  Lottery tickets themselves must still be purchased through a lottery terminal or kiosk at an authorized retailer.

drawing is played only as a promotional add-on to instant or online games, it is also a lottery in and of itself").

    a.    "[S]econd-chance promotions allow participants to submit non-winning lottery tickets or promotional slips as entries in a drawing to win a secondary prize." Okla. Att'y Gen. Op. 2017-2 at 3.

    b.    Prior to HB 3538, the Oklahoma Education Lottery Act did not "permit any part of a lottery game transaction to be conducted over the internet." *Id.* at 5.

    c.    "[G]ambling activities, including the *transmission or receipt of information* used to make bets by means of *any* communications facilities, are illegal unless specifically permitted by law." *Id.* (citations omitted) (first string of emphasis added).

    d.    Thus, under Oklahoma law, electronic second-chance lotteries were deemed by the Attorney General an illegal lottery unto themselves until the Oklahoma Legislature expressly authorized this as a new form of electronic gaming for the OLC. *Id.*

136.    In sum, HB 3538 authorized the OLC to conduct previously illegal mobile and internet-based online lottery games.

137.    Because users participate in the OLC's mobile lottery games via the internet and smartphone app, users are able to participate from within Indian country. Thus, the OLC – an arm of the State – is unlawfully conducting gaming in Indian country in violation of IGRA.

138.   "At that time" (January 1, 2020), the OLC ("others") was authorized to conduct "electronic gaming in any form" (electronic mobile and internet-based lottery gaming) as a result of HB 3538 ("governmental action of the state"), which legislation was signed April 26, 2018, after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

139.   Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

a.   Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

b.   The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.   The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT VI

### THE COMPACTS AUTOMATICALLY RENEWED BECAUSE THE STATE AUTHORIZED THE USE OF DICE AND ROULETTE WHEELS

140.    The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

141.    On April 10, 2018, Governor Fallin approved Oklahoma House Bill 3375, sometimes referred to as the "ball-and-dice bill," which specifically permitted non-electronic non-house banked ball and dice table games, but simultaneously struck general the prohibition on the use of dice or wheels:  "This act shall not permit the operation of slot machines, ~~dice games, roulette wheels,~~ house-banked card games, house-banked table games involving dice or roulette wheels, or games where winners are determined by the outcome of a sports contest"  Okla. H.B. 3375 § 1 (2018) (amending 3A O.S. § 262(H)) ("HB 3375") (strikeout and underline in original).

142.    As a result of HB 3375, it is now lawful for tribal casinos and organization licensees to employ electronic covered games that incorporate dice and wheels not previously permitted.

143.    "At that time" (January 1, 2020), organization licensees and tribes were authorized to conduct "electronic gaming in any form" (electronic games incorporating previously forbidden dice and roulette wheel elements) as a result of HB 3375 ("governmental action of the state"), which legislation was approved April 10, 2018, after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

144.   Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

a.   Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

b.   The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.   The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT VII

**THE COMPACTS AUTOMATICALLY RENEWED BECAUSE THE STATE EXPANDED GAMING HOURS FOR ORGANIZATION LICENSEES**

145.   The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

146.   On April 26, 2017, the Oklahoma Governor signed House Bill 1836 ("HB 1836"), which authorized organization licensees to conduct electronic gaming 24 hours per day, 7 days a week (except Christmas Day).

147.    HB 1836 removed the limits on hours that organization licenses could conduct electronic gaming.

148.    Before HB 1836, which went into effect July 1, 2017, organization licensees could only conduct authorized gaming for 18 hours in any day and 106 hours during any week.

149.    This change to the law authorized 2,184 additional hours of electronic gaming on an annual basis that was previously prohibited.

150.    For Remington Park alone, this amounts to an expansion of electronic gaming of its 750 permitted games[6] by more than 3,200 hours per year – the equivalent of at least 2,400,000 additional machine-hours of play per year.  Thus, this change in the law presents the opportunity for substantial additional gaming revenue and marked a significant expansion of electronic gaming by the State.

151.    "At that time" (January 1, 2020), organization licensees were authorized to conduct "electronic gaming in any form" ("authorized games" 3A O.S. § 269(1)) for more hours on more days as a result of HB 1836 ("governmental action of the state"), which legislation was approved April 26, 2017, after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

152.    Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

---

[6] See 3A O.S. § 262(C)(1)-(2).

a.   Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

b.   The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.   The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT VIII

**THE COMPACTS AUTOMATICALLY RENEWED BECAUSE THE STATE AUTHORIZED TWO TRIBES TO CONDUCT ELECTRONIC GAMING ON LANDS TO BE ACQUIRED BY THE UNITED STATES IN TRUST**

153.   The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

154.   Under IGRA, three avenues exist for a tribe to conduct gaming on lands acquired after October 17, 1988. *See* 25 U.S.C. § 2719(a)–(b) ("gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust … unless … .").

155.   One of those avenues is the "two-part determination" of 25 U.S.C. § 2719(b)(1)(A).   First, the Secretary of the Interior must determine "that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and

its members, and would not be detrimental to the surrounding community." *Id.* Second, the gaming may occur "only if the Governor of the State … concurs in the Secretary's determination." *Id.*

156.   The Oklahoma Governor has twice approved tribal gaming land acquisitions, most recently on March 3, 2017, and earlier on May 23, 2013, for the Shawnee Tribe and Kaw Nation, respectively.   Letter from Governor Mary Fallin to Kevin K. Washburn, Assistant Secretary – Indian Affairs, United States Department of the Interior (May 23, 2013),         https://www.indianaffairs.gov/sites/bia.gov/files/assets/public/oig/pdf/idc1-025822.pdf) (last visited Feb. 13, 2020) (Kaw Nation); *see* Governor Mary Fallin, News Room, *Gov. Fallin Approves Shawnee Tribe's Proposal to Build Casino near Guymon* (Mar.                            7,                          2017), http://www.ppb.state.ok.us/triton/modules/newsroom/newsroom_article.php?id=223&article_id=29806 (last visited Feb. 13, 2020) ("Governor Mary Fallin today announced she has concurred with the findings of a federal agency giving permission to the Shawnee Tribe to build a casino near Guymon.") (Shawnee Tribe).

157.   For the Shawnee Tribe, prior to its property acquisition – and at the time the Act was approved by referendum – the Tribe had no land base in Oklahoma at all on which to conduct electronic gaming.   "Absent the Governor's concurrence[s], no tribal gaming could occur." *See* Letter from Ryan K. Zinke, Secretary of the Interior, to The Honorable Ron Sparkman, Chief, Shawnee Tribe, at 7 (Jan. 19, 2018).

158.    For Kaw Nation, the Governor's concurrence permitted an off-reservation gaming acquisition, allowing the Nation to conduct electronic gaming outside of its former reservation boundaries.

159.    Thus, on January 1, 2020, the Shawnee Tribe and Kaw Nation were authorized to conduct electronic gaming pursuant to the Governor of Oklahoma's authorization of land acquisitions under IGRA – acquisitions that were intended and approved expressly and explicitly for the conduct of electronic gaming –  and without which, the tribes could not have conducted electronic gaming on these particular tracts of land.

160.    The Governor took these governmental actions well after the effective date of the Wichita Tribe's Compact.

161.    "At that time" (January 1, 2020), Kaw Nation and the Shawnee Tribe ("others") were authorized to conduct "electronic gaming in any form" ("covered games" under the Compact) as a result of the State's authorization of trust land acquisitions ("governmental action of the state"), which authorization occurred after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

162.    Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

>    a.    Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

b.     The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.     The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT IX

### THE COMPACTS AUTOMATICALLY RENEWED BECAUSE THE STATE AUTHORIZED LIQUOR STORES TO BECOME LOTTERY RETAILERS

163.   The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

164.   On November 8, 2016, Oklahoma voters passed State Question 792 ("SQ 792"), which for the first time permitted liquor stores "to sell at retail any item that may be purchased at a grocery store or convenience store," including lottery tickets.  37A O.S. § 2-156(C).

165.   Even before SQ 792 went into effect on October 1, 2018, the OLC actively recruited liquor stores as potential retailers.  *See* OLC, *Board of Trustees Meeting Minutes* (Sep. 18, 2018) ("[OLC Executive Director] Redburn gave an update on liquor store recruitment … most liquor stores are taking a wait-and-see approach [regarding SQ 792].")

166.    As of June 25, 2019, "the Lottery [had] twenty-six active liquor stores contracted to sell lottery products."  OLC, *Board of Trustees Meeting Minutes* at 3 (June 25, 2019).

167.    Thus, liquor stores, which previously were prohibited from conducting electronic lottery gaming, are now expressly authorized to conduct electronic lottery gaming, constituting an entirely new class of entities who are authorized to offer such electronic gaming (and are subject to annual authorization by the OLC).

168.    "At that time" (January 1, 2020), liquor stores ("others") were authorized to conduct "electronic gaming in any form" (electronic lottery gaming) as a result of the passage of SQ 792 ("governmental action of the state"), which legislative referendum occurred November 8, 2016, after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

169.    Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

        a.      Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

        b.      The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

   c.     The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT X

### THE COMPACTS AUTOMATICALLY RENEWED BECAUSE OF A FEDERAL COURT ORDER AUTHORIZING THE IOWA TRIBE TO CONDUCT ELECTRONIC INTERNET GAMING

170.    The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

171.    On April 18, 2016, the U.S. District Court for the Western District of Oklahoma entered an order certifying an arbitration award in favor of the Iowa Tribe of Oklahoma, to which the State did not object. *Iowa Tribe of Oklahoma v. Oklahoma*, 2016 WL 1562976 (W.D. Okla. 2016).

172.    The arbitration award that "If an authorized "covered game" is properly certified for operation as an Internet game the Tribe may conduct the game on its lands[.]" *Iowa Tribe of Oklahoma v. Oklahoma*, Case No. CV-2015-0137, Exhibit 1 to Complaint, Doc. 1-1 at 28 (W. D. Okla., filed Dec. 23, 2015).

173.    The matter began in September 2015 when the Iowa Tribe "sent a letter to the state serving notice of the Tribe's intent to pursue internet gaming as a covered game under the Gaming Compact." *Iowa Tribe*, 2016 WL 1562976 at *1.

174.    As proposed, the Iowa Tribe would offer electronic games otherwise covered by the Compact via the Internet to individuals residing outside the United States.

175.   A week later, Oklahoma expressed its "intent to refer [the] matter to arbitration for a determination on whether or not the internet gaming [the Tribe] described [was] permissible under the terms of the Compact." *Id.* (middle alteration in original).

176.   The State did not contest the Iowa Tribe's position.

177.   In November 2015, the arbitrator issued an award in favor of the Iowa Tribe, concluding the internet gaming described was covered under the Compact.

178.   The Iowa Tribe then sought confirmation of the award in federal court, which Oklahoma did not oppose.

179.   On April 18, 2016, the federal district court certified the arbitration award pursuant to an unopposed motion for summary judgment filed by the Iowa Tribe.

180.   The 2016 court order is a court order authorizing internet gaming as of January 1, 2020, (or electronic gaming in any form) that was entered after the effective date of the Compacts.  Therefore, by the express terms of the Compact, that order supported the renewal terms in the Compacts.

181.   "At that time" (January 1, 2020), the Iowa Tribe ("others") was authorized to conduct "electronic gaming in any form" (electronic gaming via the internet) of a court order ("governmental action of the state or court order"), which court order was entered April 18, 2016, after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

182.   Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

a.   Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

b.   The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.   The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT XI

**THE COMPACTS AUTOMATICALLY RENEWED BECAUSE THE STATE OPERATES ELECTRONIC GAMING DEVICES**

183.   The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

184.   As discussed above, the conduct of the State's Lottery is generally electronic in nature.

185.   Augmenting the electronic nature of the online game is the implementation of lottery kiosks, or "Player Central Terminals" or "PCTs." *See* OLC, *Board of Trustees Minutes* at 2 (Apr. 18, 2006).

a.   These lottery kiosks are electronic self-service gaming machines that allow a player to purchase online and instant "scratcher" games without any clerk assistance. *See* Okla. Admin. Code 429:10-1-2; 429:15-1-2; and 429:20-1-2 ("Play Central Lottery Kiosk"); OLC, *Retailer Advisory Board (RAB) Minutes* at 4 (Feb. 8, 2012) (noting that "the PCT was great for selling online tickets like Pick 3 and 4").

b.   The date kiosks first went into service is unclear, but appears to be on or about April of 2016.  "Mr. Scroggins pointed out a Player Activated Terminal (PAT) at the back of the room and offered to demonstrate its function following the meeting. He stated that PAT's are primarily designed for the grocery store environment, and that 12 machines have been placed in various Homeland Stores as a pilot project . . ." OLC meeting minutes, April 18, 2016.

186.   Game play using the kiosks is as follows:

a.   A player inserts credits, in the form of cash or by scanning winning lottery tickets, and may purchase scratcher games or entries for one of the online games.

b.   The player may then reveal the scannable barcode on scratcher tickets, scan them at the kiosk and, if they are winners, the player may select, through the touch-activated screen, to "Keep Playing," with the winnings having been added to the player's balance on the machine,

or "Cash Out Now," in which case the player's balance will print on a voucher redeemable for cash.

187.    Almost every aspect of game play utilizing a kiosk is electronic, involving a touchscreen video interface, in an electronic environment.  Although the "scratchers" themselves are paper, they may be played and redeemed instantly and electronically utilizing unique barcodes and scanners built into the machines that identify the individual ticket and its winning value.

188.    Thus, the OLC has authorized deployment of electronic gaming machines for use by the public.

189.    "At that time" (January 1, 2020), lottery retailers licensed by the OLC were authorized to conduct "electronic gaming in any form" (electronic lottery gaming) utilizing electronic lottery kiosks deployed by the OLC ("governmental action of the state"), which deployment began on or about April of 2016, after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

190.    Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

      a.    Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

b.     The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.     The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT XII

### THE COMPACTS AUTOMATICALLY RENEWED BECAUSE THE STATE AUTHORIZED THE CHEYENNE AND ARAPAHO TRIBES TO CONDUCT INTERNET-BASED ELECTRONIC GAMING

191.    The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

192.    On September 12, 2013, the Oklahoma Governor signed the "*First Amended Settlement Agreement between the State of Oklahoma and the Cheyenne-Arapaho Tribes* ("Settlement Agreement") (filed with the Oklahoma Secretary of State on September 13, 2013.).

193.    The Settlement Agreement stems from the Cheyenne and Arapaho Tribes operating a website that, according to Oklahoma, "materially violated the State Tribal Gaming Compact."  Settlement Agreement at 1.

a.     The Settlement Agreement contained material changes to the Model Gaming Compact, including the addition of a termination provision.

b.     The Settlement Agreement further extended an offer to other tribes to enter into similar agreements with the State under the same terms.

194.   The U.S. Department of the Interior determined the Settlement Agreement constituted an amendment to the Cheyenne and Arapaho Tribes' Compact by "*expanding the scope of games the Tribe is currently operating to include internet gaming* as part of the Compact's covered games." *Id.* at 1 (emphasis added). Letter from Kevin K. Washburn, Assistant Secretary-Indian Affairs, U.S. Dep't of the Interior, to Honorable Janice Prairie Chief-Boswell, Governor, Cheyenne and Arapaho Tribes, (Nov. 6, 2013).

195.   The Assistant-Secretary disapproved the Agreement (as a proposed amendment to the Compact) because the State had not offered a meaningful concession in exchange for fees. *Id.* at 2. Essentially, by permitting gaming by players outside the United States, the State could not offer exclusivity. Id.

196.   The State rejected the Department of the Interior's disapproval and advised, the Cheyenne and Arapaho Tribes that, pursuant to State authority, as opposed to federal authority, the Cheyenne and Arapaho Tribes were authorized to conduct "all forms of internet and/or electronic gaming" described in the Settlement Agreement. Specifically, following the Department of the Interior's disapproval letter, Oklahoma sent a letter to the Cheyenne and Arapaho Tribes, stating:

> We disagree with the Assistant Secretary that concessions from the State are … "illusory." … In the Governor's view, the State Tribal Gaming Act … fully authorized the Amended Settlement and igaming directed to an international market contemplated by the parties.

Letter from Steven K. Mullins, General Counsel, Office of Governor Mary Fallin to Governor Janice Prairie-Chief Boswell (Dec. 9, 2013).

197.    The letter concluded by saying the terms of the Amended Settlement, "in the State's view remain in effect, notwithstanding the purported decision taken by the Assistant Secretary for Indian Affairs." *Id.*

198.    Thus, the State's last articulated position is that the Cheyenne and Arapaho Tribes remain authorized to engage in internet-based electronic gaming pursuant to the Settlement Agreement entered into by Governor Fallin.

199.    "At that time" (January 1, 2020), the Cheyenne and Arapaho Tribes ("others") were authorized to conduct "electronic gaming in any form" (electronic gaming via the internet) as a result of state authorization ("governmental action of the state"), which authorization occurred on or about September 12, 2013, after the effective date of the Wichita Tribe's Compact (and the other Plaintiff Tribes' Compacts).

200.    Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

    a.    Part 15(B)'s requirements have been satisfied by the actions of the State alleged in this Count, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

    b.    The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.   The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

## COUNT XIII

### THE STATE HAS VIOLATED THE EXCLUSIVITY PROVISIONS UNDER PART 11.A OF THE COMPACT

201.   The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

202.   Subparagraph A of Part 11 of the Compact ("Part 11A") provides that, in exchange for the substantial exclusivity granted the tribes under the Compact, the tribes will make certain payments to the State, and that the payments will continue ONLY for so long as the State does not violate that exclusivity.   Specifically, Part 11.A provides as follows:

> The parties acknowledge and recognize that this Compact provides tribes with substantial exclusivity and, consistent with the goals of IGRA, special opportunities for tribal economic opportunity through gaming within the external boundaries of Oklahoma in respect to the covered games.   In consideration thereof, so long as the state does not change its laws after the effective date of this Compact to permit the operation of any additional form of gaming by any such organization licensee, or change its laws to permit any additional electronic or machine gaming within Oklahoma, the tribe agrees to pay the following fees:

203.   The State of Oklahoma has violated the exclusivity provision contained in subparagraph A of Part 11 of the Compact ("Part 11.A") by permitting the operation of

additional forms of gaming and changing its laws to permit additional electronic gaming, for example, by the passage of HB 3538.

204.   Subparagraph E of Part 11 ("Part 11.E") of the Compact provides that the State shall be liable for damages in the event it violates provisions Part 11.A.  Part 11.E specifically provides as follows:

> In consideration for the covenants and agreements contained herein, the state agrees that it will not, during the term of this Compact, permit the nontribal operation of any machines or devices to play covered games or electronic or mechanical gaming devices otherwise presently prohibited by law within the state in excess of the number and outside of the designated locations authorized by the State-Tribal Gaming Act.  The state recognizes the importance of this provision to the tribe and agrees, in the event of a breach of this provision by the state, to require any nontribal entity which operates any such devices or machines in excess of such number or outside of the designated location to remit to the state at least quarterly no less than fifty percent (50%) of any increase in the entities' adjusted gross revenues following the addition of such excess machines.  The state further agrees to remit at least quarterly to eligible tribes, as liquidated damages, a sum equal to fifty percent (50%) of any increase in the entities' adjusted gross revenues following the addition of such excess machines.  For purposes of this Part, "eligible tribes" means those tribes which have entered into this Compact and are operating gaming pursuant to this Compact within forty-five (45) miles of an entity which is operating covered game machines in excess of the number authorized by, or outside of the location designated by, the State-Tribal Gaming Act.  Such liquidated damages shall be allocated pro rata to eligible tribes based on the number of covered game machines operated by each Eligible Tribe in the time period when such adjusted gross revenues were generated.

205.   As a result of the State's ongoing violation of Part 11.A of the Compact, the Wichita Tribe is entitled to a permanent injunction prohibiting the State from violating Part

11.A. of the Compact and a declaration that the Wichita Tribe is entitled to damages from the State pursuant to Part 11.E of the Compact during the period of violation.

## COUNT XIV

### THE GOVERNER HAS BREACHED HIS OBLIGATION TO DEFEND THE VALIDITY OF THE COMPACT

206.   The Wichita Tribe incorporates by reference the facts alleged in the preceding paragraphs as if fully set forth herein.

207.   Pursuant to Section 13(B) of the Compact, the State is bound by an obligation to defend the validity of the Compact and its enabling legislation:

> Each party hereto agrees to defend the validity of this Compact and the legislation in which it is embodied. This Compact shall constitute a binding agreement between the parties and shall survive any repeal or amendment of the State-Tribal Gaming Act.

3A O.S. § 281, Part 13(B).

208.   Further, the Governor is charged with faithfully executing the State's laws:

> The Governor shall cause the laws of the State to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States, and he shall be a conservator of the peace throughout the State.

Okla. Const. Art. 6, sec. 8.

209.   By failing to uphold the continued validity of the Compacts, the Governor has breached both the State's obligation to defend the Compacts and violated his constitutional duty to faithfully execute the State's laws.

210.   Accordingly, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

    a.   As a result of the Governor's actions, the State has breached its obligation to defend the validity of the Compacts under 3A O.S. § 281, Part 13(B).

    b.   The Governor has failed to faithfully execute the State's laws as required by Article 6, Section 8 of the Oklahoma Constitution.

## PRAYER FOR RELIEF

WHEREFORE, the Wichita Tribe respectfully prays for a judgment in its favor and against the Defendant as follows:

1.   First, the Wichita Tribe is entitled to and prays for a declaratory judgment in its favor and against the Defendant as follows:

    a.   Part 15(B)'s requirements have been satisfied by the actions of the State alleged herein, and the Compacts accordingly automatically renewed by their terms and by operation of law effective January 1, 2020.

    b.   The Wichita Tribe is, therefore, entitled under Federal law to continue its conduct of Class III gaming activities under its Compact on and after January 1, 2020.

c.     The Governor's contentions that the Compacts terminated on January 1, 2020, and that it is unlawful for compacting tribes to conduct Class III gaming activities after that date, is wrong as a matter of law.

    i.    As a result of the Governor's actions, the State has breached its obligation to defend the validity of the Compacts under 3A O.S. § 281, Part 13(B).

    ii.    The Governor has failed to faithfully execute the State's laws as required by Article 6, Section 8 of the Oklahoma Constitution.

d.     The State of Oklahoma has violated the exclusivity provision contained in subparagraph A of Part 11 of the Compact ("Part 11.A") by permitting the operation of additional forms of gaming and changing its laws to permit additional electronic gaming and, as a result, the Wichita Tribe is under no legal obligation to continue the payment of the fees otherwise required under Part 11.A of the Compact.

e.     As a result of the State's ongoing violation of Part 11.A of the Compact, the Wichita Tribe is entitled to a permanent injunction prohibiting the State from violating Part 11.A. of the Compact and a declaration that the Wichita Tribe is entitled to damages from the State pursuant to Part 11.E of the Compact during the period of violation.

2. Second, to the extent not prayed for herein, the Wichita Tribe joins in the prayers for relief contained in the Complaints filed by the Plaintiff Tribes and the other Intervenor Plaintiffs.

3. Additionally, the Wichita Tribe prays for an award of all costs of suit and attorney fees, plus all additional and further relief to which it is entitled both at law and in equity.

Respectfully submitted,

March 17, 2020                        HOBBS, STRAUS, DEAN & WALKER, LLP


By:   /s/ Michael D. McMahan
      William R. Norman, OBA No. 14919
          wnorman@hobbsstraus.com
      Michael D. McMahan, OBA No. 17317
          mmcmahan@hobbsstraus.com
      W. Gregory Guedel, OBA No. 33317
          gguedel@hobbsstraus.com
      Zachary T. Stuart, OBA No. 32517
          zstuart@hobbsstraus.com

      101 Park Avenue, Suite 700
      Oklahoma City, Oklahoma 73102
      (405) 602-9425
      (405) 602-9426 fax

      ATTORNEYS FOR INTERVENOR-PLAINTIFF
      WICHITA AND AFFILIATED TRIBES

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 17, 2020, a true and correct copy of the above and foregoing with exhibits (if applicable) was served on the following via the Court's ECF system:

**Attorneys for Plaintiffs**
Douglas Endreson
dendreson@sonosky.com

Robert Henry
rh@rhhenrylaw.com

Sara Hill
sara-hill@cherokee.org

Frank Holleman
fholleman@sonosky.com

Stephen Greetham
stephen.greetham@chickasaw.net

Bradley Mallett
bmallett@choctawnation.org

**Attorneys for Defendant**
Daniel Webber, Jr.
dwebber@ryanwhaley.com

Jeffrey Cartmell
jeffrey.cartmell@gov.ok.gov

Mark Burget
mark.burget@gov.ok.gov

Matthew Felty
mkfelty@lytlesoule.com

Matthew Kane
mkane@ryanwhaley.com

Patrick Pearce, Jr.
rpearce@ryanwhaley.com

Phillip Whaley
Pwhaley@ryanwhaley.com

Steven Mullins
mullins@lytlesoule.com

**Attorneys for Intervenor-Plaintiffs**
George Wright
george.wright@potawatomi.org

Gregory Quinlan
gquinlan@potawatomi.org

Charles Birnie
abirnie@cwlaw.com

Robert Carter
dcarter@cwlaw.com

Roger Wiley
rwiley@mcnag.com

Leslie Taylor
leslietaylorlaw@gmail.com

Robert Rosette
rosette@rosettelaw.com

Jason Aamodt
jason@iaelaw.com

Stephen Ward                          Matthew Alison
sward@cwlaw.com                       matthew@iaelaw.com

Stuart Campbell                       Dallas Dale Strimple
scampbell@dsda.com                    dallas@aamodt.biz

Kyle Haskins
khaskins@mcnag.com

                                      */s/ Michael D. McMahan*
                                      Michael D. McMahan