**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| THE CHEROKEE NATION,<br>THE CHICKASAW NATION, and<br>THE CHOCTAW NATION, | )<br>)<br>)<br>) | |
|     Plaintiffs, | )<br>) | |
| and | )<br>) | |
| THE CITIZEN POTAWATOMI NATION,<br>THE MUSCOGEE (CREEK) NATION,<br>THE QUAPAW NATION,<br>THE DELAWARE NATION,<br>THE COMANCHE NATION,<br>THE SEMINOLE NATION,<br>THE OTOE-MISSOURIA TRIBE, and<br>THE WICHITA AND AFFILIATED TRIBES, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
|     Plaintiffs/Intervenors, | )<br>) | |
| vs. | )<br>) | Case No. CIV-19-1198-D |
| J. KEVIN STITT, in his official capacity as<br>the Governor of the State of Oklahoma, and<br>*ex rel.* STATE OF OKLAHOMA, as the real<br>party in interest, | )<br>)<br>)<br>)<br>) | |
|     Defendants/Counterclaimants. | )<br>) | |

---

**OKLAHOMA'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN SUPPORT REGARDING PART 15(B) EXPIRATION OF THE
COMPACTS AT ISSUE**

---

PHILLIP G. WHALEY, OBA NO. 13371
DANIEL G. WEBBER, JR., OBA NO. 16332
PATRICK R. PEARCE, JR., OBA NO. 18802
MATTHEW C. KANE, OBA NO. 19502
**RYAN WHALEY**
400 North Walnut Avenue
Oklahoma City, OK  73104
Telephone:  (405) 239-6040
Facsimile:  (405) 239-6766
pwhaley@ryanwhaley.com
dwebber@ryanwhaley.com
rpearce@ryanwhaley.com
mkane@ryanwhaley.com

*-and-*

STEVEN K. MULLINS, OBA NO. 6504
MATTHEW K. FELTY, OBA NO. 31057
**LYTLE, SOULÉ & FELTY, P.C.**
1200 Robinson Renaissance
119 N. Robinson Ave.
Oklahoma City, OK 73102
Telephone:  (405) 235-7471
Facsimile:  (405) 232-3852
mullins@lytlesoule.com
mkfelty@lytlesoule.com

*-and-*

MARK E. BURGET, OBA NO. 1326
JEFFREY C. CARTMELL, OBA NO. 31012
**STATE OF OKLAHOMA, OFFICE OF THE GOVERNOR**
2300 N. Lincoln Boulevard, Suite 212
Oklahoma City, OK  73105
Telephone:  (405) 521-2342
mark.burget@gov.ok.gov
jeffrey.cartmell@gov.ok.gov

**ATTORNEYS FOR J. KEVIN STITT,
AS GOVERNOR OF THE STATE OF OKLAHOMA, AND *EX REL.* THE STATE OF
OKLAHOMA**

# **TABLE OF CONTENTS**

THE GRAND BARGAIN ............................................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 6

ARGUMENT AND AUTHORITIES ............................................................ 9

  I.   Gaming Compacts are Subject to Rules of Contract Interpretation.........................10

  II.  The Plain Language of Each Compact Requires Enforcement of the Fifteen-Year Term, Expiring January 1, 2020.................................................................................13

  III. Contracts of Indefinite Duration are Terminable at Will by Either Party. ..............18

  IV. The Renewal Provision of the Compact has not been Triggered............................19

      A.  Question 1 - Are organization licensees or others authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing as of January 1, 2020?.....................................................................21

      B.  Question 2  - Does the authority to conduct electronic gaming derive from some governmental action of the State or court order?.....................................29

      C.  Question 3 -  Did the action that is the source of the authority occur following the effective date of the Compact? .....................................................35

  V.  The State Should be Excused from Continued Performance of the Compacts Because of the Tribes' Material Breach of "Clause 3" of Part 15(B)......................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

2001 OK AG 5 .............................................................................................................. 31

*Adams v. Professional Practices Comm'n,*
    1974 OK 88, 425 P.2d ............................................................................................ 31

*Am. Greyhound Racing, Inc. v. Hull,*
    305 F.3d 1015 (9th Cir. 2002) ............................................................................... 15

*Arizona v. Tohono O'odhom Nation,*
    No. CV11-0296-PHX-DGC, 2011 WL 2357833 (D. Ariz. June 15, 2011) ................ 10

*Astro-Space Labs., Inc. v. United States,*
    470 F.2d 1003 (Ct. Cl. 1972).................................................................................. 12

*Barseback Kraft AB v. United States,*
    121 F.3d 1475 (Fed. Cir. 1997) .............................................................................. 11

*Biodiversity Associates v. Cables,*
    357 F.3d 1152 (10th Cir. 2004) ........................................................................ 32, 33

*Bowen v. Public Agencies Opposed to Social Security Entrapment,*
    477 U.S. 41 (1986)................................................................................................. 32

*Boydston v. State,*
    1954 OK 327, 277 P.2d 138 ................................................................................... 31

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,*
    618 F.3d 1066 (9th Cir. 2010) ............................................................................... 11

*Chemehuevi Indian Tribe v. Newsom,*
    919 F.3d 1148 (9th Cir. 2019)................................................................................ 15

*Choctaw Nation of Oklahoma v. Oklahoma,*
    724 F. Supp. 2d 1182 (W.D. Okla. 2010) ............................................................... 13

*Citizen Potawatomi Nation v. Oklahoma,*
    881 F.3d 1226 (10th Cir.)..................................................................... 10, 11, 13, 14

*City of Sand Springs v. Dep't of Pub. Welfare,*
    1980 OK 36, 608 P.2d 1139 ................................................................................... 24

*Cont'l Am. Corp. v. Barton,*
    932 F.2d 981, 1991 WL 66046 n.3 (Fed. Cir. 1991) ................................................ 18

*Dairyland Greyhound Park, Inc. v. Doyle,*
    719 N.W.2d 408 (Wis. 2006) ................................................................................. 15

*Dunn v. Birmingham Stove & Range Co.,*
    1935 OK 107, 44 P.2d 88 ....................................................................................... 19

*Enron Fed. Sols., Inc. v. United States,*
    80 Fed. Cl. 382 (2008) ....................................................................................... 38, 39

*Franconia Assocs. v. United States,*
    61 Fed. Cl. 718 (2004) ........................................................................................... 11

*Freeport Sulphur Co. v. Aetna Life Ins. Co.*,
    206 F.2d 5 (5th Cir. 1953) ......................................................................... 15
*Gen. Paint Corp. v. Kramer*,
    57 F.2d 698 (10th Cir. 1932) ...................................................................... 18
*Graves v. People of State of New York ex rel. O'Keefe*,
    306 U.S. 466 (1939) .................................................................................... 30
*Griffith v. Choctaw Casino of Pocola*,
    2009 OK 51, , 230 P.3d 488 ................................................................ 3, 6, 13
*H & R Block Tax Servs. LLC v. Franklin*,
    691 F.3d 941 (8th Cir. 2012) (franchise agreement with successive automatic renewals
    could not be enforced ................................................................................. 17
*Hansen Bancorp, Inc. v. United States*,
    67 Fed. Cl. 411 (2005) ................................................................................ 38
*Higby Crane Serv., LLC v. Nat'l Helium, LLC*,
    751 F.3d 1157 (10th Cir. 2014) .................................................................... 1
*Holt v. St. Louis Union Tr. Co.*,
    52 F.2d 1068 (4th Cir. 1931) ...................................................................... 15
*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934) .................................................................................... 32
*Iowa Tribe of Oklahoma v. State of Oklahoma*, 5:15-CV-01379-R,
    2016 WL 1562976 (W.D. Okla. Apr. 18, 2016) ......................................... 35
January 1, 2020. *See, e.g. Fiorino v. Qwest Employees Benefit Comm.*, 08CV1082
    MCA/RLP,
    2010 WL 11602776 (D.N.M. Mar. 18, 2010) ..................................... 21, 22
*Lee v. Conocophillips Co.*,
    No. CIV-14-1391-D, 2016 WL 67803 (W.D. Okla. Jan. 5, 2016) ............... 16
*M & G Polymers USA, LLC v. Tackett*,
    574 U.S. 427 (2015) .................................................................................... 15
*Marley v. Cannon*,
    1980 OK 147, 618 P.2d 401 ....................................................................... 31
*Merrion v. Jicarilla Apache Tribe*,
    455 U.S. 130 (1982) .................................................................................... 32
*Miller v. Gonzales*,
    2010 OK CIV APP 56, 239 P.3d 163 .......................................................... 24
*Miller v. Miller*,
    134 F.2d 583 (10th Cir. 1943) .................................................................... 18
*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018) ......................................................................... 23, 24
*Navajo Nation v. Dalley*,
    896 F.3d 1196 (10th Cir. 2018) .................................................................... 2
*New Moon Shipping Co. v. MAN B & W Diesel AG*,
    121 F.3d 24 (2d Cir. 1997) ......................................................................... 12

*Panzer v. Doyle*,
　680 N.W.2d 666 (Wis. 2004) ............................................................. 18
*Pauma Band of Luiseno Mission Indians v. California*,
　813 F.3d 1155 (9th Cir. 2015) ............................................................ 11
*Preferred Physicians Mut. Mgmt. Grp., Inc. v. Preferred Physicians Mut. Risk Retention Grp., Inc.*,
　961 S.W.2d 100 (Mo. Ct. App. 1998)................................................. 15, 17
*Priddy v. City of Tulsa*,
　1994 OK CR 63, 882 P.2d 81 .............................................................. 24
*Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*,
　36 U.S. 420 (1837)................................................................................ 31
*Providence Bank v. Billings*,
　29 U.S. 514 (1830)................................................................................ 31
*Pueblo of Isleta v. Grisham*,
　No. CV 17-654 KG/KK, 2019 WL 1429586 (D.N.M. Mar. 30, 2019)...... 10
*Pueblo of Santa Ana v. Kelly*,
　104 F.3d 1546 (10th Cir. 1997) .......................................................... 10, 11
*R. S. Mikesell Associates v. Grand River Dam Authority*,
　627 F.2d 211 (10th Cir. 1980) ............................................................. 18
*Resolution Tr. Corp. v. Fed. Sav. & Loan Ins. Corp.*,
　25 F.3d 1493 (10th Cir. 1994) ............................................................. 39
*Roye Realty & Dev., Inc. v. Watson*,
　1996 OK 93, 2 P.3d 320 ...................................................................... 17
*Seminole Tribe of Florida v. Florida*,
　517 U.S. 44 (1996)................................................................................ 26
*Stoltz, Wagner & Brown v. Cimarron Expl. Co.*,
　564 F. Supp. 840 (W.D. Okla. 1981) ................................................... 39
*Texas v. New Mexico*,
　482 U.S. 124 (1987).............................................................................. 10
*Tohono O'odham Nation*,
　818 F.3d.............................................................................................. 11
*Town of Readsboro v. Hoosac Tunnel & W.R. Co.*,
　6 F.2d 733 (2d Cir. 1925).................................................................... 15
*United States v. Brye*,
　146 F.3d 1207 (10th Cir. 1998) .......................................................... 15
*United States v. Cherokee Nation of*,
　Okla., 480 U.S. 700 (1987) ................................................................. 32
*United States v. Turley*,
　878 F.3d 953 (10th Cir. 2017) ............................................................. 11
*Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*,
　310 U.S. 32 (1940)................................................................................ 32
*Walker v. Builddirect.Com Techs. Inc.*,
　2015 OK 30, 349 P.3d 549 .................................................................. 12

iv

*Webco Indus., Inc. v. Diamond*,
  No. 11-CV-774-JHP-FHM, 2012 WL 5995740 (N.D. Okla. Nov. 30, 2012) .............. 39

Statutes

18 U.S.C. §§ 1166-1168 ........................................................................ 12
25 U.S.C. § 2701 .................................................................................... 2
25 U.S.C. § 2710(d) ................................................................................ 3
25 U.S.C. §§ 2702(2), 2710(d)(1)(B) & (3)(A) .................................... 2
25 U.S.C. §§ 2710(d)(8)(A-C) ............................................................ 12
25 U.S.C.A. § 2710(d)(2)(D) ............................................................... 16

Regulations

Okla. Admin. Code § 325:1-1-3 .......................................................... 26
Okla. Admin. Code § 325:80-1-1 .................................................... 26, 33
Okla. Admin. Code 325:80-7-1(a) .................................................. 33, 34

Other Authorities

11 Williston on Contracts § 30:25 (4th ed. 1999) ............................... 12
70 Fed. Reg. 18,041 ................................................................................ 7
70 Fed. Reg. 21,440 ................................................................................ 7
70 Fed. Reg. 31,499 ................................................................................ 7
70 Fed. Reg. 3942 ................................................................................... 7
70 Fed. Reg. 6725 ................................................................................... 7
70 Fed. Reg. 6903 ................................................................................... 7
71 Fed. Reg. 53,706 ................................................................................ 7
H.B. No. 1836 ......................................................................................... 8
H.B. No. 3375 ......................................................................................... 8
Restatement (Second) of Contracts § 241 .......................................... 38
Restatement (Second) of Contracts, § 237 ......................................... 38
S.B. 1512 ................................................................................................. 3
S.B. No. 556 ........................................................................................... 8
S.B. No. 984 ........................................................................................... 8

**Additional References**

Oklahoma Indian Gaming Association, 2016 Annual Impact: State Economic Impacts from
Oklahoma Tribal Government Gaming (October 19, 2016), https://oiga.org/wp-
content/uploads/2018/01/OIGA-Impact-Report-2016.pdf ...................................................3

Office of Management and Enterprise Services, Oklahoma Gaming Compliance Unit
Annual Report (Fiscal Year 2018), https://omes.ok.gov/sites/g/files/gmc316/f/publications/
GameCompAnnReport2018.pdf ..........................................................................................3

Tribal Gaming Compact Between the Chickasaw Nation and the State of Oklahoma, including Secretary of Interior approval and Federal Register Publication (February 8, 2005), https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038409.pdf ..........4

Citizen Potawatomi Nation Off-Track Wagering Compact, including Secretary of Interior approval (January 24, 1997), https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038416.pdf ...............6

Tony Choate, Chickasaw Nation Press Release: Governor Anoatubby Says State of Chickasaw Nation is Strong (October 2, 2010), https://chickasaw.net/News/Press-Releases/Release/Governor-Anoatubby-says-State-of-Chickasaw-Nation-1037.aspx ........8

Office of the Governor - Chickasaw Nation, Locations - Remington Park, https://chickasaw.net/Our-Nation/Locations/Remington-Park.aspx .....................................8

Cherokee Nations Enterprises, Media Advisory: Cherokee Casino Purchases Will Rogers Downs (March 24, 2004), http://www.cherokeeobserver.org/2004/cherokee_casino_purchases_will_rogers_down.htm ....................................................................................8

Cherokee Casino and Hotel, Will Rogers Downs, https://www.cherokeecasino.com/will-rogers-downs ..............................................................................................................8

Letter from Various Tribes to Attorney General Mike Hunter regarding October 28, 2019 (November 5, 2019), https://www.governor.ok.gov/static-assets/documents/gamingcompacts/110519_Tribe_Letter.pdf ..........................................9

Pursuant to the Court's Order of April 23, 2020 (Dkt. No. 122), Defendant/ Counterclaimant J. Kevin Stitt, in his official capacity as Governor of the State of Oklahoma (the "Governor") and *ex rel.* State of Oklahoma (the "State") as the real party in interest (collectively referred to as "Oklahoma") submits this Motion for Partial Summary Judgment and Brief in Support (the "Motion").[1]

Oklahoma's request is simple. The Court should find that the State-Tribal Compacts have expired because the unambiguous language of Part 15(B) of the Compacts provides that they expired on January 1, 2020. *See Higby Crane Serv., LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1160 (10th Cir. 2014) ("Summary judgment on a contract dispute should be granted if the contractual language is unambiguous."). If the Compact renewed on January 1, 2020, as the Tribes contend, the law provides that it has become terminable at will by either party.  Regardless, no governmental action of the State following the entry of the Compacts has caused them to renew. Moreover, even if the Court should find the specified conditions for renewal are satisfied, the Tribes are in material breach of Part 15(B) of the Compacts, by refusing to renegotiate new terms upon request by the Governor, and by conditioning any negotiation on acquiescence to their legal position on renewal. The unambiguous language of the Compact and applicable law as set forth below allow

---

[1] For purposes of this Motion, the original plaintiffs – The Cherokee Nation, The Chickasaw Nation, and The Choctaw Nation – and the intervenor plaintiffs – The Citizen Potawatomi Nation, The Muscogee (Creek) Nation, The Quapaw Nation, The Delaware Nation, The Seminole Nation, and The Wichita and Affiliated Tribes – are collectively referred to as the "Tribes."

only one of these three outcomes at this time – the Compacts have expired, have become terminable at will, or are unenforceable against the State.

*None* of these outcomes ***will extinguish Tribal gaming*** in the State. Tribes will continue to have the right to conduct class II gaming, which is not subject to the Compacts. "Racinos," racetracks that are now owned by Tribal affiliates, will continue to operate electronic gaming. And, moreover, the State has entered into new gaming compacts with the Otoe-Missouria Tribe and the Comanche Nation as the result of the court-ordered mediation. There could be no greater evidence of the State's intent to continue Tribal class III gaming – *i.e.,* "casino games, slot machines, [] horse racing," and all other gaming not expressly identified as class I or class II, *see Navajo Nation v. Dalley*, 896 F.3d 1196, 1200 (10th Cir. 2018). As long as any class III gaming is permitted in the State by anyone, all federally recognized tribes have the right to negotiate class III gaming compacts with the State under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.* IGRA's requirement that "the Indian tribe is the primary beneficiary of the gaming operation," *see* 25 U.S.C. §§ 2702(2), 2710(d)(1)(B) & (3)(A), as well as market and economic forces, will ensure these negotiations occur and are a win-win for all parties. Holding that the Compacts expired on January 1, 2020 assures all parties to future Compacts of the integrity and legal security of the bargains they negotiate, and will ensure the stability of the State's Tribal gaming policy pursuant to IGRA.

## THE GRAND BARGAIN

In 1988, Congress enacted IGRA, which "create[d] a framework for states and Indian tribes to cooperate in regulating on-reservation tribal gaming." *See Navajo Nation*,

896 F.3d at 1200. IGRA provides that class III gaming "shall be lawful on Indian lands only if" certain requirements are met. 25 U.S.C. § 2710(d). One such requirement is that a tribe enters into a "Tribal–State compact" governing such gaming. *Id*., § 2710(d)(3).

In 2003, the State's political leaders set out to find common ground among horse racing groups, federally recognized Indian tribes, and supporters of the state lottery. A deal was made – a "Grand Bargain" – as the various interests aligned. Supporters of education funding would see the creation of a state lottery. Indian tribes and designated racetracks would be authorized to conduct limited class III games; and in return, the State would receive fees that the State determined would largely go toward education.

As part of implementing this Grand Bargain, former Governor Brad Henry negotiated the Model Tribal Gaming Compact ("Model Compact") with various Indian tribes.[2] Subsequently, the Model Compact was incorporated into legislation that became the State-Tribal Gaming Act (the "STGA"), Oklahoma Session Laws 2004, Section 316 (S.B. 1512), codified at 3A O.S. § 261 *et seq*., and approved in a legislative referendum (State Question No. 712); *see generally Griffith v. Choctaw Casino of Pocola*, 2009 OK 51, ¶¶ 12-14, 230 P.3d 488, 493 (describing the enactment history and process).

---

[2] To be clear, the Compact applies only to class III Tribal gaming in Oklahoma. The Tribes' rights to conduct class II gaming are not the subject of the Compact or any State interest. Based on 2016 figures, class II gaming represents approximately 40-50% of the total Tribal gaming revenues in the State, or roughly $2 billion of $4.5 billion. https://oiga.org/wp-content/uploads/2018/01/OIGA-Impact-Report-2016.pdf; https://omes.ok.gov/sites/g/files/gmc316/f/publications/GameCompAnnReport2018.pdf. Additionally, this litigation does not affect the off-track wagering compacts, previously entered into by the State and various Tribes, authorizing those Tribes to conduct class III gaming involving pari-mutuel betting on races in an interstate pool. *See* UMF 1.

Of central importance to the Model Compact was the State's offer of "substantial exclusivity" to compacting tribes. Specifically, the Model Compact guaranteed tribes the right to operate certain class III games with extremely limited competition from nontribal entities – no more than 750 total electronic terminals across no more than three racetracks – as specifically contemplated by the STGA. *See* 3A O.S. § 262(A); 3A O.S. § 281, Part 11(E). In exchange, signatory tribes would agree to pay fees to the State as set forth in the Compact (the "Exclusivity Fees"). *See* 3A O.S. § 281, Part 11(A); *see also* UMF 6.

The litigating Tribes, among others, began executing compacts with the State on November 2, 2004, the date of the referendum.[3] In approving these compacts, the U.S. Department of Interior ("DOI") recognized the significant economic value to tribes afforded by substantial exclusivity. For example, as to the Chickasaw Nation Compact, DOI found that: (1) "the limitations on electronic games at the nearest horseracing track will help the Nation generate an estimated additional $3.75 million over the **fifteen-year life of the Compact**"; and (2) "the prohibition on non-tribal (charitable) gaming will help the Nation generate an estimated additional $60 million over the **fifteen-year course of the Compact**." *See* Chickasaw Compact Approval (emphasis added).[4]

---

[3] Each of the compacts entered by the named Tribes is referred to simply as the "Compact." As it relates to the Court's consideration of the Motion, the language of each Compact is identical to the Model Compact, 3A O.S. § 281, generally cited throughout. An exemplar (the Chickasaw Nation Approval Letter, Compact and publication) (the "Chickasaw Compact Approval") can be found at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038409.pdf.

[4] The State never added to the number of organization licensees or expanded charitable electronic gaming, actions which could have potentially resulted in presumptive renewal of the Compacts.

What the State offered, and the Tribes agreed to, was a guaranteed near-monopoly to develop and grow class III gaming operations.[5] However, this period of substantial exclusivity had an expiration date. Part 15(B) of the Compact provides:

> **This Compact shall have a term which will expire on January 1, 2020**, and at that time, if organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or court order following the effective date of this Compact, the Compact shall automatically renew for successive additional fifteen-year terms; provided that, within one hundred eighty (180) days of the expiration of this Compact or any renewal thereof, either the tribe or the state, acting through its Governor, may request to renegotiate the terms of subsections A and E of Part 11 of this Compact. (Emphasis added).

At the end of 15 years (January 1, 2020), the Compact expired pursuant to the express and unambiguous language of Part 15(B).  The Compacts would automatically renew for successive terms if – and only if – as of that date, the State had taken some affirmative act *after* the effective date of the Compact that authorized electronic gaming operations by nontribal entities.

Part of the Grand Bargain required the Oklahoma Horse Racing Commission ("OHRC") to carry out various administrative functions, such as licensing of a limited number of racetrack operators as organization licensees to conduct on-site gaming.  Absent such activities it would have been impossible to effectuate the Compact.  These efforts by the OHRC cannot constitute "governmental action of the state" referenced in Part 15(B) or there would be no reason to have included that condition to renewal at all, as the

---

[5] Even that limited competition was effectively negated after commercial affiliates for the Chickasaw and Cherokee Nations acquired Remington Park and Will Rogers Downs respectively. In essence, all class III gaming in Oklahoma is now tribal.

implementation of the STGA itself as enacted (which mandated the issuance of such licenses) would have automatically triggered successive renewals.

There is no dispute that the State upheld its end of the Bargain regarding substantial exclusivity, evidenced by the fact that no Tribe contended during the life of the Compact that the State has breached Part 11. Notwithstanding, the Tribes ask this Court to ignore the express terms of the now-expired Compact to find that the State has surrendered its sovereign power to limit the duration of the Compacts (or to terminate them), and thus effectively extended the Tribes' near monopoly on class III gaming in the State in perpetuity – contrary to applicable law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      The State and various tribes have negotiated class III gaming compacts since IGRA was passed by Congress.  *See e.g.,* Citizen Potawatomi Nation Off-Track Wagering Compact, approved by DOI on January 24, 1997, (the "CPN Wagering Compact") https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038416.pdf.

2.      In May 2004, the Oklahoma Legislature approved the STGA (which included the Model Compact), sending it to a vote of the people.  *See* State's Counterclaims [Dkt. No. 15], ¶ 25, which was admitted by the Tribes (*see, e.g.*, Answer, [Dkt. No. 38]); *see also* Complaint [Dkt. No. 1], ¶ 1 & n.1; *see also,* 3A O.S. § 281.

3.      "State Question 712" was passed, and the STGA became law on November 2, 2004. *See id.;* 3A O.S. § 261.

4.      The STGA mandated the OHRC to license organization licensees (racetracks) to conduct electronic gaming if at least four Indian tribes entered into the

Model Compact and such compacts were approved by DOI and published in the Federal Register. *See* 3A O.S. § 262(A).

5.      The STGA placed strict limitations on the number and location of organization licensees that could be licensed and the number and type of electronic gaming machines each organization licensee could operate. *See* 3A O.S. § 262.

6.      The State offered the Model Compact to federally recognized Indian tribes in 2004. *See* Compl., ¶ 1; *see generally* 3A O.S. § 281.

7.      On January 27, 2005, DOI approval of compacts between the State and four (4) Indian tribes was published in the Federal Register. *See* 70 Fed. Reg. 3942.

8.      Each of the Compacts at issue became effective on or after the date of publication in the Federal Register, as follows:

| Tribe | Publication Date | Citation |
|---|---|---|
| Cherokee Nation | January 27, 2005 | 70 Fed. Reg. 3942 |
| Chickasaw Nation | February 8, 2005 | 70 Fed. Reg. 6725 |
| Quapaw Nation | February 8, 2005 | 70 Fed. Reg. 6725 |
| Choctaw Nation | February 9, 2005 | 70 Fed. Reg. 6903 |
| Citizen Potawatomi Nation | February 9, 2005 | 70 Fed. Reg. 6903 |
| Muscogee (Creek) Nation | April 8, 2005 | 70 Fed. Reg. 18,041 |
| Seminole Nation | April 26, 2005 | 70 Fed. Reg. 21,440 |
| Delaware Nation | June 1, 2005 | 70 Fed. Reg. 31,499 |
| Wichita and Affiliated Tribes | September 12, 2006 | 71 Fed. Reg. 53,706 |

*See also* Exemplar Compact at footnote 3 *supra.*

9.      The OHRC issued its first electronic gaming license to an organization licensee on August 11, 2005, and, as mandated by the STGA, has issued gaming licenses each ensuing year. *See* Compl., ¶ 43.

10.     Remington Park, now operated by a commercial affiliate of the Chickasaw Nation, was and continues to be an organization licensee. https://chickasaw.net/News/Press-Releases/Release/Governor-Anoatubby-says-State-of-Chickasaw-Nation-1037.aspx; https://chickasaw.net/Our-Nation/Locations/Remington-Park.aspx. Will Rogers Downs, now operated by a commercial affiliate of the Cherokee Nation, was and continues to be an organization licensee. *See* http://www.cherokeeobserver.org/2004/cherokee_casino_purchases_will_rogers_down.htm; https://www.cherokeecasino.com/will-rogers-downs. These tribal affiliates were the only organization licensees licensed to conduct class III gaming on January 1, 2020. *See Compl.,* ¶¶ 43, 54.

11.     The State has not repealed the STGA. *See* 3A O.S. §§ 261-282.

12.     Since 2004, the State has not amended the STGA to authorize organization licensees or others to conduct electronic gaming. *See* 3A O.S. §§ 261-282. There have been four minor amendments to the STGA since 2004 (none of which authorized electronic gaming by organization licensees):

      a.     S.B. No. 556 (2005) – Permitting manufacturers and distributors to make and store the player terminals used for class III gaming pursuant to the STGA;

      b.     S.B. No. 984 (2007) – Allowing for player terminals in smoking areas;

      c.     H.B. No. 1836 (2017) – Removing certain restrictions on weekly hours of operation for previously authorized gaming at Racinos (which by this time were owned by tribal affiliates); and

      d.     H.B. No. 3375 (2018) – Allowing certain non-electronic gaming (*e.g.*, dice and roulette) by compacting tribes, but expressly excluding such non-electronic gaming by organization licensees.

13.     On July 5, 2019 (within 180 days of January 1, 2020), the Governor sent a letter to compacting tribes invoking Part 15(B) of the Compacts. *See* Counterclaims, ¶ 36; Answer, ¶ 36 (admitting in pertinent part). The tribes did not respond to the letter.

14.     On August 13, 2019, the Governor sent another letter designating Attorney General Mike Hunter as lead negotiator and proposing a September 3, 2019 meeting. *See* Counterclaims, ¶ 39; Answer, ¶ 39 (admitting existence and accuracy of quotes from letter).

15.     On August 28, 2019, the tribes sent a letter acknowledging that the Compact allowed "State or Tribal governments to request a Part 11 renegotiation." *See* Counterclaims, ¶ 40; Answer, ¶ 40 (admitting in pertinent part). The tribes expressly stated: "We continue to look forward to a substantive proposal from the State regarding that part of the compact which may be renegotiated. ***We will consider such a proposal, however, only when the State of Oklahoma affirms the automatic renewal of the [Compact].***" *Id.* (emphasis added); *see also* Answer, ¶ 43 (quoting pertinent language).

16.     Attorney General Hunter meet with various tribes, including the litigating Tribes, on October 28, 2019, to discuss potential resolution.   Such efforts were unsuccessful.  Answer, ¶ 46; *see also* Complaint, ¶ 53, 55;  https://www.governor.ok.gov/static-assets/documents/gamingcompacts/110519_Tribe_Letter.pdf.

## ARGUMENT AND AUTHORITIES

The sole question before the Court on this Motion is the interpretation of Part 15(B) of the Compacts. The Grand Bargain resulted in Compacts with an express 15-year term that expired on January 1, 2020.  The Tribes' interpretation of automatic renewal for

successive terms, results in a Compact that can be terminated after 15 years by either party. Even then, renewal could only occur if the State changed the status quo after it became effective but before its expiration.  This did not happen.  Moreover, the Tribes refused to renegotiate with the State as requested by the Governor (and required by the Compacts), thus foreclosing the Tribes' right to enforce the renewal of the Compact. Thus, Oklahoma is entitled to partial summary judgment.

## I.    Gaming Compacts are Subject to Rules of Contract Interpretation.

Federal courts generally treat compacts as a form of contract. *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1556 (10th Cir. 1997), *quoting Texas v. New Mexico,* 482 U.S. 124, 128 (1987) ("'[a] Compact is, after all, a contract'"); *Pueblo of Isleta v. Grisham*, No. CV 17-654 KG/KK, 2019 WL 1429586, at *11 (D.N.M. Mar. 30, 2019) ("A tribal-state gaming compact under IGRA is 'a form of contract'…").[6]

> It remains a legal document that must be construed and applied in accordance with its terms. There is nothing in the nature of compacts generally or of this Compact in particular that counsels against rectifying a failure to perform in the past as well as ordering future performance called for by the Compact.

*Texas v. New Mexico*, 482 U.S. at 128 (citations omitted).

When interpreting Indian gaming compacts, including the specific Compact at issue here, federal courts apply federal common law principles of contract interpretation. *Citizen*

---

[6] While there is authority suggesting that certain compacts may hold a dual contract-statute status, state-tribal compacts are not subject to congressional approval, eliminating the concern. *See Arizona v. Tohono O'odhom Nation*, No. CV11-0296-PHX-DGC, 2011 WL 2357833, at *10 (D. Ariz. June 15, 2011), *aff'd sub nom. Arizona v. Tohono O'odham Nation*, 818 F.3d 549 (9th Cir. 2016).

*Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1239 (10th Cir.), *cert. denied,* 139 S. Ct. 375, 202 L. Ed. 2d 286 (2018) (citing *Pauma Band of Luiseno Mission Indians v. California*, 813 F.3d 1155, 1163 (9th Cir. 2015)) ("General principles of federal contract law govern ... compacts, which were entered pursuant to IGRA.").

There is also room for state contract law principles to apply, in particular: (1) where a specific provision relates to state law, rather than federal law, *see Citizen Potawatomi Nation,* 881 F.3d at 1239 n.18, discussing *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557–59 (10th Cir. 1997); and (2) where state and federal interpretive provisions do not conflict. *See id.* (noting Oklahoma contract law mirrors federal common law); *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066, 1073 (9th Cir. 2010); *United States v. Turley*, 878 F.3d 953, 956–57 (10th Cir. 2017).

Certainly, "[a] contract must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the contract." *Citizen Potawatomi Nation*, 881 F.3d at 1239 (quoting *Tohono O'odham Nation*, 818 F.3d at 560-61). However, the Compacts at issue were derived from the Model Compact, which was included as part of the STGA. Courts interpret contracts originating in legislation by reference to the underlying statute. *See, e.g., Barseback Kraft AB v. United States*, 121 F.3d 1475, 1480–81 (Fed. Cir. 1997) (construing agreement in light of underlying legislation); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 731 (2004) ("the contracts here originated in legislation passed by Congress, requiring the court to consider that legislation in construing them."). Additionally, the Compacts explicitly adopt various portions of the STGA, which, in turn, rely upon other portions of the legislative scheme, as well as other Oklahoma

statutes outside the STGA. *See, e.g.,* 3A O.S. § 281, Parts 3.4, 3.5, 3.23, 4(B), 5(J), 11(F), 13(D), 15(D). Similarly, the Compacts incorporate portions of IGRA, 18 U.S.C. §§ 1166-1168, and pertinent administrative regulations. *See, e.g.,* 3A O.S. § 281, Introduction, Parts 2.5, 3.18, 5(B), 5(F), and 15(D).

Contracting parties can and frequently do incorporate external materials by reference. *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 30 (2d Cir. 1997) (contracts subject to federal common law "may validly incorporate by reference terms from other documents or agreements"); *see also Walker v. Builddirect.Com Techs. Inc.*, 2015 OK 30, 349 P.3d 549, 554 ("A contract may include a separate writing or portions thereof, if properly incorporated by reference."); 11 Williston on Contracts § 30:25 (4th ed. 1999). Incorporating such materials is also consistent with courts' application of technical terms for specialized industries in unambiguous contracts. *See Astro-Space Labs., Inc. v. United States,* 470 F.2d 1003, 1009 (Ct. Cl. 1972); 15 O.S. § 161 ("Technical words are to be interpreted as usually understood by persons in the profession…to which they relate...").

Additionally, gaming compacts, unlike normal contracts, require Secretarial approval[7] and publication in the *Federal Register* before taking effect. Secretarial approval or "deemed approved" letters may condition the Secretary's approval and/or sever a particular provision. Such letters thus become a part of the compact, which must inform

---

[7] The Secretary of Interior is authorized to disapprove a compact if it violates IGRA or federal law; a compact is deemed approved if the Secretary does not act within 45 days. *See* 25 U.S.C. §§ 2710(d)(8)(A-C).

the Court's analysis of its terms, rather than extrinsic evidence. For example, Part 15(D) was severed from the Compacts when approved by DOI, thus altering the terms of the Compacts. *See e.g.,* Chickasaw Compact Approval.

Finally, courts have already interpreted portions of the Compact, which define the viability of compact provisions. *See e.g., Griffith,* 230 P.3d at 493*; Citizen Potawatomi Nation,* 881 F.3d at 1228; *Choctaw Nation of Oklahoma v. Oklahoma,* 724 F. Supp. 2d 1182 (W.D. Okla. 2010).

Therefore, the Court must look to the four corners of the Compact itself in interpreting the language utilized in the contract.  The Court may apply federal common law principals governing the interpretation of contracts, state law for issues involving specific provisions relating to a state law, external materials that are specifically referenced in the contract, and in the case of the Compacts, Secretarial approval documents to achieve a more complete understanding and interpretation of the language utilized in the Compact.

## II.     The Plain Language of Each Compact Requires Enforcement of the Fifteen-Year Term, Expiring January 1, 2020.

The Grand Bargain provided the Tribes with a 15-year head start but did not create an endless Tribal monopoly on class III gaming in the State.  Part 15(B) begins: "**This Compact shall have a term which will expire on January 1, 2020**…" (emphasis added). Part 15(C) provides: "This Compact shall remain in full force and effect until the ***sooner*** of the **expiration of the term** or until the Compact is terminated by mutual consent of the parties." (emphasis added). Thus, while Part 15(B) provided the date certain of expiration and the limited condition for renewal, Part 15(C) ensured that the Compact would run until

January 1, 2020, unless the parties mutually agreed to terminate it earlier.  There are several other references in the Compact to "the term of the Compact" or substantially similar language, further evidencing that the parties intended to create obligations of limited duration. *See, e.g.,* 3A O.S. § 281, Parts 5(A), 6(A)(1), 11(E).[8] These terms are unambiguous, and the Court must apply the most basic of contractual principles to determine the parties' intent, *i.e.*, that "the language of a contract is to govern its interpretation." *See Citizen Potawatomi Nation,* 881 F.3d at 1239 n.19 (quoting 12 O.S. § 154).

Part 15(B) continues with a "condition," which – if satisfied as of January 1, 2020 – states that "the Compact shall *automatically* renew for **successive** *additional* fifteen-year terms" (emphasis added). In other words, if the interpretation advanced by the Tribes is applied, a renewal at the end of the original term means that the Compact is renewed every fifteen years thereafter, regardless of any future state action or the continued conduct of authorized gaming at the time of any subsequent renewal. The Tribes' position on renewal means the Compact is of indefinite duration and leaves the State without any means to exit the Compact.[9]

Under basic rules of contract construction, "[the] court will construe the Compact to give meaning to every word or phrase." *Citizen Potawatomi Nation,* 881 F.3d at 1239

---

[8] The DOI also understood that the parties intended for the Compact to have a "fifteen-year life." *See* Chickasaw Compact Approval, *supra*.

[9] Pursuant to Part 15(C), the Compact is subject to termination upon mutual consent of the parties on or before (*i.e.*, "sooner" than) January 1, 2020, but there is no provision allowing for termination upon renewal. As discussed *infra*, an agreement, with an indefinite term, becomes terminable at will by either party.

(citing *United States v. Brye*, 146 F.3d 1207, 1211 (10th Cir. 1998)). However, "[t]hat a contract would run for five years, terminate, and be in need of renewal – whether automatically or otherwise – belies any contention that it was to run in perpetuity. *A contract that runs forever has no need for renewal*." *Preferred Physicians Mut. Mgmt. Grp., Inc. v. Preferred Physicians Mut. Risk Retention Grp., Inc.*, 961 S.W.2d 100, 104 (Mo. Ct. App. 1998) (emphasis added).[10]  Courts should eschew an interpretation that makes a material provision in a contract superfluous.

The State plainly has the power under IGRA to include a durational limit in any State-Tribal compact. *See Chemehuevi Indian Tribe v. Newsom*, 919 F.3d 1148, 1152 (9th Cir. 2019) ("IGRA's plain language unambiguously permits parties to include durational limits in compacts."). If the parties intended for the compacts to automatically renew, they could have drafted a provision to that effect ("Renewal-Unless"). Examples of compacts containing such terms are discussed throughout federal case law. *See, e.g.*, *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1023 (9th Cir. 2002) ("The compacts provide for automatic renewal if neither party gives the requisite notice of termination."); *Dairyland Greyhound Park, Inc. v. Doyle*, 719 N.W.2d 408, 433 (Wis. 2006) ("The Original

---

[10] This is wholly consistent with the general rule applied by the courts that contracts should not be construed to create lifetime promises. *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441 (2015); *see also, Freeport Sulphur Co. v. Aetna Life Ins. Co.*, 206 F.2d 5, 8 (5th Cir. 1953) ("Perpetual contracts, though sometimes sanctioned, are not favored in the law. A construction of a contract conferring a right in perpetuity will be avoided unless compelled by the unequivocal language of the contract."); *Holt v. St. Louis Union Tr. Co.*, 52 F.2d 1068, 1069 (4th Cir. 1931) ("The ordinary rule is that a construction conferring a right in perpetuity will be avoided unless compelled by the unequivocal language of the contract."); *Town of Readsboro v. Hoosac Tunnel & W.R. Co.*, 6 F.2d 733, 735 (2d Cir. 1925).

Compacts state that the compact is 'automatically extended' unless either party exercises its right of nonrenewal.").

The State and Tribes are no strangers to such provisions. For example, in Section 3 of the CPN Wagering Compact, approved by DOI on January 24, 1997 (and still in existence today) (*see* UMF 1), the parties agreed:

> b. <u>Term</u>. This Compact shall have a three-year automatically-renewable term from the effective date. The three-year term will automatically renew unless a party gives notice of intent to terminate before 30 days prior to expiration of the three-year term.
>
> c. <u>Duration</u>. Once effective, this Compact will remain in full force and effect until one of the following shall occur:
>
> > (1)  The term expires pursuant to a notice of an intent to terminate;
> > (2)  The Compact is terminated by mutual consent of the parties;
> > (3)  The Potawatomi duly adopt an ordinance or resolution revoking authority to conduct Class III Gaming in Potawatomi Indian country as provided by 25 U.S.C.A. § 2710(d)(2)(D);
> > (4)  Pursuant to a final, non-appealable judgment by a court…

This excerpted compact language sets an initial term with an expectation of renewal if the status quo is maintained, while providing a mechanism for termination by either party. By contrast, the Model Compact does the opposite: it sets an initial term with the expectation of expiration if the status quo is maintained. The State could and did allow for the renewal of the Compacts, but only by its affirmative acts following the effective date. While parties can negotiate for "Renewal-Unless" provisions, the Compact here contains an "Expiration-Unless" provision.  "A fundamental precept of contract law in Oklahoma is that the law will not make a better contract than the parties themselves entered. The judicial function of this Court is to enforce the contract as it is written." *Lee v.*

*Conocophillips Co.*, No. CIV-14-1391-D, 2016 WL 67803, at *6 (W.D. Okla. Jan. 5, 2016) (quoting *Roye Realty & Dev., Inc. v. Watson*, 1996 OK 93, ¶ 33, 2 P.3d 320, 329). Plainly, the parties agreed to an "Expiration-Unless" provision with a 15-year expiration.

Courts construing durational provisions in other types of contracts containing an "Expiration-Unless" framework with "automatic renewal" have refused to interpret those agreements to create binding perpetual obligations on the parties. For example, in *Preferred Physicians*, the court analyzed the following similar provision:

> The initial term of this Agreement shall be until January 1, 1995; provided, however, that this Agreement shall automatically be renewed for terms of five (5) years thereafter, unless terminated as permitted by [this contract by the plaintiff for cause] or both of the parties hereto give written notice of their intent not to renew this Agreement[.]

961 S.W.2d at 102. While recognizing the "oddity" of the agreement's approach to renewal, the court nonetheless found that the unambiguous language regarding "a series of five-year contracts [had] the practical effect [of] a perpetual contract." *Id*. at 103. Because the language was not sufficiently unequivocal to demonstrate that defendant intended to surrender its right to impose a durational limit on its obligations, the court found that the defendant had a legal right to terminate the contract after an initial renewal. *Id.* at 104; *see also H & R Block Tax Servs. LLC v. Franklin*, 691 F.3d 941, 945 (8th Cir. 2012) (franchise agreement with successive automatic renewals could not be enforced in perpetuity). Under the Tribe's construction of Part 15(B), as in *Preferred Physicians,* the State would be left with no option to exit the Compact at any point after January 1, 2020, a wholly unfair result, clearly inconsistent with the parties' intent.

17

III.    **Contracts of Indefinite Duration are Terminable at Will by Either Party.**

Indefinite contracts are also disfavored. As stated by the Tenth Circuit, "[t]he vast weight of authority would seem to be against enforcement of very long or indefinite term contracts." *See, R. S. Mikesell Associates v. Grand River Dam Authority*, 627 F.2d 211, 216 (10th Cir. 1980) (concurring in part; dissenting in part); *see also Gen. Paint Corp. v. Kramer*, 57 F.2d 698, 703 (10th Cir. 1932). A particular concern arises in the context of legislative action.   The "repealability" or "nonentrenchment" canon provides that "legislators cannot make their laws irrepealable or disable themselves or their successors from taking action...one legislature cannot bind a subsequent one..." Scalia & Garner, *Reading Law,* at 278 (internal quotation/citation omitted); *see also Panzer v. Doyle*, 680 N.W.2d 666, 690 (Wis. 2004), *abrogated on other grounds by Dairyland Greyhound Park, Inc. v. Doyle*, 719 N.W.2d 408 (Wis. 2006) (holding amendment to gaming compact relinquishing Wisconsin's right to withdraw from the compact unlawful as it "gave away power delegated to [governor] so that the legislature cannot take it back").

To avoid forfeiture, the courts have held that contracts of indefinite terms become terminable at will by either party. *See, e.g.*, *Miller v. Miller*, 134 F.2d 583, 588 (10th Cir. 1943) ("If no period of duration is specified in a contract, and none can be inferred from its nature and subject matter, the law infers that the parties intended such agreement to be terminable at the pleasure of either party upon reasonable notice."); *Cont'l Am. Corp. v. Barton*, 932 F.2d 981, 1991 WL 66046, at *2 n.3 (Fed. Cir. 1991) (unpublished) (concluding that an agreement was terminable at will based upon the rule that a contract that contemplates "successive   performances" that "are indefinite in duration can be

18

terminated at the will of either party"); *Dunn v. Birmingham Stove & Range Co.*, 1935 OK 107, 44 P.2d 88 (contract of indefinite duration is terminable at will by either party).

The expiration provision in the Compact is a plain and unambiguous provision. It is the starting point for construing the Compact and must be given the meaningful significance ascribed to it by the parties. Part 15(B) expressly provides that the Compact expires on January 1, 2020. Moreover, if the State bound itself to a contract with an indefinite term by successive renewals triggered as of January 1, 2020 (and surrendered its right to terminate the Compact), the Compact has become terminable at will pursuant to prevailing law. In either event, given the unambiguous language at issue, the law simply does not – and cannot – permit a contract extending the Compact forever with no right of the State to terminate it.

## IV. The Renewal Provision of the Compact has not been Triggered.

As quoted above, Part 15(B) begins: "This Compact shall have a term which will expire on January 1, 2020…"  It continues:

> and at that time, if organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or court order following the effective date of this Compact, the Compact shall automatically renew for successive additional fifteen-year terms…

As part of the Grand Bargain, the State gave to the Tribes a drastic remedy for any governmental action which would authorize non-Tribal gaming – an automatic extension of the near monopoly.

The *only* fair reading of this condition that gives effect to each of the Compact's provisions and the Compact as whole is that the Compact expires on January 1, 2020, *unless*:

- as of January 1, 2020

- the State, by some affirmative act that is within its constitutional power

- that occurred following the date the Compact became effective

- authorized nontribal electronic gaming that interfered with the 15 years of substantial exclusivity promised to the Tribes as part of the Grand Bargain (*i.e.*, gaming neither authorized by the STGA nor anticipated in the Compact).

**The State has taken no such affirmative act**. Stated more precisely, in order for the automatic renewal provision to be triggered, *all three* questions of the following test must be *answered in the affirmative*:

1.   Are organization licensees or others authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing as of January 1, 2020?

2.   Does the authority to conduct electronic gaming derive from some governmental action of the State or court order?

3.   Did the action that is the source of the authority occur following the effective date of the compacts?

While organization licensees are presently authorized to conduct electronic gaming (a narrow "yes" to *Question 1*), by state law (another narrow "yes" to *Question 2*), the State's authorization of such operations undisputedly occurred on or before (and not *following*) the effective date of each Compact (an unambiguous "**no**" to *Question 3*); thus, the Compacts have not renewed.

**A.** **Question 1 - Are organization licensees or others authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing as of January 1, 2020?**

> **Answer:** Yes. There is no dispute that, as of January 1, 2020, organization licensees are authorized (as narrowly defined *infra*) by the STGA to conduct specifically defined electronic gaming in the State (or that two racetracks owned by commercial affiliates of the Chickasaw and Cherokee Nations are licensed pursuant to that authority). No "others" as the term is used in Part 15(B) are authorized to conduct electronic gaming.

*1. "At that Time"*

When read in the context of Part 15(B) of the Compact, the phrase "at that time" is unambiguous and clearly means on January 1, 2020. *See, e.g. Fiorino v. Qwest Employees Benefit Comm.*, 08CV1082 MCA/RLP, 2010 WL 11602776, at *5–6 (D.N.M. Mar. 18, 2010) (holding that the phrase "at that time" in contractual provision stating that "[w]hen you return to pension status, you will resume the Retiree Benefits in affect [sic] for Retirees at that time" was unambiguous and clearly meant the time the employee returns to pension status). This phrase is not susceptible of any other interpretation. Thus, the Compacts expired on January 1, 2020, unless, as discussed below, ***as of January 1, 2020***, the status quo established as of the effective date of each Compact has changed through some affirmative act of the State.

*2. "Organization Licensees or Others"*

The terms "organization licensee" and "organizational licensee" are used interchangeably six times in the Model Compact. The same terms are used approximately 110 times in the STGA. The lack of a definition within the STGA and the Compacts simply reflects the preexisting definition found in previously existing portions of Title 3A,

21

originally passed in 1983. There, an "'[o]rganization licensee' means any person receiving an organization license." 3A O.S. § 200.1(9). "Any person desiring to conduct a race meeting may apply to the [OHRC] for an organization license." 3A O.S. § 205.1(A) (eff. Mar. 22, 1983). Detailed rules for such an application process are provided. *Id.*

These statutory provisions make it clear that an "organization licensee" is simply a person or entity licensed to conduct horse racing in the State. 3A O.S. § 200.1(A)(9). An organization licensee may or may not be licensed to conduct pari-mutuel wagering. 3A O.S. § 205.2. Such a licensee may or may not be licensed to conduct class III gaming contemplated under the STGA. Regardless, the status of "organization licensee" exists only because the statute says it exists – there is no "organization licensee" separate and apart from the grant of that title by the method prescribed by the statute. Moreover, it is undisputed that, as of January 1, 2020, Remington Park and Will Rogers Downs are the only organization licensees in the State. UMF 9-10.

The term "others," as utilized here, would address some person or entity "other" than the contracting parties, who did not have the status of an "organization license" but was authorized to conduct electronic games.[11] No such "others" are authorized to conduct electronic gaming as contemplated by Section 15(B) of the Compacts. What was not intended – obviously – was that "others" would include Indian tribes themselves. The

---

[11] 3A O.S. § 262(A) specifically excludes various non-organizational licensees, including "fair associations or organizations," which could host horse races in conjunction with organization licensees, or cities, towns or municipalities. *See also* 3A O.S. § 263 (providing for payment by certain tribes for local exclusivity "as long as the prohibition against fair associations or organizations licensed pursuant to Section 208.2 ... remains prohibited.").

parties included the term "tribe," or some variation thereof, approximately 174 times in the Compact. Had the parties intended for "others" to include Indian tribes, they would have said so. Additionally, reading "others" to include tribes would render the termination provision meaningless because the Compact's renewal provision would be triggered by the very existence of the Compact (and thus Tribal gaming) as of January 1, 2020. Instead, the provision of renewal (with corresponding liquidated damages) to tribes that would result from the State acting during the 15-year term to authorize others to conduct electronic gaming simply served as a disincentive for the State to violate the substantial exclusivity it promised tribes during the 15-year term of the Compact.

### 3. "Authorized"

**Authorized v. Licensed.** The term "authorized," as used in the Compact, should be ascribed its plain and ordinary meaning. The Supreme Court's recent decision in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), which effectively struck down the federal law prohibiting states from authorizing sports gambling and paved the way for legalized sports betting in the United States, is instructive. An act passed by the New Jersey legislature repealed a state law prohibiting sports gambling at casinos and racetracks, except as to sporting events involving a New Jersey college team or a collegiate event taking place in the State. In asking the Court to decide whether the act "authorized" sports gambling in violation of federal law, the parties presented different definitions of the term "authorize" from Black's Law Dictionary, which included both "permit" and "to empower; to give a right or authority to act." *Id*. at 1473. The Court held:

> When a State completely or partially repeals old laws banning sports
> gambling, it "authorize[s]" that activity … The concept of state
> "authorization" makes sense only against a backdrop of prohibition or
> regulation. A State is not regarded as authorizing everything that it does not
> prohibit or regulate. No one would use the term in that way. For example, no
> one would say that a State "authorizes" its residents to brush their teeth or
> eat apples or sing in the shower. We commonly speak of state authorization
> only if the activity in question would otherwise be restricted.

*Id.* at 1474. In other words, in the case of gambling, which has been expressly banned by

states such as New Jersey (and Oklahoma) for years, it is the legislative act of changing

laws that prohibit gambling that "authorizes" such gaming.

By contrast, a "license gives to the licensee a special privilege not accorded to others

and which the licensee otherwise would not enjoy." *Priddy v. City of Tulsa*, 1994 OK CR

63, 882 P.2d 81, 83; *see also Miller v. Gonzales*, 2010 OK CIV APP 56, 239 P.3d 163, 171

n.18 (citing Black's Law Dictionary, which defines a license as the "permission by

competent authority to do an act which, without such permission, would be illegal."). In

*Murphy*, for example, the Supreme Court specifically distinguished the legislature's act

from the licensing of the casinos and racetracks. 138 S. Ct. at 1472. In New Jersey, casinos

and racetracks were required to be licensed (for other forms of gaming) before the act

"authorized" sports gambling by repealing the law prohibiting it.  *Id.* at 1474, 1481.

Pursuant to the fundamental separation of powers found in Oklahoma's

Constitution, the State authorizes certain conduct such as gambling through legislative

enactments; the executive branch administers that authority, frequently through the

issuance of licenses and permits to those who are then given a privilege or permission to

act in a manner consistent with the State's policy. *See City of Sand Springs v. Dep't of Pub.*

*Welfare*, 1980 OK 36, 608 P.2d 1139, 1146 ("the dichotomy between administrative acts and legislative acts hinges upon the declaration of policy, which is a legislative function, and the implementation of that policy, which is traditionally an administrative function.").

As a general rule, gambling is illegal in the State. *See* 21 O.S. §§ 941-988. However, the state legislature has developed a State policy proscribing Tribal gaming and electronic gaming by nontribal entities. As an example, Part 4 of the Compact – "Authorization of Covered Games" – begins: "The tribe and state agree that the tribe is ***authorized*** to operate covered games only in accordance with this Compact." *See* 3A O.S. § 281, Part 4 (emphasis added). [12] Moreover, the STGA specifically provides:

> Notwithstanding [the State's criminal laws prohibiting gambling], the conducting of and participation in gaming in accordance with the provisions of this act or the model compact set forth in Section 281 of this title is lawful and shall not be subject to any criminal penalties …

3A O.S. § 262(A). Adoption of this policy is clearly a **legislative function**. Thus, as in *Murphy*, it was through the legislative acts of the State, which made certain forms of

---

[12] Also, Part 8(D) reads: "Nothing in this Compact shall be deemed to ***authorize*** the state to regulate the tribe's government." 3A O.S. § 281, Part 8(D). Similarly, Part 11 provides: "Nothing in this Compact shall be deemed to ***authorize*** the state to impose any tax, fee, charge or assessment upon the tribe or enterprise except as expressly authorized pursuant to this Compact." *Id.* at § 281, Part 11(D).; *see also* Part 11(E) (prohibiting gaming terminals "in excess of the number and outside of the designated locations ***authorized*** by the State-Tribal Gaming Act."); Part 13(D) (discussing games authorized by STGA); 3A O.S. § 282 (Commission "is ***authorized*** to charge an application fee" and "is ***authorized*** to assess a fee upon each organization license ***authorized*** by the [STGA]."); *see also* 75 O.S. § 250.3(9) (Oklahoma's Administrative Procedures Act, the "OAPA," defines "license" to include "the whole or part of any agency permit, certificate, approval, registration, charter, or similar form of permission ***required by law***.") (emphasis added).

gaming by nontribal entities lawful, that such gaming was, indeed, "authorized." *See* 3A

O.S. §§ 262(A), 269(1).[13]

The legislature empowered the executive branch, namely the OHRC, to administer

and implement part of this new gaming policy, by ensuring that nontribal entities properly

apply for and obtain licenses and abide by the rules and regulations established to effectuate

the legislative scheme.[14] *See* Okla. Admin. Code § 325:80-1-1 ("The Rules in this chapter

[the OHRC's Gaming Licensing Requirements] establish Standards and requirements for

licensure, certification, registration, renewal and other approval ***under the State-Tribal***

***Gaming Act***.") (emphasis added). The legislature initially created the OHRC, *see* 3A O.S.

§§ 201(A), and authorized it to carry out the State's policy regarding horse racing, *id*. §

204; Okla. Admin. Code § 325:1-1-3 (OHRC is "an administrative body" created by

statute, "whose powers and duties are prescribed by the Legislature."). With the adoption

of the STGA, the legislature subsequently expanded the OHRC's duties to include

licensing of nontribal entities to conduct authorized gaming under specific conditions and

limitations, *i.e.*, those that were specifically designed to maintain and protect the substantial

exclusivity afforded to compacting tribes. The legislature mandated that the OHRC "**shall**

license organization licensees which are licensed pursuant to Section 205.2 of this title to

---

[13] Conversely, the State is afforded only such authority to regulate gaming by Indian tribes
as is supplied to it by Congress under IGRA.  *See Seminole Tribe of Florida v. Florida*,
517 U.S. 44, 58 (1996) ("[T]he Act grants the States a power that they would not otherwise
have, viz., some measure of authority over gaming on Indian lands.  [T]he Act extends to
the States a power withheld from them by the Constitution.").

[14] Notably, the Model Compact contemplated a similar role for the Tribes – to "promulgate
any rules and regulations necessary to implement this Compact."  3A O.S. 281, Part 5(A).

conduct authorized gaming **as that term is defined by this act pursuant to this act utilizing gaming machines or devices authorized by this act subject to the limitations of subsection C of this section.**" *See* 3A O.S. § 262(A) (emphasis added). But the legislature **never** authorized the OHRC to act to renew the Compact.

Because "authorizing" electronic gaming by organization licensees is a legislative function, only a legislative enactment (or court order, as expressly stated in the Model Compact) after the effective date of the Compacts could trigger the automatic renewal provision in Section 15(B). Conversely stated, subsequent administrative acts, such as the issuance of licenses or promulgation of rules related to the same, necessary to carry out the provisions of the STGA **do not** "authorize" electronic gaming—they merely license it, offering to named licensees a privilege not enjoyed by those who are not so licensed.

4. *"Electronic Gaming"*

Part 15(B) limits the triggering action for renewal to authorization of "electronic gaming." As defined in the STGA:

> "Electronic gaming" means the electronic amusement game, the electronic bonanza-style bingo game and the electronic instant bingo game described in this act, which are included in the authorized gaming available to be offered by organization licensees.

3A O.S. § 269(8); *see also,* 3A O.S. § 268(B) (compacting tribe may conduct "any electronic bonanza-style bingo game, any electronic amusement game or any electronic

instant bingo" game meeting modified standards of electronic games that may be used by organizational licensees).[15]

**Electronic Amusement Game.** "'Electronic amusement game' means a game that is played in an electronic environment in which a player's performance and opportunity for success can be improved by skill that conforms to the standards set forth in this act." 3A O.S. § 269(5); 3A O.S. § 281, Part 3.10; *see also,* §§ 270, 271(A). Further instruction on the nature and limitations of electronic amusement games is provided in the subsections of 3A O.S. § 271(A).

**Electronic Bonanza-Style Bingo Game.** "'Electronic bonanza-style bingo game' means a game played in an electronic environment in which some or all of the numbers or symbols are drawn or electronically determined before the bingo cards for that game are sold that conforms with the standards set forth in this act." 3A O.S. § 269(6); 3A O.S. § 281, Part 3.11. Explicit details on the nature and limitations of electronic bonanza-style bingo games are set out in 3A O.S. § 273.

---

[15] Electronic gaming, regardless of which of the three types, is conducted at a "player terminal."    3A O.S. §§ 271, 273, 274. "'Player terminals' means electronic or electromechanical terminals housed in cabinets with input devices and video screens or electromechanical displays on which players play electronic bonanza-style bingo games, electronic instant bingo games or electronic amusement games."  3A O.S. § 281(16); *see also* 3A O.S. § 269(11). Additionally, "'Standards' means the descriptions and specifications of electronic amusement games, electronic bonanza-style bingo games and electronic instant bingo games or components thereof."  3A O.S. § 281, Part 3(23); *see also* 3A O.S. §§ 269(12), 275(A); 3A O.S. § 281, Part 4(B). Such express limitations further confirm the limited and highly technical nature of "electronic gaming" contemplated by the STGA and the Compacts.

**Electronic Instant Bingo Game.** "'Electronic instant bingo game' means a game played in an electronic environment in which a player wins if his or her electronic instant bingo card contains a combination of numbers or symbols that was designated in advance of the game as a winning combination. There may be multiple winning combinations in each game and multiple winning cards." 3A O.S. § 269(7); 3A O.S. § 281, Part 3.12; Again, more specific information is provided in 3A O.S. § 274.

Each of the three terms comprising the definition of "electronic gaming" are specifically defined and addressed in detail in the Compact. The result of the Compact's use of such specific and well-defined terminology ensures that the renewal provision is not triggered unless one or more of these three specific types of games are the subject of the State's authorization. Forms of games and amusements that fall outside of this rubric – *i.e.*, lotteries, electronic redemption games, arcades, etc. – clearly ***cannot*** trigger the automatic renewal provision.

B.    ***Question 2 - Does the authority to conduct electronic gaming derive from some governmental action of the State or court order?***

> ***Answer:*** Yes. The **only** authority for organization licensees to conduct electronic gaming derives from governmental action in the form of the legislature's enactment of the STGA, a state statute which became law in 2004. Administrative acts of the OHRC, however, are not governmental actions of the State under the Compacts.

1.    *"Governmental Action of the State"*

The term "State" is expressly defined in the Compact as the "State of Oklahoma."[16]

---

[16] The Compact specifically defines "State" as "the State of Oklahoma." 3A O.S. § 281, Part 3(24). For example, the Compact states that the agreement is entered into between the tribe and "the State of Oklahoma (state)" and that "[t]he State of Oklahoma is a state of the

"Governmental action" is not.  While guidance is limited, the United States Supreme Court has held that "every action [of the federal government] **within its constitutional power** is governmental action." *Graves v. People of State of New York ex rel. O'Keefe*, 306 U.S. 466, 477 (1939) (emphasis added). Thus, "governmental action" means some affirmative act that can be taken by the sovereign – here, the State – **within its constitutional power**. Class III gaming for organization licensees was authorized by legislation, and legislation alone.

Part 11(A), in addressing "substantial exclusivity," shares very similar language to that contained in Part 15(B).  It provides that compacting tribes must pay the Exclusivity Fees "so long as the state does not change its laws after the effective date of this Compact to permit the operation of any additional form of gaming by any such organization licensee, or change its laws to permit any additional electronic or machine gaming within Oklahoma." Thus, Part 11(A) clearly contemplates legislative action (*i.e.*, a change in laws).[17] A perfunctory act by an administrative agency mandated by statute and anticipated

---

United States of America possessing the sovereign powers and rights of a state." *Id.*, Part 2(2). Subordinate agencies of the State are not included in the definition. Instead, the Compact identifies the State's agencies, boards and commissions specifically – and separately – when the parties so intended. *See id.*, Part 3(25). By specifically identifying each of these subordinate agencies, including the OHRC, but not including them in the definition of "state," the parties chose to differentiate the "State" from subordinate entities.
[17] While a change in law could defeat the Tribes' bargained-for "substantial exclusivity," either by allowing the nontribal entities contemplated by the STGA to expand their operations (new forms of gaming, new locations, or more machines) or by permitting additional licensees, the Tribes cannot contend this has occurred (having never sought to invoke Part 11 of the Compact prior to its expiration). The State has upheld its side of the bargain, maintaining the "substantial exclusivity" promised to compacting tribes during the 15-year term of the Compact.

at the time of compacting is certainly neither the conduct contemplated to destroy exclusivity nor to cause the automatic renewal of the Compact.

Agencies of the State have a limited grant of power. *See* 75 O.S. § 250.2 ("In creating agencies and designating their functions and purposes, the Legislature may delegate rulemaking authority to executive branch agencies to facilitate administration of legislative policy."); 2001 OK AG 5, ¶ 3 ("An administrative agency's power to make rules under statutory authority is limited to the authority granted by those statutes and such rules may not be contrary to those statutes.") (citing *Adams v. Professional Practices Comm'n,* 1974 OK 88, 425 P.2d 932). The OHRC is not an executive agency created by the constitution; therefore, it has no independent constitutional power. The OHRC acts solely pursuant to the grant of authority given by the legislature in the STGA. *See* 3A O.S. §§ 201(A), 204(A). The long-standing rule is that "an agency created by statute may only exercise the powers granted by statute and cannot expand those powers by its own authority." *Marley v. Cannon*, 1980 OK 147, 618 P.2d 401, 405; *see also Boydston v. State*, 1954 OK 327, 277 P.2d 138, 142 (boards lack the "authority to make rules which in effect extend their powers beyond those granted and fixed by statute."); *Adams v. Prof'l Practices Comm'n*, 1974 OK 88, 524 P.2d 932, 934.

Rules of construction provide that any purported surrender of a state's power in a governmental contract, such as the power to impose durational limits on its obligations, must be stated in unmistakable language. In *Providence Bank v. Billings*, 29 U.S. 514, 561-63 (1830), and *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420, 546-47 (1837), the Court adopted a canon of construction disfavoring implied

governmental obligations in public contracts and held that "[p]ublic grants convey nothing by implication; they are construed strictly in favor of the" sovereign. More recently, the Supreme Court has held that, in a contract involving a sovereign state, "the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order" and "a grant of exclusive privilege is not to be implied as against the state." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435 (1934); *see also Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38–39 (1940) (citing *Blaisdell* for the proposition that "[t]he rule that all contracts are made subject to this paramount authority was there reiterated. Such authority is not limited to health, morals and safety. It extends to economic needs as well.").

More recently, the U.S. Supreme Court stated in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982): "[S]overeign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *See United States v. Cherokee Nation of Okla.*, 480 U.S. 700 (1987) (a waiver of sovereign authority "will not be implied, but instead must be 'surrendered in unmistakable terms.'") (quoting *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986)).[18]

---

[18] Notably, "Even when the Government unmistakably contracts not to exercise its sovereign powers in otherwise permissible ways, that promise cannot be enforced by injunction, as [Plaintiff] seeks to do here." *Biodiversity Associates v. Cables*, 357 F.3d 1152, 1173 (10th Cir. 2004). This is precisely what the Tribes are requesting here, and the Tenth Circuit has rejected.

Here, the legislature specifically authorized the OHRC "to issue licenses to conduct authorized gaming to no more than three organization licensees operating racetrack locations at which horse race meetings with pari-mutuel wagering . . . occurred in calendar year 2001" (*see* 3A O.S. § 262(C)) – *i.e.*, the Racinos that were specifically contemplated as part of the Grand Bargain. UMF 4, *see also* Okla. Admin. Code § 325:80-1-1, *supra* (OHRC's licensing powers are statutorily derived).  It did not delegate to the OHRC the power to cause the Compact to renew or to bind the State to perpetual obligations.

When the OHRC adopted regulations in 2005 to carry out the legislature's enactment, it made clear that an organization license to engage in electronic gaming would be issued to a Racino based solely on the legislature's authority as set forth in the STGA:

> (a) To qualify to hold and operate a Racetrack Gaming Operator License or Recipient Racetrack Gaming License, a racetrack must be licensed by the Oklahoma Horse Racing Commission pursuant to provisions of Title 3A of the Oklahoma Statutes to conduct live horse races or simulcast races and must meet the requirements pursuant to Title 3A and provisions of the Act and these Rules.

Okla. Admin. Code 325:80-7-1(a). ***Once such a license is issued, its renewal is non-discretionary and perfunctory***:

> (b) After initial issuance of a Racetrack Gaming Operator's License, the license ***shall*** be renewed each year upon the following conditions:
>
> (1) the payment of the annual Racetrack Gaming Operator Licensee application license fee, the annual Racetrack Gaming Operator Licensee regulation fee and the annual Racetrack Gaming Operator Licensee's Gaming Machine license fees;
>
> (2) the applicant has conducted the required number of live races to be eligible to operate Authorized Games and furnishing the [OHRC] with any supplementary information required by the [OHRC] or its staff; and

(3) the issuance of an Organization License to that applicant for the applicable calendar year.

Okla. Admin. Code 325:80-7-1(b) (emphasis added). Except by decision of the licensee, only a subsequent legislative enactment could cause the renewal of a Racino's organization license **not** to occur. The Tribes place undue significance on the issuance of renewal gaming *licenses* to Remington Park and Will Rogers Downs by the OHRC for the calendar year beginning January 1, 2020. In fact, organization licensees have been ***authorized*** under the STGA to conduct electronic gaming **since January 27, 2005**—the date notice of approval of four (4) State-Tribal compacts was published in the Federal Register. Had no licensee applied for renewal (which  is now entirely within the control of two of the Tribes (UMF 10)) or had the OHRC issued the renewal for 2020 to begin on January 2, such authorization would still exist.

*Reading the term "State" to include subordinate agencies such as the OHRC would effectively enable the OHRC alone to cause the Compact to renew.* Indeed, the Tribes contend that the OHRC's non-discretionary, perfunctory issuance of a renewal gaming license to Remington Park and Will Rogers Downs on October 17, 2019, for the calendar year beginning January 1, 2020, did just that. No party could plausibly suggest that the OHRC can issue a license to an entity not enumerated in the STGA or authorize an organization licensee (now Tribal affiliates) to engage in a new form of gaming at the Racinos not specifically authorized therein. Nor should the court adopt a construction of the Compact that affords the OHRC this significant power, causing the Compacts to automatically and indefinitely renew, thus binding future elected officials forever.

2.   *"Court Order"*

The term "court order" is unambiguous and should be afforded its plain meaning. According to Black's Law Dictionary (11th ed. 2019), an "order," also termed a "court order," is defined as "[a] written direction or command delivered by a government official, esp. a court or judge," which "generally embraces final decrees as well as interlocutory directions or commands." No court order since 2004 has authorized electronic gaming by organization licensees or other nontribal actors.[19]

C.   **Question 3 - Did the action that is the source of the authority occur following the effective date of the Compact?**

> *Answer* – No. The **only** authority for electronic gaming by organization licensees as of January 1, 2020, derives from the STGA, which was enacted on November 4, 2004. Organization licensees were authorized to conduct electronic gaming pursuant to the STGA as of January 27, 2005. Each of these dates is on or before, and not following, the earliest effective date of any of the Compacts with the Tribes.

While it is undoubtedly true that organization licensees are authorized to conduct electronic gaming as of January 1, 2020 (*Question 1*), and the source of such authority unquestionably is an affirmative act of the State (*Question 2*), the third part of the test for renewal is not met and thus precludes renewal. By the express terms of the Compact, the act of the State authorizing organization licensees to conduct electronic gaming must have

---

[19] Some Tribes point to the court's order in *Iowa Tribe of Oklahoma v. State of Oklahoma*, 5:15-CV-01379-R, 2016 WL 1562976 (W.D. Okla. Apr. 18, 2016). There, the tribe and the State arbitrated whether the Compact authorized the tribe to use the internet to conduct Covered Games by persons located outside the State. *Id.*, at *1-2. The final arbitration award found that such activity was authorized by the Compact, and, on a motion for summary judgment, the Court affirmed the final award. *Id.*, at *3. While the order certainly constitutes a "court order," it clearly does not constitute an affirmative act authorizing nontribal gaming that would trigger the renewal clause of the Compact.

occurred "***following the effective date of the Compact***." This means that such act must have occurred after January 27, 2005 – the earliest date any Compact became effective.[20]

The electronic gaming that can be conducted by organization licensees in Oklahoma as of January 1, 2020, as referenced in *Question 1*, was and is only authorized by the STGA. Each of the Compacts applicable here became effective between January 27, 2005, and September 12, 2006. UMF 8. The STGA was adopted on November 2, 2004, which was clearly before any Compact became effective. UMF 2-3. Organization licensees were **<u>authorized</u>** to conduct electronic gaming as of January 27, 2005—the date when approval of State-Tribal compacts with at least (4) Indian tribes was published in the Federal Register. UMF 7. The State has taken no further action to authorize electronic gaming by organization licensees or others since January 27, 2005. And specifically, the STGA has not been amended to authorize electronic gaming by organization licensees or others since 2004. UMF 11-12.

For the renewal provision to trigger, the State must take some affirmative act to authorize electronic gaming that was not included in the STGA or necessary to effectuate the STGA, which was in effect before the Compacts; otherwise, the phrase "following the effective date of the Compact" becomes superfluous. Indeed, if this provision were to be read according to the strained interpretation put forward by the Tribes (that the OHRC's

---

[20] It should be noted that not all litigating Tribes are equally positioned. The act of the State must have occurred following the effective date of an individual Tribe's Compact. For example, if this Court determines the initial licensing performed by the OHRC in 2005 was the triggering event, then any Compact that was not in effect at that time would not be eligible for renewal.

issuance of licenses for 2020 – which it was mandated to do under the STGA – is the triggering event), the only way that renewal could be avoided would be for the State to have repealed the STGA during its stated 15-year term. No reasonable interpretation would require such an absurdity. *See* 15 O.S. § 154 ("The language of a contract is to govern its interpretation, if … [it] does not involve an absurdity.").

The STGA specifically mandated the issuance of licenses by the OHRC. It specifically contemplated the promulgation of rules to regulate and enforce the STGA. It specifically authorized the placement and operation of 750 electronic games at the Racinos. UMF 5. These activities were authorized by the State – but they were done so on or before the effective date of any Compact. And, indeed, the Compact itself not only recognized such legislative enactments and implementing regulations, **but it expressly incorporated them by reference**. *See* 3A O.S. § 281, Part 13(D). Absent a legislative enactment to the contrary, organization licensees are necessarily authorized to conduct electronic gaming under the STGA as of January 1, 2020. When the status quo is maintained, pursuant to the express terms of Part 15(B), the Compact expires on January 1, 2020.

The ***only source*** of authority for electronic gaming by organization licensees as of January 1, 2020, is the STGA. No other authority exists. And because the STGA was enacted before the Compacts were first effective, the condition for renewal is not present. Plainly, the Compacts have not renewed.

**V.     The State Should be Excused from Continued Performance of the Compacts Because of the Tribes' Material Breach of "Clause 3" of Part 15(B).**

As discussed throughout, Part 15(B) provides that the Compacts *will* expire on January 1, 2020. However, Part 15(B) also includes a "proviso":[21]

> *provided that*, within one hundred eighty (180) days of the expiration of this Compact or any renewal thereof, either the tribe or the state, acting through its Governor, may request to renegotiate the terms of subsections A and E of Part 11 of this Compact. (Emphasis added.)

The State timely invoked Part 15(B)'s proviso by the request of the Governor, but the Tribes refused to renegotiate, unless and until the State conceded its legal position on expiration. UMF 13-16. The Compact simply does not permit the Tribes to condition their performance under Part 15(B)'s duty to negotiate on the State's acquiescence to their legal position that the Compact has renewed. No such condition exists in Part 15(B). The Tribes' refusal to participate in good faith renegotiations of the Compact constitutes a **material breach** thereof. *See Enron Fed. Sols., Inc. v. United States*, 80 Fed. Cl. 382, 396 (2008) ("[a] breach is material when it relates to a matter of vital importance, or goes to the essence of the contract…"); *see also* Restatement (Second) of Contracts § 241 cmt. e. (a party's "good faith" is "a significant circumstance in determining whether the failure is material.").

Pursuant to federal common law, a material breach of a contract by one party excuses future performance of that contract by the other party. *See Hansen Bancorp, Inc. v. United States*, 67 Fed. Cl. 411, 423–24 (2005); *see also* Restatement (Second) of

---

[21] "[A] proviso is a clause that introduces a condition by the word *provided*." Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) at 154 (emphasis in original). "[A] proviso in a legal instrument conditions only the principal matter that it qualifies…." PROVISO CANON, Black's Law Dictionary (11th ed. 2019).

Contracts, § 237 ("[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."). "A basic statement of the law applicable to [the issue of material breach] is: a party who materially breaches a contract relieves the non-breaching party from all of the non-breaching party's contract obligations to the breaching party." *Enron Fed. Sols., Inc. v. United States*, 80 Fed. Cl. 382, 398 (2008).

> A material failure of performance constitutes a breach that discharges the injured party from performance. Such a breach "amount[s] to the non-occurrence of a constructive condition of exchange," and justifies the injured party's suspension of performance and termination of the contract.

*Resolution Tr. Corp. v. Fed. Sav. & Loan Ins. Corp.*, 25 F.3d 1493, 1501 (10th Cir. 1994) (citations omitted); *see also Webco Indus., Inc. v. Diamond*, No. 11-CV-774-JHP-FHM, 2012 WL 5995740, at *10 (N.D. Okla. Nov. 30, 2012) ("Under Oklahoma law, 'it is the general rule that a contract must be performed according to the terms of the agreement before a party can have any right of action.' [T]he party seeking recovery 'has the burden of showing that the contract was performed according to its terms.'") (citations omitted); *Stoltz, Wagner & Brown v. Cimarron Expl. Co.*, 564 F. Supp. 840, 850 (W.D. Okla. 1981) ("If a party seeking recovery [is] unable ***or unwilling*** to perform his portion of the contract, then said party cannot require performance by the other party.") (emphasis added).

The relief requested by the Tribes here includes a declaration that the Compacts have renewed and the State, among other things, be precluded from denying the Tribes' rights under the Compacts "as renewed on January 1, 2020." *See* Complaint, Prayer for

Relief, ¶ 1(d), (e). But the Tribes are not entitled to demand future performance by the State under one clause of Part(B), providing for "automatic renewal," while themselves refusing to comply with "Clause 3" of Part 15(B), requiring renegotiation. As a result of their refusal to comply with the express terms of the Compact, the Tribes cannot meet their burden of showing that they performed Part 15(B) according to its terms, and thus cannot enforce the "automatic renewal" provision of Part 15(B). The law does not permit a party to enforce certain favorable provisions in a contract while refusing to comply with other material terms. The Court should not enforce the Compact so as to require the State to continue to perform its obligations for successive terms when the Tribes themselves have already refused to comply with the express terms of the very same section of the very same Compact. The Court should find that the State is excused from future performance under the Compact and that the Compacts should be treated as unenforceable or terminated.

## **CONCLUSION**

Oklahoma is entitled to partial summary judgment regarding the issue of expiration of the Compacts. Construed as a whole under applicable law and rules of interpretation, the Compacts: (1) expired on January 1, 2020, pursuant to the unambiguous language of Part 15(B), and were not renewed; (2) if renewed for successive terms, as argued by the Tribes, took on an indefinite duration as of January 1, 2020, and became terminable at will; and/or (3) cannot be enforced against the State after January 1, 2020, because of the Tribes' material breach of Part 15(B).

Respectfully submitted by:

*s/Phillip G. Whaley*

Phillip G. Whaley, OBA No. 13371
Daniel G. Webber, Jr., OBA No. 16332
Patrick R. Pearce, Jr., OBA No. 18802
Matthew C. Kane, OBA No. 19502
**RYAN WHALEY**
400 North Walnut Avenue
Oklahoma City, OK  73104
Telephone:  (405) 239-6040
Facsimile:  (405) 239-6766
pwhaley@ryanwhaley.com
dwebber@ryanwhaley.com
rpearce@ryanwhaley.com
mkane@ryanwhaley.com

*-and-*

Steven K. Mullins, OBA No. 6504
Matthew K. Felty, OBA No. 31057
**LYTLE, SOULÉ & FELTY, P.C.**
1200 Robinson Renaissance
119 N. Robinson Ave.
Oklahoma City, OK 73102
Telephone:  (405) 235-7471
Facsimile:  (405) 232-3852
mullins@lytlesoule.com
mkfelty@lytlesoule.com

*-and-*

Mark E. Burget, OBA No. 1326
Jeffrey C. Cartmell, OBA No. 31012
State of Oklahoma, Office of the Governor
2300 N. Lincoln Boulevard, Suite 212
Oklahoma City, OK  73105
Telephone:  (405) 521-2342
mark.burget@gov.ok.gov
jeffrey.cartmell@gov.ok.gov

**ATTORNEYS FOR J. KEVIN STITT,
AS GOVERNOR OF THE STATE OF OKLAHOMA,
AND *EX REL.* THE STATE OF OKLAHOMA**

41

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2020, I electronically transmitted the attached document to the Clerk of Court using the Electronic Filing System for filing.  Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the ECF System.

*s/Phillip G. Whaley*
Phillip G. Whaley