# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

THE CHEROKEE NATION,                  )
THE CHICKASAW NATION, and             )
THE CHOCTAW NATION,                   )
                                      )
     Plaintiffs,                     )
                                      )
and                                   )
                                      )
THE CITIZEN POTAWATOMI NATION,        )
THE MUSCOGEE (CREEK) NATION,          )
THE QUAPAW NATION,                    )
THE DELAWARE NATION,                  )
THE COMANCHE NATION,                  )
THE SEMINOLE NATION,                  )
THE OTOE-MISSOURIA TRIBE, and         )
THE WICHITA AND AFFILIATED TRIBES,    )
                                      )
     Plaintiffs/Intervenors,         )
                                      )
vs.                                   )        Case No. CIV-19-1198-D
                                      )
J. KEVIN STITT, in his official capacity as )
the Governor of the State of Oklahoma, and )
*ex rel.* STATE OF OKLAHOMA, as the real )
party in interest,                    )
                                      )
     Defendants/Counterclaimants.    )

---

# OKLAHOMA'S MOTION TO CLARIFY PARTIES' AUTHORITY TO COMPLY WITH COURT'S MEDIATION ORDER AND BRIEF IN SUPPORT

PHILLIP G. WHALEY, OBA NO. 13371
DANIEL G. WEBBER, JR., OBA NO. 16332
PATRICK R. PEARCE, JR., OBA NO. 18802
MATTHEW C. KANE, OBA NO. 19502
**RYAN WHALEY**
400 North Walnut Avenue
Oklahoma City, OK  73104
Telephone:  (405) 239-6040
Facsimile:  (405) 239-6766
pwhaley@ryanwhaley.com
dwebber@ryanwhaley.com
rpearce@ryanwhaley.com
mkane@ryanwhaley.com

*-and-*

STEVEN K. MULLINS, OBA NO. 6504
MATTHEW K. FELTY, OBA NO. 31057
**LYTLE, SOULÉ & FELTY, P.C.**
1200 Robinson Renaissance
119 N. Robinson Ave.
Oklahoma City, OK 73102
Telephone:  (405) 235-7471
Facsimile:  (405) 232-3852
mullins@lytlesoule.com
mkfelty@lytlesoule.com

*-and-*

MARK E. BURGET, OBA NO. 1326
JEFFREY C. CARTMELL, OBA NO. 31012
**STATE OF OKLAHOMA, OFFICE OF THE GOVERNOR**
2300 N. Lincoln Boulevard, Suite 212
Oklahoma City, OK  73105
Telephone:  (405) 521-2342
mark.burget@gov.ok.gov
jeffrey.cartmell@gov.ok.gov

**ATTORNEYS FOR J. KEVIN STITT,
AS GOVERNOR OF THE STATE OF OKLAHOMA, AND *EX REL.* THE STATE OF
OKLAHOMA**

# TABLE OF CONTENTS

FACTUAL BACKGROUND ............................................................................... 1

ARGUMENT AND AUTHORITIES ............................................................... 5

I.   This Court Has Specific and Inherent Authority to Require the Parties' Good Faith
     Participation in Pretrial Mediation ............................................................. 5

II.  Clarification is Needed that the Governor Has "Full Settlement Authority," since
     the Governor Alone is Authorized to Negotiate and Enter into Tribal Gaming
     Compacts on Behalf of the State ................................................................. 8

III. Under Oklahoma's Regulatory (Rather than Prohibitory) Approach to Class III
     Gaming, the Governor has a Duty under IGRA to Negotiate with Tribes on Forms
     of Gaming not yet Legalized for Nontribal Entities ..................................... 12

   A. The Governor Must Mediate and Negotiate through the Lens of IGRA ............. 12

   B. Nothing in IGRA or State law precludes the Governor from negotiating or
      entering into compacts with the Tribes that vary from the Model Compact ....... 13

   C. IGRA Mandates that the State Negotiate in Good Faith, even if Such
      Negotiations Address Forms of Gaming Not Currently Authorized for Nontribal
      Entities ................................................................................................ 16

      1. IGRA's categorical approach is applicable ...................................... 19

      2. Non-house banked games and event wagering are also a proper subject of a
         compact under the game-specific approach ..................................... 21

      3. IGRA requires the State to negotiate on forms of gaming not yet legalized for
         nontribal entities ........................................................................ 23

CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Artichoke Joe's v. Norton*,
  216 F. Supp. 2d 1084 (E.D. Cal. 2002), *aff'd sub nom*, *Artichoke Joe's California
  Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003) ................................................. 25

*California v. Cabazon Band of Mission Indians*,
  480 U.S. 202 (1988) .......................................................................................................... 17

*Cheyenne River Sioux Tribe v. State of S.D.*,
  3 F.3d 273 (8th Cir. 1993) ............................................................................................... 20

*Citizen Potawatomi Nation v. Oklahoma*,
  881 F.3d 1226 (10th Cir.), *cert. denied,* 139 S. Ct. 375 (2018) ..................................... 15

*Confederated Tribes of Siletz Indians v. Oregon*,
  143 F.3d 481 (9th Cir.1998) ............................................................................................ 13

*Dewberry v. Kulongoski*,
  406 F. Supp. 2d 1136 (D. Or. 2005) ........................................................................... 9, 13

*Hendrick v. Walters*,
  1993 OK 162, 865 P.2d 1232 ........................................................................................... 12

*In re Novak*,
  932 F.2d 1397 (11th Cir. 1991) ......................................................................................... 6

*In re Oklahoma Dep't of Transp.*,
  2002 OK 74, 64 P.3d 546 ................................................................................................ 10

*In re Stone*,
  986 F.2d 898 (5th Cir. 1993) ............................................................................................. 6

*Kansas ex rel. Stephan v. Finney*,
  93-4098-SAC, 1993 WL 192809 (D. Kan. May 12, 1993) ...................................... 13, 20

*Mashantucket Pequot Tribe v. State of Conn.*,
  913 F.2d 1024 (2d Cir. 1990) ................................................................................ 18, 20, 21

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  138 S. Ct. 1461 (2018) ...................................................................................................... 23

*N. Arapaho Tribe v. State of Wyoming*,
  389 F.3d 1308 (10th Cir. 2004) ............................................................................ 17, 20, 23

*Nature's Sunshine Products v. Sunrider Corp.*,
  511 Fed. Appx. 710, 2013 WL 563309 (10th Cir. 2013) ................................................. 7

*Nick v. Morgan's Foods, Inc.*,
  270 F.3d 590 (8th Cir. 2001) ......................................................................................... 5, 6

*Rasure v. Sparks*,
    1919 OK 231, 183 P. 495 ....................................................................... 12

*Rumsey Indian Rancheria of Wintun Indians v. Wilson*,
    64 F.3d 1250 (9th Cir. 1994) ............................................................. 20, 21

*Schwartzman, Inc. v. ACF Indus., Inc.*,
    167 F.R.D. 694 (D.N.M. 1996)............................................................... 6

*Seminole Tribe of Florida v. Florida*,
    219 F. Supp. 3d 1177 (N.D. Fla. 2016) ...................................... 22

*Sheffer v. Buffalo Run Casino, PTE, Inc.*,
    2013 OK 77, 315 P.3d 359 ..................................................................... 9

*State ex rel. Clark v. Johnson*,
    904 P.2d 11 (N.M. 1995) ................................................................. 13, 20

*State ex rel. Fent v. State ex rel. Oklahoma Water Res. Bd.*,
    2003 OK 29, 66 P.3d 432 ..................................................................... 11

*Switzer v. Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, P.C.*,
    214 F.R.D. 682 (W.D. Okla. 2003).................................................... 5, 6

*Turner v. Young*,
    205 F.R.D. 592 (D. Kan. 2002) ............................................................. 6

*United States v. Sisseton-Wahpeton Sioux Tribe*,
    897 F.2d 358 (8th Cir. 1990) ............................................................... 17

*York v. Turpen*,
    1984 OK 26, 681 P.2d 763 ..................................................... 10, 11, 12

## Statutes

21 O.S. § 981 ............................................................................................ 23

25 U.S.C. §§ 2701-2721 ...............................................................passim

3A O.S. § 261 .......................................................................................... 13

3A O.S. § 262(H)..................................................................................... 22

3A O.S. § 280 ................................................................................ 9, 13, 14

3A O.S. § 280, Part 3.5, § 280.1(A) ..................................................... 22

3A O.S. § 280.1 ................................................................................. 22, 23

3A O.S. § 281, Part 11(A) ..................................................................... 14

3A O.S. § 281, Part 11(E) ..................................................................... 14

3A O.S. § 281, Part 15(B) ..................................................................... 14

3A O.S. §§ 205.6, 265, 266 ..................................................................................... 23

74 O.S. § 1221 ................................................................................................ 9, 19, 25

74 O.S. § 1221(C)(1-2) .............................................................................................. 9

74 O.S. § 1221(C)(3) ............................................................................................... 10

## Other Authorities

1989 OK AG 41 ........................................................................................................ 19

1993 OK AG 1 ........................................................................................... 19, 20, 22

2004 OK AG 27 ....................................................................................................... 10

2006 OK AG 39 ....................................................................................................... 10

2020 OK AG 8 .................................................................................................. passim

## Rules

Fed. R. Civ. P. 16 .................................................................................................. 1, 6

Fed. R. Civ. P. 16(a) ................................................................................................. 6

Fed. R. Civ. P. 16(a)(5) ............................................................................................ 5

Fed. R. Civ. P. 16(c)(1) ............................................................................................ 6

Fed. R. Civ. P. 16(c)(2)(I) ........................................................................................ 6

Fed. R. Civ. P. 16(f)(1)(B) ....................................................................................... 5

LCvR 16.3(b) ............................................................................................................ 6

LCvR 16.3(c) ............................................................................................................ 6

LCvR 16.3(f) ............................................................................................................. 5

## Constitutional Provisions

Okla. Const. art. VI, § 8 ........................................................................................... 9

Defendant/Counterclaimant J. Kevin Stitt, in his official capacity as Governor of the State of Oklahoma (the "Governor") and *ex rel.* State of Oklahoma (the "State") as the real party in interest (collectively, "Oklahoma"), submits this Motion to Clarify Parties' Authority to Comply with Court's Mediation Order (the "Motion").

Plaintiff and intervenor Indian tribes (collectively, the "Tribes") initiated this lawsuit, *against the Governor alone*, seeking "declaratory judgment of the legal effect of the 'shall automatically renew' clause of Part 15.B. of a Tribal-State gaming compact," which they entered with the State pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA"). Complaint (Doc. No. 1), ¶ 1. As part of these proceedings, the Court ordered the parties to mediation, which led to the Governor negotiating and entering into new gaming compacts with two of the Tribes. Subsequently, Oklahoma Attorney General Mike Hunter and many of the non-settling Tribes have taken a position that questions the Governor's authority to bind the State to new gaming compacts that address forms of gaming "prohibited by state law," specifically challenging these compacts. This position implies that complete resolution may not be possible, as it suggests that the Oklahoma Legislature must control the scope of settlement discussions. This position is wholly inconsistent with the concept of Tribal sovereignty, the IGRA scheme, and Oklahoma's Constitution and statutes.

## FACTUAL BACKGROUND

1.      On February 10, 2020, based upon its authority under FED. R. CIV. P. 16, and finding that "negotiations within the framework of an early mediation proceeding provide a means for efficient initial case management in this matter," the Court ordered the

parties to participate in mediation to "facilitate the parties' negotiation of a resolution of the issues implicated by this lawsuit" (Doc. No. 31, at 1, 2, ¶ 4).

2.     The State, through the Governor and representatives duly authorized by the Governor to negotiate on his behalf, participated in good faith settlement negotiations with each of the Tribes as required by the Court's order.

3.     One of the Tribes publicly reported that "[d]uring the mediation, the Governor proposed a new compact to various Tribes not involved in the litigation, and a few of the Tribes (but not all) participating in the litigation." *See* Exhibit 1, Letter to Secretary Bernhardt from Wichita and Affiliated Tribes, at 2.[1]

4.     As a result of the settlement discussions in the Court-ordered mediation, the Governor reached a settlement with the Otoe-Missouria Tribe (the "Otoe") and the Comanche Nation (the "Comanche"), which resolved all issues between them in the lawsuit. On April 21, 2020, the Otoe, the Comanche, and the State filed a joint motion announcing that the State had reached a settlement with these two Indian tribes and seeking leave to file stipulations of dismissal with prejudice (Doc. No. 120). On the same day, these tribes and the Governor signed and executed new State-Tribal gaming compacts (the "2020 Compacts") as part of the settlement of the litigation and submitted these new compacts to the U.S. Department of Interior ("DOI") for approval.  *See* Exhibit 2, Letter to Secretary Bernhardt from Otoe/Comanche, at 3; Exhibit 3, Comanche 2020 Compact.

---

[1] The Court's Order expressly imposed certain confidentiality obligations on the parties. *See* Doc. No. 31, at 3.

5.      On April 24, 2020, eight of the Tribes filed a "qualified objection" to the dismissal, contending that the 2020 Compacts "include terms that are not permitted by [IGRA]" (Doc. No. 123, ¶ 7). Notwithstanding, the Court entered the dismissals, stating that "any new compact that may have been made will not affect the Court's determination" regarding the continued effect of prior compacts (Doc. No. 124, at 2).

6.      On May 5, 2020, AG Hunter[2] wrote to DOI requesting that the 2020 Compacts be disapproved and attached an opinion he issued the same day, concluding that "[t]he Governor lacks authority to enter into and bind the State to compacts with Indian tribes that authorize gaming activity prohibited by state law" (the "2020 AG Opinion"). *See* Exhibit 6, Letter to Secretary Bernhardt from AG Hunter; OK AG 2020-08, ¶ 22.

7.      Three of the Tribes (the Chickasaw Nation, the Quapaw Nation, and the Wichita and Affiliated Tribes) also asked that DOI disapprove the new gaming compacts. *See* Exhibit 7, Letter to Secretary Bernhardt from Chickasaw Nation; Exhibit 8, Letter to Assistant Secretary of Indian Affairs from Quapaw Nation; Ex. 1 (Wichita Letter). The Chickasaw Nation and the Wichita and Affiliated Tribes both adopt the position that the Governor lacks authority to enter into new gaming compacts that address forms of gaming

---

[2] Before the lawsuit was filed, the Governor had designated AG Hunter to lead negotiations with compacting Tribes for a period of time. *See* Complaint, ¶ 53. A copy of the presentation AG Hunter prepared to frame his discussions with the Tribes in an October 28, 2019 meeting is attached as Exhibit 4. Ultimately, AG Hunter was not permitted by the Tribes to make his complete presentation, because the State would not first agree to the Tribes' legal position on compact renewal – which the Tribes had made a condition of their participation in negotiations. *See* Answer to Counterclaims (Doc. No. 38), ¶¶ 41-47. No member of the Legislature or a designated representative of the Legislature accompanied AG Hunter to this meeting. The Tribes expressly rejected the AG's efforts from the meeting. *See* Exhibit 5, November 5, 2019 Tribes' Letter; Complaint, ¶¶ 53, 55.

not currently permitted by nontribal entities. *See* Ex. 7 (Chickasaw Letter), Memo, at 9-12; Ex. 1 (Wichita Letter), at 4-5. Indeed, the Chickasaw objection states that "Governor Stitt exceeds his State law authority by seeking to 'make legal that which statute makes illegal'—namely, the conduct of 'events wagering' and house-banked games." *See* Ex. 7 (Chickasaw Letter), Memo, at 11.

8.      On May 7, 2020, the Oklahoma Indian Gaming Association ("OIGA")[3] announced it was suspending the membership of the Otoe and Comanche based upon their agreement to the 2020 Compacts. *See* Exhibit 9, OIGA News Release. The OIGA chairman is quoted as follows: "This was a difficult decision to make, but it was the correct one. Oklahoma Indian Gaming Association works best when its membership can speak frankly and with the trust that all members are working together to support our industry as a whole." *See* Exhibit 10, Article from Native News Online. In response to the suspension, the Otoe Chairman is quoted as follows:

> Each tribe has the right to negotiate the best compact available for their tribal government. We still support the intentions of the other tribes to fight for the very best compact for their individual governments. I certainly hope as negotiations continue, other tribes won't be singled out for exercising their tribal sovereignty.

*Id*. And the Comanche Chairman is quoted as stating: "I believe the hype of United for Oklahoma gets lost when a sovereign nation does indeed practice sovereignty." *Id*.

---

[3] The Tribes who are parties to this litigation appear to be members of the OIGA. Indeed, the OIGA chairman, Matthew Morgan, is the Director of Gaming Affairs for the Chickasaw Nation, whose revenue from the conduct of Tribal gaming and leasing of gaming machines to other gaming Tribes in Oklahoma approaches $1 billion annually.

## ARGUMENT AND AUTHORITIES

The Court has ordered the State and the Tribes to participate in early mediation as part of its initial case management plan for this matter. As Judge Heaton has previously advised in connection with court-ordered mediation, "[b]oth parties are admonished that an order for mediation is just that—an order. It is not a suggestion to be ignored at will." *Switzer v. Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, P.C.*, 214 F.R.D. 682, 683 (W.D. Okla. 2003). The State has and continues to give the Court's mediation order the respect and authority it is due. However, AG Hunter's opinion and the conduct of the other Tribes casts doubt on the negotiations. In order to fulfill its obligations to the Court and to the Tribes, and to continue good-faith settlement negotiations, Oklahoma seeks this Court's guidance: (1) affirming the Governor's authority to negotiate and enter into new or amended gaming compacts beyond the State's Model Compact; and (2) clarifying the Governor's duty under IGRA to negotiate gaming compacts, if requested by a Tribe, that address forms of class III gaming not yet legalized for any nontribal entities, and the Governor's authority to enter into such compacts that are binding upon the State.

## I. This Court Has Specific and Inherent Authority to Require the Parties' Good Faith Participation in Pretrial Mediation.

District courts have "both the specific and inherent authority to require attendance at, and good faith participation in, a settlement conference." *See Switzer*, 214 F.R.D. at 688 (citing FED. R. CIV. P. 16(a)(5)). A party who "does not participate in good faith" in a pretrial settlement conference is subject to sanctions. *See* FED. R. CIV. P. 16(f)(1)(B); *see also* LCvR 16.3(f); *Nick v. Morgan's Foods, Inc.*, 270 F.3d 590, 595 (8th Cir. 2001).

Under Federal Rule 16, district courts "have explicit authority to require pretrial conferences to improve the quality of the trial through more preparation or to facilitate the settlement of the case." *Nick*, 270 F.3d at 595, citing FED. R. CIV. P. 16(a); *see also* FED. R. CIV. P. 16(c)(2)(I). Further, the district court "may require that a party or its representative be present or reasonably available by other means to consider possible settlement." *See* FED. R. CIV. P. 16(c)(1). This district's Local Rules further require attendance at a court-ordered mediation conference by the named parties and/or certain of their representatives with "full settlement authority." *See* LCvR 16.3(b), (c); *see also Switzer*, 214 F.R.D. at 684.[4]

Further, "the power to direct parties to produce individuals with full settlement authority at pretrial settlement conferences is inherent in the district courts." *In re Novak*, 932 F.2d 1397, 1407 (11th Cir. 1991). "This applies to the government as well as private litigants." *In re Stone*, 986 F.2d 898, 903 (5th Cir. 1993) (holding that "district courts have the general inherent power to require a party to have a representative with full settlement authority present—or at least reasonably and promptly accessible—at pretrial conferences"); *see also Schwartzman, Inc. v. ACF Indus., Inc.*, 167 F.R.D. 694, 698 (D.N.M. 1996). Accordingly, the Tenth Circuit has held that a party's authority to agree to

---

[4] Another district court has held: "'Attendance' means to appear in person and participate directly, not to stand by or participate by telephone. '[S]ettlement authority' means full, meaningful, authority. A person with settlement authority does not need to pick up the phone to call anyone else to find out whether he or she can go higher or lower. A person with settlement authority is 'the' decisionmaker. He or she is the person who has authority to meet the other party's demand, even if he or she chooses not to do so." *Turner v. Young*, 205 F.R.D. 592, 595 (D. Kan. 2002).

the final terms of an agreement that is the "logical outgrowth" of a mediation session is implicit and understood. *See Nature's Sunshine Products v. Sunrider Corp.*, 511 Fed. Appx. 710, 715–16, 2013 WL 563309 (10th Cir. 2013) ("Indeed, any contrary rule would impede settlement negotiations.").

Implicit in the Court's mediation order is the requirement that the parties will negotiate in good faith and participate with full settlement authority. The State, through the Governor and his designees, has participated in the meditation to date with the understanding that the Governor is vested with such authority by the Oklahoma constitution and statutes. The position advanced by the Tribes calls into question the Governor's authority to enter an agreement that may be a "logical outgrowth" of mediation in order to effectuate a settlement here. The analysis provided to DOI by the Chickasaw Nation is emblematic of the concern:

> The question is not whether a State may *negotiate* for terms that depart from what State law presently allows. The very nature of intergovernmental compacting encourages such approach. The problem is not in the *negotiating* but in the *entering*. IGRA requires Tribes to enter compacts with *States*, not *State governors*, and to be valid, a compact must be validly *entered* by those officials who have the authority to bind their respective governments to the mutual exchange of promises the compact represents. If the parties negotiating lack that authority, then their terms must be ratified by others who do; after all, as a form of intergovernmental contract, "a compact is not *valid* unless properly authorized," and as with all such agreements, "parties entering into one must assure themselves that each contracting party is authorized to enter into the contract."

*See* Ex. 7 (Chickasaw Letter), Memo, at 8-9 (emphasis in original); *see also* Facts 5, 7.

Notwithstanding that they brought this action against the Governor alone, some of the

Tribes appear to question whether the Governor is the proper party to settle the very dispute they initiated.

These Tribes' objections to the dismissal of the Otoe and Comanche – and to the approval of the 2020 Compacts – appear designed to undermine Tribal sovereignty and frustrate other Tribes' good faith negotiations with the Governor. Moreover, given this conduct, it is fair to question whether all Plaintiff Tribes are participating in the mediation in good faith, or are instead undermining the Court's order by creating a false choice for other Tribes – "stay with us or we will fight your new compacts and kick you out of our association for dealing directly with the State" – as experienced by the Otoe and Comanche. This sentiment – that one litigating sovereign Tribe cannot negotiate and enter into a resolution of its dispute with the State free of attack and interference from other litigating Tribes – can only be characterized as contrary to the spirit of the Court's Mediation Order and the Parties' duties thereunder. Indeed, because the Tribes seem to suggest that the full Oklahoma Legislature must be present at the bargaining table (contrary to a prior AG Opinion), or must preauthorize the scope of the Governor's negotiating authority (contrary to IGRA), the State herein requests that the Court issue an order clarifying that the Governor has the authority to participate in the mediation and enter into a resolution binding on the State.

## II. Clarification is Needed that the Governor Has "Full Settlement Authority," since the Governor Alone is Authorized to Negotiate and Enter into Tribal Gaming Compacts on Behalf of the State.

In Oklahoma, the Governor is vested with constitutional and statutory authority to negotiate and enter compacts with Indian tribes regarding activities on tribal lands. *See*

*Sheffer v. Buffalo Run Casino, PTE, Inc.*, 2013 OK 77, ¶ 12, 315 P.3d 359, 364 ("The Executive Branch of the State of Oklahoma, specifically the Governor, has been and continues to be the party responsible for negotiating compacts with the sovereign nations of this state."); *see also Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136, 1156 (D. Or. 2005) (recognizing the authority of Oregon's Governor to negotiate and execute gaming compacts with Indian tribes under very similar state constitutional and statutory scheme). As noted by the Oklahoma Supreme Court, this constitutional authority is derived from Article VI, Sections 2 and 8. *See id.*, at 364 n.18. Specifically, Okla. Const. art. VI, § 8 provides: "The Governor shall cause the laws of the State to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States ..."[5]

The basis of the Governor's statutory authority to enter compacts is found in 74 O.S. § 1221, which provides:

> 1. The Governor is authorized **to negotiate <u>and enter into</u>** cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address issues of mutual interest.
>
> * * *
>
> 2. If the cooperative agreements specified and authorized by paragraph 1 of this subsection involve trust responsibilities, approval by the Secretary of the Interior or designee shall be required.

74 O.S. § 1221(C)(1-2) (emphasis added).

---

[5] The Governor's authority is expressly acknowledged in the State-Tribal Gaming Act ("STGA"). *See* 3A O.S. § 280 ("The State of Oklahoma <u>*through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe*</u> …"); cited in *Sheffer*, 315 P.3d 364 n.18.

Therefore, under Oklahoma law, it is the Governor – ***and the Governor alone*** – who is authorized to **negotiate and enter into** compacts with Indian tribes. In 2004, with regard to the very gaming compacts at issue in this litigation, former AG Drew Edmondson opined that the Governor alone held the power to enter gaming compacts with Indian tribes – and any requirement that the Legislature approve a compact negotiated by the Governor would violate the separation of powers provision of Oklahoma's Constitution.[6] 2004 OK AG 27, ¶¶ 27-29; *see also* 2006 OK AG 39, ¶ 18 (the Oklahoma Boxing Commission lacked the power to enter an agreement to regulate professional boxing on Indian land, and any such regulation "must be accomplished through a cooperative agreement (compact) between the State and the tribe that must be negotiated and entered into by the Governor or the Governor's named designee"). By contrast, under 74 O.S. § 1221(C)(3), the Legislature specifically provided that certain compacts involving the surface water and/or groundwater resources of the State require legislative consent.

The 2020 AG Opinion confirms that the authority to negotiate and enter into gaming compacts in Oklahoma is vested in the Governor without any "requirements of *post-hoc* legislative approval." 2020 OK AG 8, ¶ 10. AG Hunter's opinion specifically cites the 2004 Opinion, wherein former AG Edmondson opined that the Governor's authority

---

[6] As explained by the Oklahoma Supreme Court, "[t]his separation of powers provision mandates that each department of the government shall be kept independent in the sense that the acts of each shall never be controlled by or subjected, directly or indirectly, to the coercive influences of either of the other departments." *In re Oklahoma Dep't of Transp.*, 2002 OK 74, ¶ 8, 64 P.3d 546, 549, citing *York v. Turpen,* 1984 OK 26, ¶ 9, 681 P.2d 763, 767 (holding that legislative oversight committees with the power to review and approve grants issued by the Department of Transportation violated the separation of powers provision).

derives from statute – and not the Oklahoma Constitution – but does not expressly adopt that position. *Id.*, ¶ 9. To the contrary, in withdrawing from the pre-lawsuit compact discussion with the Tribes, AG Hunter's office released a statement *confirming* the Governor's exclusive **constitutional and statutory authority** to negotiate and enter such gaming compacts:

> Under Article VI, Section 8 of the Oklahoma Constitution and 74.O.S. S1221, the governor is given authority to enter into agreements with the federally recognized tribes. Accordingly, the attorney general and the governor have agreed to return the lead agency over tribal gaming compact negotiations to the Governor's Office. This will allow the governor and his legal counsel to negotiate directly with tribes to hopefully develop a path forward.

*See* Exhibit 11, Article from KFOR.com.

There can be no doubt, therefore, that the Governor alone has the authority to negotiate and enter into gaming compacts with the Tribes. Notwithstanding, AG Hunter's recent opinion goes on to state that "[t]he Governor lacks authority to enter into and bind the State to compacts with Indian tribes that authorize gaming activity prohibited by state law." 2020 OK AG 8, ¶ 22. In his letter to DOI, AG Hunter issued a not-so-subtle warning to the Governor that "state officers are bound by these Attorney General opinions until relieved of that duty" by the courts. *See* Ex. 6 (AG Hunter Letter), at 1, citing *State ex rel. York v. Turpen*, 1984 OK 26, 681 P.2d 763; *see also State ex rel. Fent v. State ex rel. Oklahoma Water Res. Bd.*, 2003 OK 29, 66 P.3d 432, 441 (recognizing an exception when the Attorney General finds a "constitutional infirmity"). Because the 2020 AG Opinion states that the question to which the Attorney General was responding "implicates core

notions of our constitutional structure," and cited both statutory and constitutional authority, the *York* exception is applicable here, and the opinion is merely advisory.[7]

Nonetheless, because the letter to DOI and the 2020 AG Opinion purport to limit the Governor's authority to negotiate and enter into gaming compacts as part of the court-ordered mediation, as well as with other non-party Indian tribes, Oklahoma seeks the Court's guidance. Specifically, clarification is needed as to the Governor's authority to bind the State to compact provisions related to exclusivity, rates, covered games, and other significant subjects that differ from or are not found in the Model Compact.

## III. Under Oklahoma's Regulatory (Rather than Prohibitory) Approach to Class III Gaming, the Governor has a Duty under IGRA to Negotiate with Tribes on Forms of Gaming not yet Legalized for Nontribal Entities.

### A. The Governor Must Mediate and Negotiate through the Lens of IGRA.

IGRA provides that class III gaming activities "shall be lawful on Indian lands only if," among other things, it is "located in a State that *permits <u>such gaming</u>* for any purpose by any person, organization, or entity" and "conducted in conformance with a Tribal-State compact . . . that is in effect." *Id*. § 2710(d)(1)(B), (C) (emphasis added). Indian tribes may request the State enter into a compact governing the conduct of "such gaming," and the State must in turn negotiate in good faith. *Id*. § 2710(d)(3)(A). In 2004, the Model Tribal Gaming Compact ("Model Compact") was negotiated between the State and various tribes

---

[7] Opinions issued by the Attorney General "should be followed." *Rasure v. Sparks*, 1919 OK 231, 183 P. 495. However, while Attorney General's opinions are generally binding upon state officials whom they affect, they are "*always* merely advisory on a constitutional issue." *Hendrick v. Walters*, 1993 OK 162, 865 P.2d 1232, 1243 (emphasis in original).

and incorporated into legislation that became the STGA, 3A O.S. § 261 *et seq*., as an offer of a gaming compact under IGRA. *See* 3A O.S. § 280.

What forms of class III gaming a state "permits" within the meaning of § 2710(d)(1)(B) of IGRA is "ultimately a federal question." *State ex rel. Clark v. Johnson*, 904 P.2d 11, 20 (N.M. 1995); *see also Kansas ex rel. Stephan v. Finney*, 93-4098-SAC, 1993 WL 192809, at *5 (D. Kan. May 12, 1993). Further, "[i]t is well-established that IGRA, as a matter of federal law, preempts state regulation which 'interferes or is incompatible with federal or tribal interests.'" *Dewberry*, 406 F. Supp. 2d at 1152, quoting *Confederated Tribes of Siletz Indians v. Oregon*, 143 F.3d 481, 487 (9th Cir.1998) (citation and quotation marks omitted).

When the Court invoked its specific and inherent authority to order the parties to mediation here, it did so against this IGRA backdrop. The Tribes are sovereign nations, entitled to conduct their own affairs on their lands, subject to federal law. However, no Tribe can lawfully engage in class III gaming without a Tribal-State compact that is in effect. Thus, because a compact is necessary to make continued tribal class III gaming in Oklahoma lawful, it is certainly a "logical outgrowth" of mediation here.

    B.    Nothing in IGRA or State law precludes the Governor from negotiating or entering into compacts with the Tribes that vary from the Model Compact.

Although the AG's opinion turns on the Governor's authority to enter into compacts addressing additional forms of gaming, the opinion ultimately casts doubt on the Governor's authority to bind the State to any compact whose terms differ from or are not found in the Model Compact. But the Governor's authority to bind the State to terms that

differ from those found in the Model Compact is clear from the language of the STGA and the Compact itself. *See* 3A O.S. § 280 (stating that "[n]o tribe shall be *required* to agree to terms different than the terms set forth in the [Model Compact]…," but not precluding a tribe from doing so) (emphasis added); 3A O.S. § 281, Part 15(B) (authorized the Governor to request a compacting tribe to renegotiate the exclusivity provisions at the end of the term).

The 2020 AG Opinion identifies numerous ways in which the 2020 Compacts differ from the Model Compact, including "different processes for adding new games, a different dispute resolution clause, and different audit and compliance provisions." 2020 OK AG 8, ¶ 6. There is no dispute that these topics were the subject of the Model Compact, and therefore, they are the appropriate subject of negotiation. But AG Hunter expressly declined to offer any opinion on the Governor's authority to enter gaming compacts that contain these different provisions or differ from the Model Compact only as to exclusivity (*see* 2020 OK AG 8, ¶ 13 n.6), thus casting doubt as to such authority.

Parts 11(A) and 11(E) of the Model Compact contain "exclusivity" provisions that: (1) guarantee tribes "substantial exclusivity," *i.e.*, the ability to operate certain class III gaming with limited competition from nontribal entities at specified locations with a set numbers of machines; (2) obligate signatory tribes to pay fees to the State in exchange for such substantial exclusivity; and (3) obligate the State to pay liquidated damages in the event of certain breaches of these exclusivity provisions. *See* 3A O.S. § 281, Parts 11(A), 11(E). Indeed, citing Oklahoma's disproportionately lower gross revenue sharing from tribal gaming among states with the most total revenues (Oklahoma ranks second only to

California in total tribal gaming revenue), AG Hunter specifically identified "increased total revenue share payments" to the State in return for "expanded gaming opportunities for the Tribes" as opportunities for 2020 gaming compacts. *See* Ex. 4 (AG Hunter's Presentation), Slides 8-11.

Similarly, as to the dispute resolution provisions, for example, the Tenth Circuit has expressly held that Part 12 of the Model Compact related to arbitration is unenforceable. *See Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1228 (10th Cir.), *cert. denied,* 139 S. Ct. 375 (2018). Certainly, the Governor could not be required to negotiate and enter into gaming compacts identical to Part 12 of the Model Compact, knowing that such arbitration scheme is unenforceable. Indeed, "[r]epairing the dispute resolution provisions" was specifically identified as a goal in AG Hunter's presentation. *See* Ex. 4 (AG Hunter's Presentation), Slide 12.

If the Governor lacks authority to enter into new compacts whose exclusivity provisions differed from those in the Model Compact, it would render his express authority to request renegotiation with a signatory tribe illusory. More broadly, any requirement that the Governor can enter compacts only in the form of the Model Compact would allow the Legislature to perform an end-run around the separation of powers provision of the Oklahoma Constitution, which AG Hunter and former AG Edmondson both indicated would be violated if compacts negotiated and entered into by the Governor were the subject of subsequent legislative approval. Moreover, there is no indication in the 2020 AG Opinion – nor could there be – that a compact with different exclusivity, dispute resolution, or auditing provisions would somehow "authorize gaming activity prohibited by state law."

Conversely, in the 2020 Compacts, the Governor is not attempting to change state law – those Compacts are expressly limited to tribal activities on tribal lands.

Because the Governor is expressly authorized to negotiate and enter into gaming compacts with the Tribes that contain provisions which differ from those found in the Model Compact, he has full settlement authority to participate in mediation, the result of which may be new or amended gaming compacts not identical to the Model Compact, and the Court should issue an order affirming such authority.

C. IGRA Mandates that the State Negotiate in Good Faith, even if Such Negotiations Address Forms of Gaming Not Currently Authorized for Nontribal Entities.

The main focus of the 2020 AG Opinion is the scope of gaming activity addressed in Tribal-State compacts. Broadly, AG Hunter states that the Governor cannot bind the State to a compact that would "authorize gaming activity prohibited by state law." 2020 OK AG 8, ¶ 22. More specifically, the Attorney General finds that house-banked card and table games and event wagering are prohibited by state criminal law and, therefore, cannot be the subject of a Tribal-State gaming compact. *Id.*, ¶ 13. This position adopted by the Attorney General in May 2020 is particularly curious in light of his October 2019 presentation, in which he identified several opportunities for "expanding gaming" in "2020 Gaming Compacts," specifically:

Full casino-style Class III gaming, including house-banked games

Sports Wagering in gaming facilities

Fantasy Gaming in gaming facilities

*See* Ex. 4 (AG Hunter's Presentation), Slide 7.[8] Indeed, the presentation concludes with a proposed "path forward," which specifically includes discussions on presumably new and different 2020 Gaming Compacts (with no mention of any required additional legislative approval). In any event, his opinion raises several issues involving IGRA and the scope of the Governor's authority to enter gaming compacts with Tribes that bind the State and permit class III gaming on Indian lands.

IGRA defines the scope of gaming subject to a compact and, specifically, requires a state to negotiate on gaming if the state "permits *such gaming* for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B) (emphasis added). As the Tenth Circuit has held, "Congress intended to permit a particular gaming activity, *even if conducted in a manner inconsistent with state law,* if the state law merely regulated, as opposed to completely barred, that particular gaming activity." *N. Arapaho Tribe v. State of Wyoming*, 389 F.3d 1308, 1312 (10th Cir. 2004) (emphasis in original); *see also United States v. Sisseton-Wahpeton Sioux Tribe*, 897 F.2d 358, 365 (8th Cir. 1990). This "prohibitory/regulatory" dichotomy has its origins in the Supreme Court's seminal decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 209-10 (1988) (adopting the rule that "if the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L.

---

[8] Indeed, it is ironic that AG Hunter's presentation when he was negotiating with the Tribes on behalf of the Governor included event wagering and house-banked table games with no mention that he did not have the authority to negotiate as to such gaming without legislative approval, as his subsequent opinion suggests.

280 does not authorize its enforcement on an Indian reservation."); *see also Mashantucket Pequot Tribe v. State of Conn.*, 913 F.2d 1024, 1031 (2d Cir. 1990) (applying the *Carbazon* prohibitory/regulatory test to determine whether a state permits class III gaming under IGRA). A state "permits such gaming" if class III gaming is subject to regulation; if the state instead criminally prohibits all such gaming for all persons for any purpose, it is beyond the scope of IGRA.[9]

In the leading Tenth Circuit case, the Northern Arapaho Tribe challenged Wyoming's refusal to negotiate in good faith regarding certain types of class III gaming. The court adopted the prohibitory/regulatory test, holding that the primary issue in such a case "is whether 'such gaming activity' in which the Northern Arapaho Tribe wishes to engage is 'prohibited' or merely regulated by the state of Wyoming." *Id*. at 1310. The court made it clear that in a state such as Wyoming that regulates, rather than prohibits, class III gaming, the requirement of IGRA Section 2710(d)(1)(B) is met, and "[t]he state is therefore clearly required to conduct negotiations with the Tribe concerning the full gamut of" such games *Id*. at 1312.

Like Wyoming, Oklahoma regulates, rather than prohibits, class III gaming, as confirmed by opinions of the Office of Attorney General. In 1989, the year after Congress enacted IGRA, former AG Robert Henry opined that pari-mutuel wagering on horse races

---

[9] Disputes involving the scope of the phrase "such gaming" typically arise when an Indian tribe challenges the State's refusal to negotiate in good faith, or to enter into, a compact authorizing class III gaming, or certain specific class III games, as required by 25 U.S.C. § 2710(d)(3)(A). *See also* 25 U.S.C. § 2710(d)(7)(A)(i) (granting jurisdiction in the federal district courts over such disputes).

was the proper subject of a compact under 74 O.S. § 1221, stating that "a plain reading of the statute leads one to the conclusion that the Governor possesses the power to enter into compacts with certain Indian tribal governments about issues of mutual interest, such as pari-mutuel wagering on horse races, if other prerequisites are met." 1989 OK AG 41, ¶ 4. However, the opinion incorrectly found that because Oklahoma law does not expressly permit pari-mutuel wagering by nontribal entities other than at racetrack locations, off-track pari-mutuel wagering was ***not*** a proper subject of a gaming compact. *Id*. ¶ 19. Several years later, in 1993, former AG Susan Loving addressed this issue again in light of case law interpreting IGRA, including the prohibitory/regulatory test, and expressly withdrew the 1989 opinion. 1993 OK AG 1, ¶ 64. In short, the position advanced by certain of the Tribes now has been flatly rejected given developments in controlling case law. Recognizing that Oklahoma law strictly regulates pari-mutuel wagering, but does not entirely prohibit it, Oklahoma ***was required by IGRA*** to negotiate with Indian tribes on pari-mutuel wagering, even if conducted at off-track locations. *Id*. Because at least some forms of class III gaming are permitted in Oklahoma (meaning that Oklahoma "regulates" rather than "prohibits" class III gaming), the State is required by IGRA to conduct good faith negotiations with Indian tribes regarding compacts authorizing them to conduct class III games. In Oklahoma, the Governor (or his designee) alone is authorized to conduct such negotiations, and to enter into such compacts.

### 1. IGRA's categorical approach is applicable.

There is a circuit split as to which forms of games a state is required to negotiate with Indian tribes. The "categorical approach" (adopted by the Second Circuit) provides

that if the state permits any form of class III gaming, the state must negotiate all forms of class III gaming, since the state is merely "regulating," rather than "prohibiting," this type of gaming. *See Mashantucket Pequot Tribe*, 913 F.2d at 1031-32. Under the "game-specific" approach (adopted by the Eighth and Ninth Circuits), if the state allows a particular game for any purpose, the state must negotiate with the tribe over that specific game. *See Cheyenne River Sioux Tribe v. State of S.D.*, 3 F.3d 273, 279 (8th Cir. 1993); *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1257-58 (9th Cir. 1994). The Tenth Circuit declined to adopt one test over the other, finding it unnecessary because of Wyoming's broad statute permitting "any game, wager, or transaction" for charitable purposes.[10] *See N. Arapaho Tribe*, 389 F.3d at 1311.

The categorical approach is most faithful to IGRA's plain language, which broadly refers to "class III" gaming activities, not particular class III games:

> *Class III gaming activities* shall be lawful on Indian lands only if such activities are …
>
> (B) located in a State that permits *such gaming* for any purpose by any person, organization, or entity.

25 U.S.C. § 2710(d)(1)(B) (emphasis added). The dissenting opinion in *Rumsey* is instructive:

> Thus the state must negotiate with a tribe if the state "permits such gaming." The *Rumsey* opinion regards the key question as being whether the word "permits" is ambiguous; it holds that the word is not ambiguous, so the State need not bargain. But the proper question is not what Congress meant by

---

[10] Oklahoma's Office of Attorney General has purportedly applied the game-specific approach, which is clearly more favorable to the State. *See* 1993 OK AG 1, ¶¶ 13-32; 2020 OK AG 8, ¶¶ 17-18. Regardless, this is an issue of federal – not state – law. *See State ex rel. Clark*, 904 P.2d at 20; *Kansas ex rel. Stephan*, 1993 WL 192809, at *5.

"permits," but what Congress meant by "such gaming." Did it mean the particular game or games in issue, or did it mean the entire category of Class III gaming? The structure of IGRA makes clear that Congress was dealing categorically, and that a state's duty to bargain is not to be determined game-by-game. **The time to argue over particular games is during the negotiation process.**

The only natural reading of section 2710(d)(1)(B) is that, when Congress says "Class III gaming activities shall be lawful ... if located in a State that permits such gaming," then "such gaming" refers back to the category of "Class III gaming," which is the next prior use of the word "gaming."

*Rumsey*, 64 F.3d at 1254 (dissent) (emphasis added). Further, as the Second Circuit has held, IGRA's requirement that the state negotiate with Indian tribes in good faith would be rendered meaningless if Indian gaming was subject to precisely the same rules and regulations as nontribal gaming:

Under the State's approach, on the contrary, even where a state does not prohibit class III gaming as a matter of criminal law and public policy, an Indian tribe could nonetheless conduct such gaming only in accordance with, and by acceptance of, the entire state corpus of laws and regulations governing such gaming. The compact process that Congress established as the centerpiece of the IGRA's regulation of class III gaming would thus become a dead letter; there would be nothing to negotiate, and no meaningful compact would be possible.

*Mashantucket Pequot Tribe*, 913 F.2d at 1030–31.

Interpreting Section 2710(d)(1)(B) pursuant to the categorical approach (as the Court should), because Oklahoma merely regulates class III gaming, but does not prohibit it, the State is required to negotiate all forms of class III gaming upon request by a Tribe.

2.   <u>Non-house banked games and event wagering are also a proper subject of a compact under the game-specific approach.</u>

Even under the game-specific approach, the State has a duty to conduct negotiations regarding house-banked card and table games and event wagering, if requested by a Tribe, if those specific games are permitted for any purpose by any person, organization or entity.

As applied by the Office of Attorney General in 1993 OK AG 1, *supra*, those games do **not** need to be permitted in a certain way or at certain locations to be the proper subject of gaming compact negotiations.

*House-Banked Card and Table Games*. Card and table games are regulated, though not prohibited, in Oklahoma. The STGA expressly authorizes compacting tribes to conduct both card and table games. *See* 3A O.S. § 280, Part 3.5, § 280.1(A). Table games are highly regulated in Oklahoma; indeed, they are currently permitted only by compacting tribes, where the "tribe has no interest in the outcome of the game," such as tournaments. *See id*. § 280.1(A). By contrast, a "banked game is one in which there is no common pot but instead there is a bank who pays the winners and collects from the losers." *Seminole Tribe of Florida v. Florida*, 219 F. Supp. 3d 1177, 1185 (N.D. Fla. 2016). A "house-banked" game is one in which the house (here, the tribal operator) acts as the bank. In Florida, for some period of time, only Indian tribes were authorized to offer banked games – nontribal operators (cardrooms) were not.

> Because of this statute, the Tribe's authority under the Compact to conduct banked card games afforded the Tribe the right to conduct banked card games *without competition from cardrooms.* This was perhaps the most important benefit the Tribe obtained under the Compact. The most important benefit to the State was more than a billion dollars.

*Id.*, at 1182 (emphasis in original). In other words, those tribes were afforded the opportunity to offer forms of gaming not available to nontribal operators. Similarly, in Oklahoma, tribes alone are permitted to offer non-banked table games, pursuant to an amendment to the STGA. *See* 3A O.S. § 280.1; *see also* 3A O.S. § 262(H) (prohibiting nontribal entities from offering house-banked card and table games). Because card and

table games are regulated in Oklahoma (*e.g.*, with regard to "banking"), but not prohibited, they are clearly the proper subject of a State-Tribal gaming compact negotiations.

*Event Wagering*. Likewise, the State heavily regulates, but does not prohibit, event wagering. For example, Oklahoma broadly permits wagering on horse racing events, both inside and outside of Oklahoma. *See, e.g.*, 3A O.S. §§ 205.6, 265, 266. Additionally, Oklahoma permits compacting Indian tribes to offer gaming tournaments. *See id*. § 280.1. Finally, Oklahoma exempts athletic events from the prohibition against "betting" under Oklahoma's criminal law under certain circumstances (*e.g.*, if accomplished through pool wagering). *See* 21 O.S. § 981; *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018) (holding that federal statute prohibiting state authorization of sports gambling violates the anticommandeering rule). Because Oklahoma's law relating to event wagering is merely a form of strict regulation, but not a complete prohibition, event wagering is a proper subject of compact negotiations.

### 3.   IGRA requires the State to negotiate on forms of gaming not yet legalized for nontribal entities.

Even if house-banked card and table games and event wagering are not yet authorized by state law for nontribal entities, that does not mean they are not an appropriate subject for gaming compacts entered by the Governor. According to the Tenth Circuit, a state has "a duty to negotiate for terms beyond those [the state's] law expressly permits." *N. Arapaho Tribe*, 389 F.3d at 1313. As represented to DOI by the Otoe and Comanche, State-Tribal compacts regularly address forms of gaming not yet authorized under state law. *See* Ex. 2 (Otoe/Comanche Letter), at 5-7 (providing examples).

Moreover, nothing in IGRA prevents a state from entering into a compact addressing, or indeed authorizing, forms of class III gaming that are not specifically authorized for any nontribal entity. This raises a question not addressed by the Tenth Circuit or those circuits which have applied either the categorical or game-specific approach to determine which forms of gaming a state *must* negotiate with a Tribe. Those cases do not speak to the question of whether a state *may* negotiate regarding additional class III games, even if not expressly required to do so by IGRA.

> In *Rumsey,* the court observed that "a state need only allow Indian Tribes to operate games that others can operate, but need not give tribes what others cannot have." *Rumsey* settled the question of whether a state *must* negotiate class III gaming compacts with Indian tribes when the state does not permit those activities for anyone. The decision does not address the issue presented here— whether the state *may* negotiate class III gaming compacts with Indian tribes even if the state does not permit those activities for non-Indians. Plaintiffs' argument that this "is a distinction without a difference," simply restates their position that a state may not affirmatively permit Indian tribes to engage in class III gaming without opening up such gaming to everyone else. Neither the "any person, organization, or entity" requirement nor *Rumsey* supports the plaintiffs' position.
>
> In short, the court concurs with the Secretary that the exclusive class III gaming compacts … are within the plain language of IGRA.
>
> * * *
>
> Further, California's decision to "permit" tribes to operate class III gaming facilities within the context of IGRA and the compacts, while denying those rights to other persons, organizations, and entities, is a policy judgment, which whether one agrees with it or not, does not conflict with IGRA's goal of maintaining state authority while protecting Indian gaming from discrimination. By contrast, to interpret IGRA to require the states to [choose] between no class III gaming anywhere and class III gaming everywhere would not further any of IGRA's goals and would limit the states' authority and flexibility without any resulting benefit to the tribes.

*Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1122–23, 1126 (E.D. Cal. 2002), *aff'd*

*sub nom*, *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 722 (9th Cir.

2003) (holding that IGRA "does not *compel* a reading of 'permits such gaming' that requires California to legalize non-Indian class III gaming before executing valid compacts under IGRA") (citations omitted) (emphasis added). If states were not permitted to enter into gaming compacts with Indian tribes that authorized forms of class III gaming generally prohibited by nontribal entities, the concept of "exclusivity" giving rise to the state's ability to collect fees would be eviscerated.

The Governor is not seeking to unilaterally change state law. Nothing in the 2020 Compacts makes any change to state legislation; the compacts affect activities conducted by Tribes on Indian lands. Accordingly, the Court should affirm that the Governor is authorized to negotiate and enter into new or amended gaming compacts with Tribes that address all forms of class III gaming and has the authority to bind the State to such compacts under his constitutional authority and 74 O.S. § 1221, even if those forms of gaming are not yet authorized for nontribal entities under Oklahoma law.

## CONCLUSION

Based upon the foregoing arguments and authorities, the Court should issue an order clarifying that the Governor has authority to participate in court-ordered mediation in good faith, including without limitation authority to negotiate and enter new or amended gaming compacts on behalf of the State that address house-banked card and table games and event wagering.

Respectfully submitted by:

*s/Phillip G. Whaley*
Phillip G. Whaley, OBA No. 13371
Daniel G. Webber, Jr., OBA No. 16332
Patrick R. Pearce, Jr., OBA No. 18802
Matthew C. Kane, OBA No. 19502
**RYAN WHALEY**
400 North Walnut Avenue
Oklahoma City, OK  73104
Telephone:  (405) 239-6040
Facsimile:  (405) 239-6766
pwhaley@ryanwhaley.com
dwebber@ryanwhaley.com
rpearce@ryanwhaley.com
mkane@ryanwhaley.com

*-and-*

Steven K. Mullins, OBA No. 6504
Matthew K. Felty, OBA No. 31057
**LYTLE, SOULÉ & FELTY, P.C.**
1200 Robinson Renaissance
119 N. Robinson Ave.
Oklahoma City, OK 73102
Telephone:  (405) 235-7471
Facsimile:  (405) 232-3852
mullins@lytlesoule.com
mkfelty@lytlesoule.com

*-and-*

Mark E. Burget, OBA No. 1326
Jeffrey C. Cartmell, OBA No. 31012
State of Oklahoma, Office of the Governor
2300 N. Lincoln Boulevard, Suite 212
Oklahoma City, OK  73105
Telephone:  (405) 521-2342
mark.burget@gov.ok.gov
jeffrey.cartmell@gov.ok.gov

**ATTORNEYS FOR J. KEVIN STITT,
AS GOVERNOR OF THE STATE OF OKLAHOMA,
AND *EX REL.* THE STATE OF OKLAHOMA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2020, I electronically transmitted the attached document to the Clerk of Court using the Electronic Filing System for filing.  Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the ECF System.

*s/Phillip G. Whaley*
Phillip G. Whaley