IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WICHITA AND AFFILATED TRIBES,            )<br>                                                                  )<br>            Plaintiff,                                        )<br>                                                                  )<br>vs.                                                              )<br>                                                                  )<br>J. KEVIN STITT, in his official capacity as       )<br>the Governor of the State of Oklahoma,        )<br>                                                                  )<br>            Defendant.                                    ) | Case No. CIV-19-1198-D |

**O R D E R**

The remaining parties in this case following the entry of a final judgment under Fed. R. Civ. P. 54(b) are Plaintiff-Intervenor Wichita and Affiliated Tribes (the "Tribe") and Defendant J. Kevin Stitt, in his official capacity as Governor of the State of Oklahoma (the "State").[1] *See* Final J. [Doc. No. 157]. The amended caption on this Order reflects the current controversy and shall be used in all future filings in the case.

The only remaining claims in this case under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-21, are two claims asserted by the Tribe in its Amended Complaint in Intervention [Doc. No. 103] and a counterclaim asserted by the State in its Answer and

---

[1] From the outset of this case, there was no dispute that Governor Stitt in his official capacity "for purposes of this case, represents the State." *See* 7/28/20 Order at 3; *see* 6/15/20 Order at 1-2 & n.1. This reflects the well-settled rule that an official-capacity suit is "only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). In its pleadings, the State identified the defendant as Governor Stitt "and *ex rel*. State of Oklahoma, as the real party in interest," and used this name in the caption. *See, e.g.*, Answer and Countercl. [Doc. No. 15]. However, the Court retains the name that appears in the original Complaint [Doc. No. 1] and the Tribe's Complaint in Intervention [Doc. No. 63].

Counterclaims [Doc. No. 109]. *See* Final J. [Doc. No. 157] at 2. All claims concern the State-Tribal Gaming Compact in effect between the parties (the "Compact"), which utilizes the Model Tribal Gaming Compact provided by Okla. Stat. tit. 3A, § 281. In Count XIII of the Amended Complaint, the Tribe seeks declaratory relief regarding the proper interpretation of an exclusivity provision of the Compact.[2] Specifically, the Tribe claims the State "has violated the exclusivity provision contained in subparagraph A of Part 11 of the Compact ('Part 11.A') by permitting the operation of additional forms of gaming and changing its laws to permit additional electronic gaming" and, as a result of this violation, the Tribe allegedly "is entitled to damages from the State pursuant to Part 11.E of the Compact." *See* Am. Compl. ¶¶ 203, 205 and pp.56-57 (Prayer for Relief). In Count XIV, the Tribe claims Governor Stitt engaged in conduct that "breached both the State's obligation [under Part 13.B] to defend the Compacts [sic] and violated his constitutional duty to faithfully execute the State's laws." *Id*. ¶¶ 209-10 (citing Okla. Const. art. VI, § 8). The State counterclaims that the Tribe breached the Compact "by failing to remit all substantial exclusivity fees owed to the State pursuant to Part 11.A." *See* Countercl. ¶¶ 54, 70.

Following a period of discovery and unsuccessful settlement discussions, the following motions are before the Court for decision pursuant to Fed. R. Civ. P. 56:

---

[2] If it prevails on this claim, the Tribe also requests injunctive relief to enjoin an ongoing violation of the Compact. The State objects to this proposed remedy as a preliminary matter, arguing that Governor Stitt is not the proper party for the injunction sought in Count XIII. *See* Def.'s Mot. at 9. For reasons that follow, the Court does not reach this issue.

Defendant's Motion for Summary Judgment [Doc. No. 182]; and the Tribe's Motion for Summary Judgment [Doc. No. 183]. Each movant seeks a determination in its favor of a dispositive issue raised by Count XIII, namely, whether the State has breached the exclusivity provision in Part 11.A of the Compact by amending or enacting certain laws. The State also requests a dismissal of Count XIV. Neither party addresses the State's counterclaim. The Motions are fully briefed. *See* 10/1/21 Order [Doc. No. 122].[3]

## Standard of Decision

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for either party." *Id*. at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id*. "Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion

---

[3] The Court approved the parties' agreed briefing schedule, which authorized oversized briefs and prohibited reply briefs without leave. No party asked to file a reply so full briefing consists only of the supporting briefs with each motion and the separate response briefs of the State [Doc. No. 189] and the Tribe [Doc. No. 190].

After the Motions were fully briefed, the Tribe moved to supplement the summary judgment record to include additional facts regarding recent developments that allegedly have expanded Oklahoma lottery games. *See* Mot. Suppl. Record [Doc. No. 192]. For reasons discussed *infra*, the Court finds the Tribe's supplemental materials do not affect the resolution of the Motions and are unnecessary.

viewed in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine dispute. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c)(1)-(2), (e). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see* Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see Adler*, 144 F.3d at 672.

The inquiry is whether there is a need for a trial – "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 251. "The interpretation of an unambiguous contract is a question of law to be determined by the court, and may be decided on summary judgment." *Pub. Serv. Co. v. Burlington N. R.R. Co.*, 53 F.3d 1090, 1096 (10th Cir. 1995) (citations omitted).

### Statement of Undisputed Facts

The case concerns "Class III gaming" under the Indian Gaming Regulatory Act ("IGRA"). *See* 25 U.S.C. § 2703(8). This is a broad, catch-all category that may include slot machines, casino games, banking card games, parimutuel wagering on racing, and

lotteries. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48 (1996). IGRA imposes conditions to conduct Class III gaming, including that the activities must be "located in a State that permits such gaming for any purpose by any person, organization, or entity" and must be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under [§ 2710(d)(3)], that is in effect." *Id*. § 2710(d)(1)(B) and (C).

The parties have stipulated to several material facts. *See* Joint Status Rep. [Doc. No. 162] at 4. The Tribe, which consists of affiliated Native American tribes, is a federally recognized Indian tribe. The Tribe and the State are parties to the Compact, which is a tribal-state gaming compact formed under IGRA and the State-Tribal Gaming Act ("STGA"), Okla. Stat. tit. 3A, §§ 261-82. The Compact took effect in September 2006.[4] The Court has determined that the Compact remains in effect. *See* 7/28/20 Order [Doc. No. 149]. Part 11.A of the Compact provides in pertinent part as follows:

> The parties acknowledge and recognize that this Compact provides tribes with substantial exclusivity and, consistent with the goals of IGRA, special opportunities for tribal economic opportunity through gaming within the external boundaries of Oklahoma in respect to the covered games. In consideration thereof, <u>so long as the state does not change its laws after the effective date of this Compact to permit the operation of any additional form of gaming by any such organization licensee, or change its laws to permit any additional electronic or machine gaming within Oklahoma</u>, the tribe agrees to pay the following fees:
>
> 1. The tribe covenants and agrees to pay to the state a fee derived from covered game revenues calculated as set forth in paragraph 2 of this subsection. . . .

---

[4] A tribal-state gaming compact takes effect when notice of its approval by the Secretary of the Interior is published in the Federal Register. *See* 25 U.S.C. § 2710(d)(3)(B).


Model Tribal Gaming Compact Between the Wichita & Affiliated Tribes and the State of Oklahoma (hereafter, the "Compact") [Doc. No. 103-1] at 23 (ECF page numbering) (emphasis added).[5]  Part 11.E provides:

> [T]he state agrees that it will not, during the term of this Compact, permit the nontribal operation of any machines or devices to play covered games or electronic or mechanical gaming devices otherwise presently prohibited by law within the state in excess of the number and outside of the designated locations authorized by the State-Tribal Gaming Act.  The state recognizes the importance of this provision to the tribe and agrees, in the event of a breach of this provision by the state, to require any nontribal entity which operates any such devices or machines in excess of such number or outside of the designated location to remit to the state at least quarterly no less than fifty percent (50%) of any increase in the entities' adjusted gross revenues following the addition of such excess machines.  The state further agrees to remit at least quarterly to eligible tribes, as liquidated damages, a sum equal to fifty percent (50%) of any increase in the entities' adjusted gross revenues following the addition of such excess machines.  For purposes of this Part, "eligible tribes" means those tribes which have entered into this Compact and are operating gaming pursuant to this Compact within forty-five (45) miles of an entity which is operating covered game machines in excess of the number authorized by, or outside of the location designated by, the State-Tribal Gaming Act. . . .

*Id.* at 24.

Oklahoma enacted STGA in 2004 when voters approved a legislative referendum known as State Question 712 in a statewide general election.  In addition to offering a model tribal gaming compact, STGA provided for "organization licensees" – that is, horse racetracks – to conduct authorized gaming under licenses issued by the Oklahoma Horse Racing Commission ("OHRC").  *See* Okla. Stat. tit. 3A, § 262; *see id*. §§ 205.1, 205.2.  STGA "is 'game-specific' and allows for specified forms of Class III gaming." *Treat v.*

---

[5] All spot citations to the Compact in this Order use page numbers assigned by the Court's CM/ECF electronic filing system.

*Stitt*, 2020 OK 64, ¶ 7, 473 P.3d 43, 45.  It "expressly bars house-banked card games, house-banked table games involving dice or roulette wheels, and event wagering." *Id*.; *see* Okla. Stat. tit. 3A, § 262(H).

In the same 2004 election, Oklahoma voters also approved State Question 705, which authorized a state lottery through passage of the Oklahoma Education Lottery Act, Okla. Stat. tit. 3A, §§ 701-735.  The Act created the Oklahoma Lottery Commission (the "Commission") and authorized it to operate a state lottery that would provide funds for educational purposes and programs; the Act is also game-specific and does not "allow the operation of any other form of Class III gaming . . . unless specifically allowed by law and by a cooperative agreement with a federally recognized Indian tribe in this state." *See* Okla. Stat. tit. 3A, §§ 702, 735.  Authorized lottery games include "instant tickets" and "on-line games," which is "a game where tickets or shares are purchased through a network of computer terminals located at retail outlets, and such terminals are linked to a central computer that records the purchases." *Id*. § 703(9), (15).  The system developed by the Commission involves the sale of lottery tickets or shares by licensed retailers, and includes the use of self-service computer terminals and kiosks at the locations of licensed retailers.  Players can use the kiosks to select games, purchase tickets, and validate winning tickets.  Under its authority to advertise and promote the lottery and lottery games, the Commission also sponsors second-chance drawings and promotional drawings for specific prizes, in which players participate by submitting entries to the Commission.

In November 2016, Oklahoma voters approved another legislative referendum, known as State Question 792, which repealed provisions of the Oklahoma Constitution that

had limited retail sales of alcoholic beverages to package stores and had prohibited sales of other merchandise on the same premises. *See* Okla. Const. art. XXVIII, § 4 (repealed). A new constitutional provision authorized laws to license retail sales of alcoholic beverages for off-premises consumption and to allow licensees to sell "at retail any item that may be purchased at a grocery store or convenience store" within certain sales limits. *See* Okla. Const. art. XXVIIIA, § 3(A). The Commission then began contracting with retail liquor stores to sell the same lottery products available at grocery and convenience stores.

In 2017, Oklahoma enacted an amendment to STGA through House Bill 1836, which removed restrictions on the number of hours that an organization licensee (horse racetrack) is permitted to conduct authorized gaming at its horseracing facilities. *See* Okla. Stat. tit. 3A, § 262(B). Before this change, authorized gaming could not be conducted more than 106 hours per week nor more than 18 hours per day.

In 2018, Oklahoma enacted a new law passed by the legislature as House Bill 3538 and codified at Okla. Stat. tit. 3A, § 724.5. This law allows lottery players to submit entries to the Commission for lottery-sponsored promotions and second-chance drawings "using a web application provided or sponsored by the Commission." *See* Okla. Stat. tit. 3A, § 724.5(A). The Commission now can receive entries for these promotional drawings through an internet website and a computer application, the Oklahoma Lottery app. The entries must be obtained by purchasing a lottery ticket, receiving an entry-eligible lottery ticket, or receiving a promotional entry from the Commission or a lottery retailer. *See id*. The statute specifies that submitting entries via web application "shall not be construed as illegal Internet gambling activities." Okla. Stat. tit. 3A, § 724.5(B).

The Tribe's claim for declaratory relief in Count XIII, as developed and presented through the parties' Motions, requires the Court to decide which party correctly reads and applies Part 11.A under the undisputed facts. Specifically, the question for decision is: "Did the State change its laws after September 2006 "to permit any additional electronic or machine gaming within Oklahoma"?[6]

## Discussion

**A.      Sovereign Immunity**

As a preliminary matter, the Court must address a jurisdictional issue raised by the State. The State asserts that the Tribe's claim in Count XIII seeks a declaration of its right to money damages and this claim is barred by the State's sovereign immunity from monetary liability. *See* Def.'s Mot. Summ. J. at 10-11. The Tribe responds by pointing to various filings by the State in this case, and a prior ruling by the Court, to show that the State has waived sovereign immunity from suit by affirmatively invoking the Court's jurisdiction to assert its counterclaims. *See* Tribe's Resp. Br. at 10-11.[7] The Tribe's waiver argument confuses two discrete doctrines.

---

[6] The Tribe does not assert that any change in Oklahoma law impacts the other proviso of Part 11.A, that the State not "permit the operation of any additional form of gaming by any such organization licensee." *See* Tribe's Mot. Summ. J. at 4, 17, 21; Tribe's Resp. Br. at 12, 14-15.

[7] In addition to waiver, the *Ex parte Young* doctrine provides an exception to sovereign immunity. *See* 6/15/20 Order [Doc. No. 148] at 2 n.1. However, the doctrine "applies only when a plaintiff seeks relief properly characterized as prospective;" it "may not be used to obtain a declaration that a state officer has violated a plaintiff's federal rights in the past." *See Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1215 (10th Cir.), *petition for cert. filed*, No. 22-724 (U.S. Nov. 2, 2022) (quoting *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019) and *Collins v. Daniels*, 916 F.3d 1302, 1316 (10th Cir. 2019)).

"[A] state may waive its immunity from suit in a federal forum while retaining its immunity from liability for monetary damages." *Trant v. Oklahoma*, 754 F.3d 1158, 1173 (10th Cir. 2014); *see Sossamon v. Tex.*, 563 U.S. 277, 285 (2011) ("a waiver of sovereign immunity to other types of relief does not waive immunity to damages"). The State's prior conduct in this case does not prevent it from asserting a defense of sovereign immunity from liability for damages. Upon consideration, the Court finds that the Tribe identifies no legal basis or authority to overcome the States' immunity from a claim for monetary relief. Therefore, to the extent the Tribe seeks "a declaration that the Wichita Tribe is entitled to damages from the State pursuant to Part 11.E of the Compact" (Am. Compl. ¶ 205 and p.57, Prayer ¶ 1(e)), the Court finds that the State enjoys immunity from this claim. Thus, the Court does not reach this part of Count XIII and addresses only the State's alleged violation of Part 11.A.[8]

### B.  Interpretation of Part 11.A

A tribal-state gaming compact under IGRA is like a "congressionally sanctioned interstate compact the interpretation of which presents a question of federal law." *Cuyler v. Adams*, 449 U.S. 433, 442 (1981); *accord Citizen Potawatomi Nation v. Okla.*, 881 F.3d 1226, 1238-39 (10th Cir. 2018). "A compact is a form of contract." *Citizen Potawatomi Nation*, 881 F.3d at 1238 (quoting *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1556 (10th

---

[8] Even absent immunity, the Court would find the Tribe has not established a right to damages under Part 11.E for the reasons discussed *infra* regarding Part 11.A. To the extent the Tribe asserts that Part 11.E provides a right of substantial exclusivity different from Part 11.A, the Tribe has not presented sufficient facts to show the State has permitted nontribal entities to operate gaming machines or devices "in excess of the number and outside of the designated locations authorized by the State-Tribal Gaming Act," as required by Part 11.E. *See* Compact at 24.

Cir. 1997)). It "must be construed and applied in accordance with its terms." *Texas v. New Mexico*, 482 U.S. 124, 128 (1987); *see Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 628 (2013). When interpreting a gaming compact, courts "look to federal common law" and general contract principles. *Citizen Potawatomi Nation*, 881 F.3d at 1239.

The Tenth Circuit has provided the following guidance for the interpretation of tribal-state gaming compacts:

> Under federal contract principles, if the terms of a contract are not ambiguous, this court determines the parties' intent from the language of the agreement itself. Further, this court will construe the Compact to give meaning to every word or phrase.

*Citizen Potawatomi Nation*, 881 F.3d at 1238-39 (citations and footnotes omitted). Both parties contend Part 11.A of the Compact is unambiguous and its meaning and application can be decided as a matter of law. Upon examination of the Compact, the Court agrees that Part 11.A is not ambiguous. Thus, "there is no need to look beyond the four corners of the Compact to resolve the question" presented, and any resort to extrinsic evidence would be inappropriate. *Id*. at 1240.

Part 11.A states an agreement of the Tribe to pay fees "derived from covered game revenues" in exchange for "substantial exclusivity . . . within the external boundaries of Oklahoma in respect to the covered games," provided "the state does not change its laws after the effective date of this Compact . . . to permit any additional electronic or machine gaming within Oklahoma." *See* Compact at 23. The Tribe asserts that a relevant change has occurred, and thus the Tribe is no longer bound to pay substantial exclusivity fees, for three reasons: 1) by enacting H.B. 3538 (Okla. Stat. tit. 3A, § 724.5), the State permitted

additional electronic gaming in the form of lottery-sponsored promotions and second-chance drawings in which players can participate using an internet website or computer application; 2) the State permitted additional electronic gaming by enacting H.B. 1836 and amending Okla. Stat. tit. 3A, § 262(B) to expand the hours of operation for horse racetracks to conduct authorized gaming; and 3) the State permitted additional electronic gaming through the constitutional amendment that allows liquor stores to sell general merchandise, which expanded the locations where the Commission can place player terminals or kiosks. *See* Tribe's Mot. Summ. J. at 4, 17, 21-22.

In making these arguments regarding the proviso of Part 11.A, the Tribe asserts that the phrase "any additional electronic gaming" should be read broadly, consistent with a common understanding of the words and their ordinary meanings in dictionary definitions. *See*, *e.g.*, Tribe's Mot. Summ. J. at 19-20 & n.26; *see also id*. at 30 (lottery games offered by the Commission "are inherently electronic"). This assertion ignores the well-settled rule that the meaning of words used in a contract must be read in context of the contract as a whole, giving meaning to "every word or phrase." *See Citizen Potawatomi Nation*, 881 F.3d at 1239. The phrase "any additional electronic gaming" appears in a provision regarding substantial exclusivity in Class III gaming authorized by the Compact. The Court rejects the Tribe's effort to untether "any additional electronic gaming" from the context in which the phrase appears.

The gaming authorized by the Compact is identified in Part 4. "The tribe is authorized to operate covered games only in accordance with this Compact" and to operate "any game that is Class II under IGRA" without limitation. *See* Compact at 9. Part 4

specifies that Class II games are not subject to the exclusivity provision in Part 11, and Part 11.A expressly provides "substantial exclusivity . . . in respect to covered games." *Id.* at 23 (emphasis added). The term "covered game" is defined in Part 3 of the Compact, paragraphs 5, 10, 11 and 12, and the definition is expressly stated by reference to the STGA and "the standards, as applicable, set forth in Sections 11 through 18 of the State-Tribal Gaming Act." *Id*. at 7. The games specifically identified are electronic bonanza-style bingo games, electronic amusement games, electronic instant bingo games, and nonhouse-banked card games; other Class III games may be included under stated conditions. *Id*.

The Tribe's arguments regarding additional electronic gaming largely rely on changes in the State's laws expanding the availability of lottery games, particularly "through the use of the Internet and personal computers, including cellular telephones." *See* Tribe's Mot. Summ. J. at 24-25. Before the Compact took effect, however, Oklahoma had authorized the Commission to conduct the lottery and lottery promotions, including "on-line" lottery games operated through computers and computer terminals. This form of Class III gaming is not covered by the Compact. The Tribe does not contend the Compact's definition of "covered game" encompasses a lottery or a lottery game, nor does the Tribe claim any authority to conduct lottery games. Because the Tribe is not authorized to conduct lottery games, its substantial exclusivity is not impinged by the Commission's operation of authorized lottery games and promotional drawings, including electronic lottery games. Thus, the Court finds that changes in Oklahoma law that have expanded access to lottery games and promotions do not constitute "additional electronic gaming" that impinges the Tribe's substantial exclusivity to conduct covered games.

13

Regarding Class III gaming operated by horse racetracks, the Tribe argues that expanding the hours of operation for authorized games also constitutes "additional electronic gaming." Like its position regarding lottery gaming, the Tribe's argument regarding additional gaming by horse racetracks paints with a broad brush. According to the Tribe, removing statutory limits on the number of hours that horse racetracks can operate authorized games permits them "to conduct electronic or machine gaming in addition to the degree or level of gaming previously permitted by law." *See* Tribe's Mot. Summ. J. at 27.

Again, however, the Tribe's argument ignores the context in which "any additional electronic gaming" appears in the Compact. Part 11.A contains a separate proviso that expressly addresses a change in state laws for authorized gaming by horse racetracks. This proviso obliges the Tribe to pay exclusivity fees "so long as the state does not change its laws . . . to permit the operation of any additional form of gaming by any such organization licensee." *See* Compact at 23 (emphasis added). The Tribe does not contend any change of this type has occurred. *See supra* note 7. The Court finds that the amendment of STGA in 2017 to permit horse racetracks to operate authorized games for additional hours of gaming does not violate the Tribe's substantial exclusivity to conduct covered games.[9]

---

[9] Consistent with this reading, Part 11.E addresses the State's agreement not to "permit the nontribal operation of any machines or devices to play covered games or electronic or mechanical gaming devices otherwise presently prohibited by law within the state in excess of the number and outside of the designated locations authorized by" STGA. *See* Compact at 24. Here, too, the focus of substantial exclusivity is authorized gaming and gaming devices, not operating hours.

14

For these reasons, the Court finds that the State is entitled to summary judgment on the Tribe's claim in Count XIII that the State has violated the exclusivity provision in Part 11.A of the Compact.

### C. Declaratory Judgment Claim Against Governor Stitt

The Tribe claims in Count XIV of the Amended Complaint that it is entitled to a declaratory judgment that the State breached the Compact, and Governor Stitt violated his constitutional duties under state law, "[b]y failing to uphold the continued validity of the Compacts." *See* Am. Compl. ¶ 209. The State moves for summary judgment on the grounds that this claim does not present a justiciable controversy and the Court should decline supplemental jurisdiction over any state-law claim. *See* Def.'s Mot. Summ. J. at 6-8. In response, the Tribe complains generally about Governor Stitt's conduct regarding tribal gaming compacts and compact negotiations, but the Tribe provides no argument or legal authority in opposition to the State's Motion regarding Count XIV. *See* Tribe's Resp. Br. at 7-8, 9-10; *see also* Tribe's Mot. Summ. J. at 3-4. Thus, it appears the Tribe has abandoned this claim.

Further, the Court finds that it should exercise its "unique and substantial discretion" not to decide this declaratory judgment claim. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-87 (1995); *Mid-Continent Cas. Co. v. Village at Deer Creek Homeowners Ass'n, Inc.*, 685 F.3d 977, 980 (10th Cir. 2012). The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes a federal district court "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration." *Id*. § 2201(a). The statute "presents two separate hurdles for parties seeking

15

a declaratory judgment to overcome." *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008). First, a plaintiff must show an "actual controversy" exists. *Id.* Then, district courts are "entitled to consider a number of case-specific factors in deciding whether or not to exercise their statutory declaratory judgment authority." *Id.* In this case, assuming the Tribe's claim satisfies the first step, the Court finds that it fails the second hurdle.

District courts generally rely on five nonexclusive factors to guide the determination of whether to exercise their statutory authority:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata "; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

*State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994). Here, the applicable factors weigh heavily in favor of dismissal of the Tribe's claim.

As to the first factor, the claim in Count XIV challenges Governor Stitt's past conduct in opposing the automatic renewal of tribal gaming compacts and attempting to negotiate new compacts. The declaration sought by the Tribe would not resolve any current dispute. Similarly, as to the second factor, a declaratory judgment would not serve a useful purpose in clarifying the parties' legal relations. Declaratory relief provides a means for "parties uncertain of their legal rights to seek a declaration of rights prior to injury." *Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269, 1274 (10th Cir. 1989). The Tribe identifies no prospective conduct by Governor Stitt that would be guided by the requested declaration,

and effectively seeks an advisory opinion. As to the third factor, procedural fencing might reasonably be inferred from the fact that the Tribe utilized the parties' compact-renewal dispute to assert additional claims not joined by any of the other eleven Native American tribes with identical compacts that joined or intervened in this case. Finally, as to the fourth factor, if any court could properly determine whether Governor Stitt has faithfully performed the duties of his office with respect to tribal gaming, it is likely not a question for federal courts to decide. In sum, the Court finds no need to entertain a claim for declaratory relief that would not resolve an actual controversy or provide any useful guidance. The Court therefore declines to consider the Tribe's declaratory judgment claim in Count XIV.

## Conclusion

For these reasons, the Court finds that the Tribe is not entitled to summary judgment on any remaining claim but the State is entitled to summary judgment on the Tribe's claim in Count XIII asserting an alleged violation of substantial exclusivity under Part 11.A of the Compact. The part of Count XIII seeking a declaration of entitlement to damages is dismissed for lack of jurisdiction. The Court declines to entertain the declaratory judgment claim asserted in Count XIV. Because the parties do not address the State's counterclaim, the Court will direct them to file a joint status report or notice regarding the resolution of this sole remaining claim.[10]

---

[10] A footnote in the Tribe's Motion suggests the counterclaim may have become moot. The Tribe states: "Notwithstanding the State's ongoing violations of exclusivity, the Wichita Tribe has continued to pay exclusivity fees during the pendency of this litigation." *See* Tribe's Mot. Summ.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment [Doc. No. 182] is **GRANTED** and Plaintiff-Intervenor's Motion for Summary Judgment [Doc. No. 183] is **DENIED**. The State is entitled to summary judgment on Count XIII of the Tribe's Amended Complaint, as set forth herein. Count XIV of the Amended Complaint is dismissed without prejudice. Within 14 days from the date of this Order, the parties shall jointly file an appropriate notice, stipulation, or status report regarding the State's counterclaim against the Tribe, including any agreement or proposal for action by the Court to resolve the counterclaim.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Supplement the Record of Summary Judgment [Doc. No. 192] is **DENIED** as moot.

**IT IS SO ORDERED** this 24th day of February, 2023.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge

---

J. at 3 n.7. If this is so, the parties may elect to file a joint notice of mootness or, if appropriate, a joint stipulation for dismissal of the counterclaim under Fed. R. Civ. P. 41(a)(1)(B).